UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>DIAMOND GLASS, INC., *et al.*,[1]<br><br>Debtors. | ) Chapter 11<br>) Case No. 08-_____ (____)<br>)<br>) (Joint Administration Requested)<br>)<br>) **Hearing Date: April __, 2008 at __:__ _.m.**<br>) **Objections Due: April __, 2008 at 4:00 p.m.** |

**DEBTORS' MOTION FOR ENTRY OF ORDER, PURSUANT TO 11 U.S.C.
§§ 105(A), 363, 365, 503, AND 507 AND FEDERAL BANKRUPTCY RULES 2002,
6004, 6006, AND 9014, (A) APPROVING BID PROCEDURES FOR SALE
OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (B) SCHEDULING
A HEARING TO CONSIDER THE SALE AND APPROVING THE FORM AND
MANNER OF NOTICES; (C) ESTABLISHING PROCEDURES FOR ASSUMPTION
AND ASSIGNMENT OF CERTAIN CONTRACTS, INCLUDING NOTICE OF
PROPOSED CURE AMOUNTS; (D) AUTHORIZING PAYMENT OF AN
EXPENSE REIMBURSEMENT; AND (E) GRANTING RELATED RELIEF**

Diamond Glass, Inc. ("Diamond Glass") and DT Subsidiary Corp., a wholly-

owned subsidiary of Diamond Glass ("DT Subsidiary, and together with Diamond Glass, the

"Debtors"), hereby move this Court (this "Motion"), pursuant to §§ 105(a), 363, 365, 503 and

507 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), and

Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules") for entry of an order (A) approving certain bid procedures, which are

attached hereto as Exhibit 1 (the "Bid Procedures"), for the proposed sale of substantially all of

Debtors' Assets, as more fully set forth in that certain asset purchase agreement (the "APA") by

and between Debtors and Diamond Glass Acquisition, LLC or its assignee(s) or designee(s) (the

"Stalking Horse Bidder"); (B) scheduling a hearing (the "Sale Hearing") and approving the form

and manner of notice of the Auction and the Bid Procedures; (C) establishing procedures for

---

[1] The Debtors in these proceedings are: Diamond Glass, Inc. (Tax ID No. XX-XXX8853) and DT Subsidiary Corp. (Tax ID No. XX-XXX8853). The Debtors' corporate address is 220 Division Street, Kingston, PA 18704. Diamond Glass, Inc. is formerly known as Diamond Glass Companies, Inc. and Diamond Triumph Auto Glass, Inc.

assumption and assignment of certain Designated Contracts[2], including notice of proposed cure amounts; (D) authorizing Debtors to pay to Stalking Horse Bidder an expense reimbursement under certain terms and conditions set forth more particularly below; and (E) granting related relief. In support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this District and before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are §§ 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9019.

## GENERAL BACKGROUND

2.      On the date hereof (the "Petition Date"), the Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code. The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of Title 11 of the United States Code (the "Bankruptcy Code").

3.      No request for appointment of a chapter 11 trustee or examiner has been made and, as of the date hereof, no official committee has been appointed.

### History and Operations

4.      The Debtors collectively constitute one of the nation's oldest and leading providers of automotive glass replacement and repair services. Founded as a one-man shop by Avram Levine, a Russian immigrant in 1923, the "Diamond Glass Works" grew steadily as a

---

[2]      All capitalized terms shall have the meaning ascribed to them in the APA unless otherwise defined herein.

family business throughout most of the twentieth century, adapting repeatedly to revolutionary transformations in automobile glass technology, including the introduction of laminated windshields, and tempered glass for back and side windows.

5.     The Debtors rapidly expanded in the 1980s. They opened their first additional branch in 1982 in Monticello, New York. With the success of the Monticello facility, the Debtors began a successful campaign of expansion. Through the early to mid 1980s, the Debtors added approximately one to two new branches per year, reaching 10 branches in 1987. As the Debtors refined and standardized their store-opening model, they dramatically increased the number of new branch openings each year through the late 1980s and into the 1990s, reaching 140 stores in 1996.

6.     While remaining true to their roots as a family enterprise, the Debtors recognized that the great increase in the scope of their operations required them to recruit professional leadership with a strong history of experience in the modern auto glass industry, as well as increased financial resources, and they acted accordingly. In 1998, the Debtors and Leonard Green Partners, LLP came together in a leveraged financing transaction that, together with the recruitment of new management with vast auto glass industry experience, gave the Debtors a much higher profile.

7.     In the past decade, the Debtors have grown into a truly national network of auto glass stores with a coast-to-coast presence in most major markets throughout the United States. Headquartered in Kingston, Pennsylvania, this family-owned company has grown from a one-man shop into a network of 217 service centers and approximately 900 mobile installation vehicles in 42 states, serviced by three distribution facilities located in Kingston, Pennsylvania; Columbus, Ohio; and Atlanta, Georgia. The Debtors currently have approximately 1,620 full

and part-time employees including field technicians, customer service representatives, sales associates, and corporate associates.

8.      The United States auto glass replacement market is estimated to be approximately $3.0 to $3.5 billion annually.  The Debtors' share of the market is approximately 7%.  The Debtors' revenue today comes primarily from three sources: (a) insurance sales (work paid for by insurance companies in respect to auto glass replacement for covered policyholders), which comprises approximately 30% of the Debtors' dollar sales; (b) commercial sales (work performed on behalf of local body shops, new and used car dealerships, rental car fleets, company fleets, or other business entities), which comprises approximately 43% of the Debtors' dollar sales; and (c) cash/retail (work performed directly for individual consumers who pay for auto glass replacement without involving an insurance company), which comprises approximately 27% of the Debtors' dollar sales.

9.      The Debtors compete with local, regional and national service providers in a mature, highly fragmented market where it is estimated that more than 75% of participants operate fewer than three locations.  Notwithstanding that the barriers of entry are low, the Debtors' size and distribution network has enabled them to leverage their buying power and provide low cost glass to their stores on a just-in-time basis, resulting in higher profit margins and lower store inventory levels.  In addition, the Debtors have been able to develop long-standing customer relationships and significant brand recognition due to their longevity in the marketplace.

DB02:6700828.5                                                                                          066831.1001

## Existing Indebtedness

10.     Diamond Glass, as Borrower,[3] is a party to that certain Credit Agreement dated January 12, 2007 (as amended, supplemented or otherwise modified, the "Existing Credit Agreement") with Guggenheim Corporate Funding, LLC (the "Guggenheim").[4] Pursuant to the Existing Credit Agreement, Guggenheim provided the Debtors with a term loan and revolving loan in the aggregate principal amount of approximately $35 million (the "Prepetition Loans").

11.     In connection with the Prepetition Loans, Diamond Glass and Guggenheim entered into a Security Agreement dated January 12, 2007, pursuant to which Diamond Glass and DT Subsidiary (as guarantor) granted Guggenheim a security interest in substantially all of their assets.[5]

12.     As part of the Existing Credit Agreement, Security Agreement, and related credit documents (collectively, the "Prepetition Loan Documents"), Kenneth Levine (whose family founded the Debtors, and who until October 25, 2007 was the Debtors' Chief Executive Officer and remains its principal stockholder) executed a Pledge Agreement (the "Levine Pledge Agreement") and Guaranty (the "Levine Guaranty") to further secure the Secured Obligations of

---

[3]     Diamond Glass's predecessor, Diamond Triumph Auto Glass, Inc., is the borrower under the Existing Credit Agreement. Unless otherwise indicated, all references to "Diamond Glass" shall include "Diamond Triumph Auto Glass, Inc."

[4]     Guggenheim is the agent for the financial institutions identified as lenders under the Existing Credit Agreement and the DIP Facility (as defined below) (including their respective successors and assigns) (the "Lenders"). Orpheus Holdings, LLC ("Holdings") is the predecessor in interest to Orpheus Funding, LLC, as the Lender under the Credit Agreement. Holdings also is the original proposed lender under the DIP Facility. The Stalking Horse Bidder, Diamond Glass Acquisition, LLC, is a Delaware limited liability company, a wholly-owned subsidiary of Holdings, and the proposed acquisition vehicle through which Guggenheim, as agent, would acquire (or direct the acquisition of, on behalf of the Lenders) all or substantially all of the Debtors' business and assets in the transactions contemplated herein, including with respect to effecting any credit bid on account of the Lenders' claims against the Debtors at any auction or otherwise for the purchase and sale of the Debtors' business and related assets.

[5]     The Prepetition Loan Documents (defined above) contemplated that other guarantors might be added in the future.

Diamond Glass under the Prepetition Loan Documents. Mr. Levine's obligations and liabilities under the Levine Guaranty are limited to his equity interests, cash collateral and the proceeds thereof in an aggregate amount of approximately ten million dollars ($10,000,000) pledged by Mr. Levine to Guggenheim pursuant to the Levine Pledge Agreement.

13.     On or about May 2, 2007, Guggenheim and Diamond Glass entered into a First Amendment to the Existing Credit Agreement, pursuant to which Guggenheim agreed to decrease the minimum liquidity requirement from $5 million to $3 million, such that the Revolving Loan Commitment available for borrowing by Diamond Glass was increased by $2 million.

14.     On or about November 7, 2007, Guggenheim and Diamond Glass entered into a Second Amendment to the Existing Credit Agreement, pursuant to which Guggenheim agreed to (a) advance to the Debtors an additional $9,687,456.99, (b) extend the maturity date on the Prepetition Loans to February 29, 2008, and (c) limit the guarantee obligations of any DT Subsidiary to an amount not to exceed $37 million.

15.     On or about January 31, 2008, Guggenheim and Diamond Glass entered into a Third Amendment to the Existing Credit Agreement, pursuant to which Guggenheim agreed to extend the payment date for interest due under the Existing Credit Agreement from January 31, 2008 to February 29, 2008. Guggenheim subsequently agreed to successive grace periods for Diamond Glass to pay the Prepetition Loan through April 1, 2008.

16.     As of the Petition Date, the Debtors estimate that the outstanding indebtedness on the Prepetition Loans is approximately $45 million.

17.     In addition to the Prepetition Indebtedness, the Debtors' predecessor, Diamond Triumph Auto Glass, Inc., issued $100 million in unsecured 9 ¼% Senior Notes Due

2008 (the "Notes") in favor of various noteholders (the "Noteholders") pursuant to an Indenture dated March 31, 1998 (as amended) (the "Indenture"). The Debtors estimate that as of the Petition Date they owe approximately $45,215,000 in principal, and $2,091,193.75 in accrued interest to the Noteholders in connection with the Indenture. The Notes were scheduled to mature on April 1, 2008. The Noteholder claims are unsecured and *pari passu* with other unsecured claims.

18.    In addition to the aforementioned institutional debt, as of the Petition Date, the Debtors estimate that they have approximately $13.1 million in unsecured trade debt outstanding.[6]

## Events Leading to Commencement of Chapter 11 Cases

19.    Until 2006, the Debtors never had a year in which they suffered operating and financial losses. Among other things, the insurance segment of the market, which historically has been the most profitable and most influential in driving revenues, has experienced a steady decline in revenue per unit over the past few years as insurance companies have attempted to align their prices more closely with prices paid by customers in other segments of the market. There has also been a reduction in automotive glass replacement insurance claims as insurance companies have increased their deductibles to enhance their price competitiveness in the market. At the same time, certain of the Debtors' decisions to improve performance regrettably and inadvertently had the opposite effect. Thus, the Debtors brought in a fresh management team, implemented new and aggressive steps to increase revenue and decrease costs, rehired local sales representatives, closed unprofitable stores, cut overhead, increased

---

[6]    Nothing contained herein is intended to be (nor shall it be deemed to be) an admission regarding the existence or amount of any indebtedness.

066831.1001

revenue per unit, and resolved pending litigation. This led to immediate improvements in performance which continue to date.

20.     While the Debtors are confident that the measures employed by the current management will continue to yield positive results, the Debtors were faced with some insurmountable obstacles that necessitated the commencement of these chapter 11 cases. As set forth more fully above, the Debtors' Prepetition Loans with Guggenheim matured on April 1, 2008. In addition, the Debtors' indebtedness to the Noteholders pursuant to the Indenture was to mature on April 1, 2008. The likely inability to obtain further extensions in the maturity of the senior debt and the Notes, when combined with the recent deterioration in the nation's economy and, in particular, limited availability in the credit markets, made it practically impossible for the Debtors to satisfy or refinance their obligations. Thus, left with no viable alternative that would enable the Debtors to obtain continued financing to operate their business, the Debtors retained the investment banking firm of NatCity Investments, Inc. ("NatCity") and began a process of exploring strategic alternatives, including a potential sale or restructuring of the business.

21.     The Debtors, in consultation with NatCity, their other professionals, and other interested parties, considered a number of potential sales and restructuring alternatives in order to develop a plan that would maximize value for their creditors and to ensure the long-term survival of their business. After considering their options and, in light of the aforementioned financial deadlines and restrictions, including a purchase offer from Guggenheim, the Debtors determined that the floor established by a purchase of all or substantially all of their assets by Guggenheim, subject to higher and better bids pursuant to a Bankruptcy Court approved open auction process pursuant to section 363 of the Bankruptcy Code, afforded them the best opportunity to maximize value for their creditors. Accordingly, concurrently with the filing of

066831.1001

their bankruptcy petitions, the Debtors have filed a *Motion for Entry of an Order (1) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Interests and Encumbrances; (2) Approving Assumption and Assignment and Sale of Certain Contracts and Leases; (3) Authorizing and Approving the Asset Purchase Agreement; and (4) Granting Related Relief* (the "Sale Motion").

      22.    Had the Debtors not commenced these cases, their ability to finance, sell or restructure their business, maximize value and preserve and enhance the Debtors' financial health would likely have been severely compromised by litigation, either inside or outside of a bankruptcy proceeding, which would have risked serious interruption of the Debtors' business and significantly impacted the Debtors' going-concern value. The commencement of these cases and implementation of an orderly sale process under the supervision of this Court, with Guggenheim providing a floor against which interested parties may bid, will permit the Debtors to consummate a going-concern sale of all or substantially all of their assets and maximize value of their estates for all interested parties.

## RELIEF REQUESTED

      23.    By this Motion, the Debtors respectfully request entry of an order (a) approving Bid Procedures; (b) scheduling the Sale Hearing and approving the form and manner of notice of the Auction and the Bid Procedures; (c) establishing procedures for assumption and assignment of certain Designated Contracts, including notice of proposed cure amounts; (d) authorizing Debtors to pay to Stalking Horse Bidder an expense reimbursement under certain terms and conditions set forth more particularly below; and (e) granting related relief.

9

      066831.1001

## A.    The Proposed Sale

24.    As discussed above, the Debtors retained NatCity as their investment banking firm in early March 2008, and began a process of exploring strategic alternatives, including a potential sale or restructuring of the Debtors' business. The Debtors, in consultation with NatCity, their other professionals, and other interested parties, considered a number of potential sales and restructuring alternatives in order to develop a plan that would maximize value for their creditors and to ensure the long-term survival of their business. After considering their options and, in light of the aforementioned financial deadlines and restrictions, including a purchase offer from the Stalking Horse Bidder – an affiliate of Guggenheim's and Guggenheim's designee for purposes of effecting the transactions under the APA, including the credit bid contemplated therein, as further described herein - the Debtors determined that the floor established by a purchase of all or substantially all of their assets by the Stalking Horse Bidder, subject to higher and better bids pursuant to a Bankruptcy Court-approved, open auction process pursuant to section 363 of the Bankruptcy Code (the "Proposed Sale"), afforded them the best opportunity to maximize value for their creditors.

## B.    The Asset Purchase Agreement

25.    On or about April 1, 2008, the Debtors entered into the APA with the Stalking Horse Bidder under which the Stalking Horse Bidder would acquire substantially all of the Debtors' assets as described in the APA (the "Assets"). A true and correct copy of the APA is attached to the Sale Motion filed concurrently herewith.

26.    Pursuant to the APA, the Stalking Horse Bidder has agreed to provide consideration for the Assets equal to the following: (a) $34.0 million (in the form of a credit bid (the "Credit Bid Component")), plus (b) the Assumed Liabilities, including the payment by Purchaser: (i) to NatCity the fee payable pursuant to the NatCity Retention Letter, (ii) of the cure

payments to non-debtor parties to the Designated Contracts that are assigned to Purchaser and assumed by Purchaser in accordance with section 7.5 of the APA (if such cure payments have not been satisfied by the Sellers using the proceeds of Loans under the DIP Financing), (iii) to the Sellers the amount of $1.5 million, which the Sellers shall use to fund: (A) $670,000.00 into a segregated escrow account for the benefit of participants under a management incentive program to be proposed by the Sellers in the Chapter 11 Cases (and subject to the entry of an order of the Bankruptcy Court approving any such plan), and (B) the amount of $830,000.00 to be held in the Sellers' general funds to satisfy in part the costs of administration and winding down the Chapter 11 Cases (and subject to any orders of the Bankruptcy Court, including any order confirming a chapter 11 plan entered after the Closing Date), and (iv) to the Sellers the amount equal to the sum of (A) the positive difference, if any, between (1) initial aggregate budgeted amount, pursuant to the budget as approved by Guggenheim under the DIP Financing, for the reasonable fees and costs incurred during the Chapter 11 Cases by the professionals retained by the Sellers, the official committee of unsecured creditors appointed in the Sellers' Chapter 11 Cases, and Guggenheim, and (2) the actual aggregate amount of such fees and costs incurred during such period by such professionals, which amount (if any) will be held and used by the Sellers pursuant to section 2.3(b)(iii)(B) of the APA; plus (c) an amount equal to the aggregate outstanding Revolving Loans (included in the DIP Obligations) determined as of the Effective Time. Except with respect to the components of the Purchase Price identified above in sub-section (b)(ii) and (iii), which amounts the Purchaser will pay in cash at the Closing, sub-section (b)(i), which amount the Purchaser will pay on terms and conditions agreed to with NatCity, and sub-section (b)(iv), which amount (if any) the Purchaser will pay upon the confirmation of a chapter 11 plan for the Sellers, such Purchase Price will be satisfied in the form

11

of a credit bid (in whole or in part) under section 363(k) of the Bankruptcy Code and in accordance with the order approving this Motion and Sale Order on account of, and applied in the following order (on a dollar-for-dollar basis) against, (a) the then outstanding amount of the DIP Obligations until such obligations have been fully satisfied in accordance with the DIP Financing, and next (b) the then outstanding amount of the Prepetition Obligations until such obligations have been fully satisfied in accordance with the Credit Agreement, whether such obligations are owing to the Purchaser, the Agent or the Lenders (including their successors and assigns) under either the DIP Financing or the Credit Agreement.

27.     In order to maximize the Debtors' assets for the benefit of their estates and creditors, the Debtors, in consultation with their professionals, have determined that it is in the best interests of the estates at this time to commence the formal solicitation of bids for the sale of the Assets as a going concern. In contemplation of Court approval of the proposed Bid Procedures, the Debtors (through NatCity) have actively marketed the Debtors' Assets and executory contracts and unexpired leases. As of the date of this Motion, more than 130 potential financial purchasers have been contacted, and at least 18 have executed or are in the process of executing, confidentiality agreements which allow the financial purchasers access to the Debtors' confidential business information. NatCity and the Debtors intend to expand their marketing to include approximately 30 potential strategic buyers, thus increasing the number of potential purchasers. The Debtors intend to aggressively solicit potential purchasers in accordance with the Bid Procedures set forth herein. The Debtors intend to execute their plan of pursuing the sale of substantially all of their Assets and/or other strategic transactions as promptly as practicable, in accordance with provisions of the Bankruptcy Code, in a manner that will afford

12

all of the Debtors' economic stakeholders an opportunity to participate in the process and otherwise to maximize the value of the Debtors' assets for all creditors.

28.     Although the Debtors will consider all Bids submitted in accordance with the Bid Procedures, they will favor bids that maximize the value of their estates. Subject to the entry and terms and conditions of an order approving the Sale Motion and the proposed debtor-in-possession financing facility with Guggenheim, the Debtors propose to sell, assign and transfer title to the Assets free and clear of Encumbrances, with such Encumbrances to attach to the net proceeds of the Sale, if any.

*C.*     ***Financing Option***

29.     An important feature of the Bid Procedures includes the offer by Guggenheim to provide up to $25,000,000 of acquisition and working capital financing to any Qualified Bidder to support its competing bid to acquire the Assets (the "Acquisition Facility"). Subject to the "Summary of Terms and Conditions" annexed as Exhibit A to the Bid Procedures, and the entry into a definitive commitment between Guggenheim (as agent for the lenders under the Acquisition Facility) and such Qualified Bidder, the lenders under the Acquisition Facility would provide financing on the terms provided in such commitment. The Summary of Terms and Conditions contemplates that any such Qualified Bidder who accepts the Acquisition Facility and becomes the Successful Bidder, having submitted the "highest and best" offer for the Assets as compared to all other bidders, including the Purchaser, at any Auction, would pay in cash the purchase price for the Assets at closing. Such cash consideration would be funded in part by the loan proceeds made available and drawn under the Acquisition Facility, with the remaining balance paid through a cash investment made by such Successful Bidder. The Sale Order would provide, among other things, that any such cash proceeds would be paid directly to Guggenheim and applied by Guggenheim (on a dollar-for-dollar basis) in the following order:

13

(a) to reduce the then outstanding amount of the Obligations (as defined in the DIP Financing) until such Obligations have been fully satisfied in accordance with the DIP Financing, and next (b) to reduce the then outstanding amount of the obligations (including any accrued and unpaid interest and adequate protection payments owing as of the Closing Date) under the Diamond Credit Agreement until such obligations under the Credit Agreement have been fully satisfied in accordance with the Diamond Credit Agreement; provided that Guggenheim in its sole and absolute discretion may deem any such obligations to have been satisfied based on any advances and loans made, or deemed to be made, to the Successful Bidder, as borrower under the Acquisition Facility. Annexed as Exhibit A to the "Summary of Terms and Conditions" is a schedule that demonstrates the foregoing "sources and uses" of funds in a sample transaction where the would-be Successful Bidder would draw the entire amount of funds available under the Acquisition Facility in connection with its successful bid to purchase of the Assets. The Acquisition Facility offered by Guggenheim further supports the Debtors' efforts to ensure that any sale of the Assets is the product of a fair and robust marketing effort.

D.      **Proposed Bid Procedures**[7]

30.     The Debtors desire to receive the greatest value for the Assets. Although the Debtors have undertaken certain efforts to market the assets over the past several weeks, in order to reach a broader pool of possible purchasers and to seize on possible sale opportunities before any declination in value, the Debtors believe that it is imperative that they promptly move forward with approval and implementation of the Bid Procedures. Accordingly, the Bid Procedures (as summarized below) were developed consistent with the Debtors' need to expedite

---

[7]     As noted below, to facilitate the Bid Procedures, the Debtors respectfully request the Bid Deadline (as defined below) be no later than June 3, 2008; the Auction (as defined below) be scheduled for no later than June 5, 2008; and the Sale Hearing be scheduled, at the convenience of the Court, no later than June 6, 2008.

the sale process, but with the objective of promoting active bidding that will result in the highest and best offer the marketplace can sustain for the Assets. Moreover, the Bid Procedures reflect the Debtors' objective of conducting the Auction in a controlled, but fair and open, fashion that promotes interest in the Assets by financially-capable, motivated bidders who are likely to close a transaction.

31. The following paragraphs in this section summarize only the key provisions of the Bid Procedures, but are qualified in their entirety by reference to the actual Bid Procedures attached hereto as Exhibit 1.[8]

a. <u>Bid Deadline</u>. All Bids (as defined below) must be submitted in writing so that they are **actually** received no later than 12:00 noon (Eastern time) on June 3, 2008 (the "<u>Bid Deadline</u>"). Prior to the Bid Deadline, a Qualified Bidder that wants to make an offer, solicitation, or proposal (a "<u>Bid</u>") shall deliver written copies of its bid to: (a) the Debtors, 220 Division Street, Kingston, PA 18704, Attn: William Cogswell, President; (b) counsel to the Debtors, Foley & Lardner LLP, 90 Park Avenue, New York, NY 10016, Attn: Michael P. Richman, and Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington, DE 19801, Attn: Michael Nestor; (c) investment bankers for the Debtors, National City Investments, Inc., 300 Barr Harbor Drive, West Conshohocken, PA 19428, Attn: J. Scott Victor; (d) counsel to Stalking Horse Bidder, Allen & Overy LLP, 1221 Avenue of the Americas, New York, NY 10020, Attn: Ken Coleman and Daniel Guyder, and Buchanan Ingersoll & Rooney PC, the Brandywine Building, 1000 West Street, Suite 1410, Wilmington, DE 19801-1054, Attn: Mary F. Caloway; and (e) counsel to any official committee of unsecured creditors appointed in these cases (collectively, the "<u>Notice Parties</u>"), by the Bid Deadline. A Bid received after the Bid Deadline (unless extended by the Debtors in their sole discretion) shall not constitute a Qualified Bid. Interested bidders requesting information about the qualification process, including a form asset purchase agreement, and information in connection with their due diligence, should contact J. Scott Victor, Senior Managing Director & Co-Head Special Situations Group, National City Investment Banking, 300 Barr Harbor Drive, West Conshohocken, PA 19428, (610) 940-5802. The Bid Deadline may be extended by the Debtors in their sole discretion for any party.

b. <u>Participation Requirements</u>: To participate in the bidding process, a person interested in all or portions of the Assets (a "<u>Potential Bidder</u>") must first deliver (unless previously delivered) to the Debtors and their counsel, an executed confidentiality agreement in form and substance acceptable to the Debtors and their counsel. Thereafter,

---

[8]     Capitalized terms used and not defined in this paragraph shall have the meanings ascribed to them in the Bidding Procedures attached hereto as Exhibit 1.

066831.1001

following due diligence, the following documents and information must have been received by Debtors and their counsel no later than one week prior to the Bid Deadline:

*Identification of Potential Bidder*. Identification of the Potential Bidder and any Principals (defined below), and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated transaction;

*Non-Binding Expression of Interest*. An executed non-binding indication of interest satisfactory to the Debtors that must reasonably identify the contemplated transaction, including the assets proposed to be acquired, the proposed purchase price, contingencies, and conditions precedent to closing;

*Corporate Authority*. Written evidence of the Potential Bidder's chief executive officer or other appropriate senior executive's approval of the contemplated transaction; provided, however, that, if the Potential Bidder is an entity specially formed for the purpose of effectuating the contemplated transaction, then the Potential Bidder must furnish written evidence reasonably acceptable to the Debtors of the approval of the contemplated transaction by the equity holder(s) of such Potential Bidder (the "Principals"); and

*Proof of Financial Ability to Perform*. Written evidence upon which the Debtors may reasonably conclude that the Potential Bidder has the necessary financial ability to close the contemplated transaction and provide adequate assurance of future performance under all contracts to be assumed in such contemplated transaction. Such information should include, among other things, the following:

(i)     the Potential Bidder's current financial statements (audited if they exist);

(ii)     contact names and numbers for verification of financing sources;

(iii)     evidence of the Potential Bidder's internal resources and proof of any debt or equity funding commitments that are needed to close the contemplated transaction;

(iv)     any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors demonstrating that such Potential Bidder has the ability to close the contemplated transaction; provided, however, that the Debtors shall determine, in their reasonable discretion, in consultation with their advisors, whether the written evidence of such financial wherewithal is reasonably acceptable, and shall not unreasonably withhold acceptance of a Potential Bidder's financial qualifications; and

DB02:6700828.5                                    066831.1001

(v)    If the Potential Bidder intends to seek financing under the Acquisition Facility, then, at least 20 days prior to the Bid Deadline, the Potential Bidder will contact Guggenheim in writing to begin discussions regarding the potential financing contemplated under the Acquisition Facility.

c.    Designation as Qualified Bidder: A "Qualified Bidder" is a Potential Bidder (or combination of Potential Bidders whose bids for the assets of the Debtors do not overlap and who agree to have their bids combined for purposes of the determination of whether such Potential Bidders together constitute a Qualified Bidder, and who shall also be referred to herein as a single Qualified Bidder) that delivers the documents described in paragraph (b) above, and that the Debtors in their discretion and with assistance from their advisors determines is reasonably likely to submit a bona fide offer that would result in greater cash value being received for the benefit of the Debtors' creditors than under the APA and to be able to consummate a sale if selected as a Successful Bidder (defined below).

Upon the receipt from a Potential Bidder of the information required under paragraph (b) above, as soon as is practicable, the Debtors shall determine and notify the Potential Bidder with respect to whether such Potential Bidder is a Qualified Bidder.

The Stalking Horse Bidder is a Qualified Bidder.

d.    Access to Due Diligence Materials: Only Potential Bidders that execute the Confidentiality Agreement are eligible to receive due-diligence access or additional non-public information. If the Debtors determine that a Potential Bidder who has satisfied the Participation Requirements does not constitute a Qualified Bidder, then such Potential Bidder's right to receive due-diligence access or additional non-public information shall terminate. The Debtors will designate an employee or other representative to coordinate all reasonable requests for additional information and due-diligence access from such Qualified Bidders. The Debtors shall not be obligated to furnish any due diligence information after the Bid Deadline (as hereinafter defined). The Debtors are not responsible for, and will bear no liability with respect to, any information obtained by Qualified Bidders in connection with the sale of the Assets.

e.    Due Diligence From Bidders: Each Potential Bidder and Qualified Bidder (collectively, a "Bidder") shall comply with all reasonable requests for additional information and due-diligence access by the Debtors or their advisors regarding such Bidder and its contemplated transaction. Failure by a Potential Bidder to comply with requests for additional information and due-diligence access will be a basis for the Debtors to determine that the Potential Bidder is not a Qualified Bidder. Failure by a Qualified Bidder to comply with requests for additional information and due-diligence access will be a basis for the Debtors to determine that a bid made by a Qualified Bidder is not a Qualified Bid.

f.     Bid Process:  The Debtors and their advisors shall:  (a) determine whether a Potential Bidder is a Qualified Bidder; (b) coordinate the efforts of Bidders in conducting their due-diligence investigations, as permitted by the provisions herein; (c) receive offers from Qualified Bidders; and (d) negotiate any offers made to purchase the Assets (collectively, the "Bid Process").  The Debtors shall have the right to adopt such other rules for the Bid Process (including rules that may depart from those set forth herein) that, in their sole discretion, will better promote the goals of the Bid Process.

g.     Bid Requirements:  To participate in the Auction, each Bid and Qualified Bidder submitting such a Bid must be determined by the Debtors to satisfy each of the following conditions:

Written Submission of APA and Commitment to Close.  Qualified Bidders must submit by the Bid Deadline a blackline of the APA reflecting their proposed changes, and a written commitment that they intend to close on the terms and conditions set forth therein.

Good Faith Deposit.  Each Bid must be accompanied by a deposit in the form of a certified check or cash payable to the order of the Debtors in the amount of $1,000,000.00.

Minimum Overbid.  The consideration proposed by the Bid must be cash.  The aggregate consideration must equal or exceed the sum of the Purchase Price plus $200,000.

Irrevocable.  A Bid must be irrevocable until two (2) business days after the Assets have been sold pursuant to the Closing of the sale or sales approved by the Bankruptcy Court in a final, non-appealable order (the "Termination Date");

Contingencies:  A Bid may not be conditioned on obtaining financing or any internal approval or on the outcome or review of due diligence.  Any other contingencies associated with a Bid may not be more burdensome than those set forth in the APA;

Financing Sources:  A Bid must contain written evidence of a commitment for financing or other evidence of the ability to consummate the sale satisfactory to the Debtors with appropriate contact information for such financing sources.  If a Bid will rely on the Acquisition Facility, the Bid must include a definitive commitment letter entered into between the Qualified Bidder and Guggenheim set forth the terms and conditions of such Facility;

No Fees payable to Qualified Bidder:  A Bid may not request or entitle the Qualified Bidder to any break-up fee, expense reimbursement or similar type of payment.  Further, by submitting a Bid, a Bidder shall be deemed to waive its right to pursue a substantial contribution claim under section 503 of the

18

Bankruptcy Code or in any way related to the submission of its Bid or the Bid Procedures;

A Bid received from a Qualified Bidder before the Bid Deadline that meets the above requirements, and that satisfies the Bid-Deadline requirement above, shall constitute a "Qualified Bid," if the Debtors believe, in their reasonable discretion, that such Bid would be consummated if selected as the Successful Bid. For purposes herein, the APA shall constitute a Qualified Bid; and

h.      Auction: Only if a Qualified Bid (other than the Stalking Horse Bidder) is received by the Bid Deadline, shall the Debtors conduct an auction (the "Auction") to determine the highest and/or best bid with respect to the Assets. The Auction shall commence on June 5, 2008, at 9:00 a.m. (Eastern Time); at the offices of Young Conaway Stargatt & Taylor, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington, DE 19801.

If no such Qualified Bid is received by the Bid Deadline, then the Auction will not be held. The Stalking Horse Bidder will be the Successful Bidder, the APA will be the Successful Bid, and, at the June 6, 2008 Sale Hearing, the Debtors will seek approval of and authority to consummate the Proposed Sale contemplated by the APA.

The Auction shall be conducted according to the following procedures:

(a)      *Participation At The Auction*: Only a Qualified Bidder that has submitted a Qualified Bid is eligible to participate at the Auction. Only the authorized representatives of each of the Qualified Bidders, Debtors and the official committee of unsecured creditors shall be permitted to attend. During the Auction, bidding shall begin initially with the highest Qualified Bid and subsequently continue in minimum increments of at least $100,000 (or such other amount the Debtors determine to facilitate the Auction).

(b)      *Debtors Shall Conduct The Auction*: The Debtors and their professionals shall direct and preside over the Auction. At the start of the Auction, the Debtors shall describe the terms of the highest and best Qualified Bid. The determination of which Qualified Bid constitutes the highest and best Qualified Bid shall take into account any factors the Debtors reasonably deem relevant to the value of the Qualified Bid to the estates, including, among other things, the following: (i) the amount and nature of the consideration; (ii) the proposed assumption of any liabilities, if any; (iii) the ability of the Qualified Bidder to close the proposed transaction; (iv) the proposed Closing Date and the likelihood, extent and impact of any potential delays in Closing; (v) any purchase-price adjustments; (vi) the impact of the contemplated

DB02:6700828.5                                                                                  066831.1001

transaction on any actual or potential litigation; (vii) the net economic effect of any changes from the APA, if any, contemplated by the Contemplated Transaction Documents, (viii) the net after-tax consideration to be received by the Debtors' estates; and (ix) such other considerations the Debtors deem relevant in their sole discretion (collectively, the "Bid Assessment Criteria"). All Bids made thereafter shall be Overbids (as defined below), and shall be made and received on an open basis, and all material terms of each Bid shall be fully disclosed to all other Qualified Bidders. The Debtors shall maintain a transcript of all Bids made and announced at the Auction, including the Baseline Bid (as defined below), all Overbids and the Successful Bid.

(c)      *Terms of Overbids*: An "Overbid" is any Bid made at the Auction *subsequent* to the Debtors' announcement of the highest and best Qualified Bid. To submit an Overbid for purposes of this Auction, a Qualified Bidder must comply with the following conditions:

(i)      Minimum Overbid Increment: Any Overbid after the highest and best Qualified Bid shall be made in increments of at least $100,000 (or such other amount the Debtors determine to facilitate the Auction). Additional consideration in excess of the amount set forth in the Baseline Bid may include only cash; provided, however, notwithstanding the foregoing, the Credit Bid Component of any Overbid by the Stalking Horse Bidder may be increased up to an amount not to exceed the aggregate amount of its claims under the DIP Financing and Diamond Credit Agreement.

(ii)      Remaining Terms are the same as for Qualified Bids. Except as modified herein, an Overbid must comply with the conditions for a Qualified Bid set forth above, provided, however, that the Bid Deadline and the Initial Minimum Overbid Increment shall not apply. Any Overbid made by a Qualified Bidder must remain open and binding on the Qualified Bidder until and unless (a) the Debtors accept a higher Qualified Bid as an Overbid and (b) such Overbid is not selected as the Back-up Bid (as defined below).

To the extent not previously provided (which shall be determined by the Debtors), a Qualified Bidder submitting an Overbid must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors)

DB02:6700828.5                                         066831.1001

demonstrating such Qualified Bidder's ability to close the transaction proposed by such Overbid.

(iii)    Announcing Overbids: The Debtors shall announce at the Auction the material terms of each Overbid, the basis for calculating the total consideration offered in each such Overbid, and the resulting benefit to the Debtors' estates based on, among other things, the Bid Assessment Criteria.

(iv)    Consideration of Overbids: The Debtors reserve the right, in their reasonable business judgment, to make one or more adjournments in the Auction to, among other things: (a) facilitate discussions between the Debtors and individual Qualified Bidders; (b) allow individual Qualified Bidders to consider how they wish to proceed; and (c) give Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment, may require that the Qualified Bidder (other than Stalking Horse Bidder) has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed transaction at the prevailing Overbid amount.

(d)    *Additional Procedures*: In their reasonable discretion, the Debtors may adopt rules for the Auction at or prior to the Auction that will better promote the goals of the Auction and that are not inconsistent with any of the provisions of the Bid Procedures Order. All such rules will provide that all Bids shall be made and received in one room, on an open basis, and all other Qualified Bidders shall be entitled to be present for all bidding with the understanding that the true identity of each Qualified Bidder – i.e., principals submitting the Bid – shall be fully disclosed to all other Qualified Bidders and that all material terms of each Qualified Bid will be fully disclosed to all other Qualified Bidders throughout the entire Auction.

(e)    *Closing the Auction*: Upon conclusion of the bidding, the Auction shall be closed, and the Debtors shall (i) immediately review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Proposed Sale, and (ii) identify the highest, best, and/or otherwise financially superior offer for the Assets (the "Successful Bid") and the entity submitting such Successful Bid, the "Successful Bidder"), which highest, best and/or otherwise financially superior offer will provide the greatest amount of net value to the Debtors, and the next highest or otherwise best offer after the Successful

21

Bid (the "Back-up Bid"), and advise the Qualified Bidder of such determination. If the Stalking Horse Bidder's final bid is deemed to be highest and best at the conclusion of the Auction, the Stalking Horse Bidder will be the Successful Bidder, and such bid, the Successful Bid.

     i.     Terms of Expense Reimbursement: If (i) the APA terminates because the Debtors have accepted or selected, and the Bankruptcy Court has approved, the bid or bids (including a credit bid) of any bidder(s) other than Stalking Horse Bidder to purchase all or any portion of the Debtors' business or Assets, and such transaction or transactions contemplated by any such bid or bids has been consummated, or (ii) the Debtors withdraw their support for the transactions contemplated by the APA and seek to have a stand-alone plan of reorganization confirmed by the Court, the Debtors shall reimburse Stalking Horse Bidder for all actual out-of-pocket costs and expenses (including professional fees) reasonably incurred by Stalking Horse Bidder in connection with the transactions contemplated by the APA, up to a maximum of 2.0% of the Purchase Price (excluding the Assumed Liabilities) (the aggregate amount of such reimbursement being the "Expense Reimbursement"), in accordance with the terms of the APA.

     j.     Inclusion of Expense Reimbursement in Initial Minimum Overbid Amount: The Expense Reimbursement shall be deemed to be included in the stated amount of any bid equal to or greater than the Initial Minimum Overbid Amount.

     k.     Acceptance of Successful Bid: The Debtors shall sell the Assets to the Successful Bidder upon the approval of the Successful Bid by the Bankruptcy Court after the Sale Hearing. The Debtors' presentation of a particular Qualified Bid to the Bankruptcy Court for approval does not constitute the Debtors' acceptance of the Bid. The Debtors will be deemed to have accepted a Bid only when the Bid has been approved by the Bankruptcy Court at the Sale Hearing. All interested parties reserve their right to object to the Debtors' selection of the Successful Bidder (including the assignment of any of such objector's Assumed Executory Contract thereto, provided, however, that any objection to such assignment on the basis of the Cure Cost must be made and/or reserved as set forth in the order approving these Bid Procedures).

     l.     Credit Bidding: The Stalking Horse Bidder may, for itself, on behalf of its affiliates and the lenders and as directed by Guggenheim, credit bid some or all of its claims (and the claims of its affiliates and the lenders as if the Stalking Horse Bidder is the owner and assignee of all such claims) against the Debtors under the DIP Financing and Diamond Credit Agreement to the fullest extent permitted under the Bid Procedures Order and section 363(k) of the Bankruptcy Code.

     m.     "As Is, Where Is": The sale of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their agents or estates except to the extent set forth in the APA or the purchase agreement of another Successful Bidder. The Stalking Horse Bidder and each Qualified

Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer, that it has relied solely on its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its Bid, and that it did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in these Bid Procedures or, (a) as to the Stalking Horse Bidder, the terms of the sale of the Assets shall be set forth in the APA, or (b) as to another Successful Bidder, the terms of the sale of the Assets shall be set forth in the applicable purchase agreement.

n. <u>Free Of Any And All Encumbrances</u>: Except as otherwise provided in the APA or another Successful Bidder's purchase agreement, all of the Debtors' right, title, and interest in and to the Assets subject thereto shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests thereon and there against (collectively, the "<u>Encumbrances</u>") in accordance with 11 U.S.C. § 363, with such Encumbrances to attach to the net proceeds of the sale of the Assets.

o. <u>Sale Hearing</u>: The Sale Hearing shall be conducted by the Bankruptcy Court on June 6, 2008, at 10:00 a.m. (Eastern Time) or such other time as the Court may direct, located at 824 North Market Street, Wilmington, Delaware. Following the approval of the sale of the Assets to the Successful Bidder at the Sale Hearing, if such Successful Bidder fails to consummate an approved sale within thirty (30) days after entry of an Order approving the Sale, the Debtors shall be authorized, but not required, to deem the Back-up Bid, as disclosed at the Sale Hearing, the Successful Bid or Back-up Bid, as applicable, and the Debtors shall be authorized, but not required, to consummate the sale with the Qualified Bidder submitting such Bid without further notice or order of the Bankruptcy Court. The Sale Hearing may be adjourned or rescheduled without notice other than by announcement of the adjourned date at the Sale Hearing.

p. <u>Return of Good Faith Deposit</u>: Good Faith Deposits of the Successful Bidder shall be applied to the purchase price of such transaction at Closing. Good Faith Deposits of all other Qualified Bidders shall be held in an interest-bearing escrow account until two (2) days after Closing of the transactions contemplated by the Successful Bid, and thereafter returned to the respective bidders. If a Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Debtors shall be entitled to retain the Good Faith Deposit as part of their damages resulting from the breach or failure to perform by the Successful Bidder.

q. <u>Modifications and Reservations</u>: The Bid Procedures may be modified only upon the express written consent of the Debtors and the Stalking Horse Bidder, or by order of the Court.

The Debtors may (a) determine which Qualified Bid, if any, is the highest, best, and/or otherwise financially superior offer; and (b) reject at any time before entry of an order of the Bankruptcy Court approving a Qualified Bid, any Bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bid Procedures, or the terms and conditions of sale, or (iii) contrary to the best interests of the Debtors, their estates and creditors thereof.

At or before the Sale Hearing, the Debtors may impose such other terms and conditions as the Debtors may determine to be in the best interests of their estates and creditors and other parties in interest thereof.

r.    <u>Reservation of Rights</u>. The Debtors reserve the right as they may determine to be in the best interests of their estates to: (i) determine which bidders are Qualified Bidders; (ii) determine which Bids are Qualified Bids; (iii) determine which Qualified Bid is the highest and best proposal and which is the next highest and best proposal, (iv) reject any bid that is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bid Procedures Order or the requirements of the Bankruptcy Code or (c) contrary to the best interests of the Debtors and their estates; (v) waive terms and conditions set forth herein with respect to any or all potential bidders, (vi) impose additional terms and conditions with respect to any or all potential bidders, (vii) extend the deadlines set forth herein, (viii) adjourn or cancel the Auction and/or Sale Hearing in open court without further notice; (ix) remove some or all of the Assets from the Auction, and (x) modify the Bid Procedures as they may determine to be in the best interests of their estates or to withdraw the Sale Motion at any time with or without prejudice. Without limiting the generality of the foregoing, the Debtors may determine to (a) distribute or not distribute copies of other Qualified Bids to other Qualified Bidders prior to or during the Auction, or (b) proceed with sealed bidding.

32.    The Debtors submit that implementation of the Bid Procedures will facilitate the bidding for the Assets. The Debtors do not believe that at this juncture, given their available liquidity and the need to sell the Assets on an expedited basis, approval of the Bid Procedures will chill any bidding. Quite to the contrary, approval of the Bid Procedures is in the best interests of the Debtors, their estates and their creditors in that it provides a structure and format for all potentially interested parties to equally formulate a bid for the Assets and participate in the sale process. The Acquisition Financing offered by Guggenheim further ensures that all qualified interested parties will have a meaningful opportunity to participate in

the competitive bidding for the purchase of the Assets as described herein. Failure to approve the Bid Procedures may jeopardize a sale to the detriment of the Debtors' estates and creditors.

**E.    *Expense Reimbursement.***

33.    As stated above, the Debtors also seek this Court's approval of certain expense reimbursement provisions set forth in the APA. The Debtors seek authorization to reimburse the Stalking Horse bidder its actual out-of-pocket expenses reasonably incurred by the Stalking Horse Bidder in connection with the Sale up to two (2%) percent of the Purchase Price if (i) the APA terminates because the Debtors have accepted or selected, and the Bankruptcy Court has approved, the bid or bids (including a credit bid) of any bidder(s) other than Stalking Horse Bidder to purchase all or any portion of the Debtors' business or Assets, or (ii) the Debtors withdraw their support for the transactions contemplated by the APA and seek to have a stand-alone plan of reorganization confirmed by the Court. The Expense Reimbursement shall be paid as a carve out to, and be free and clear of, the Encumbrances of any secured creditors on the proceeds of such Sale and shall constitute a superpriority administrative expense claim under Sections 503(b) and 507 of the Bankruptcy Code. The Stalking Horse Bidder shall be entitled to "credit bid" the amount of its Expense Reimbursement in any Auction.

34.    The Debtors submit that implementation of the Bidding Procedures, including the Expense Reimbursement, will not chill bidding for the Assets. To the contrary, approval of the Bid Procedures will invigorate bidding, especially given the offer by Guggenheim to provide the Acquisition Facility to qualified interested parties as described therein. Prior to the Petition Date, the Debtors, through their management and NatCity, employed approximately one week of marketing effort. As of the date of this Motion, more than 130 potential financial purchasers have been contacted, and at least 18 have executed or are in the process of executing, confidentiality agreements which allow the financial purchasers access

25

to the Debtors' confidential business information. NatCity and the Debtors intend to expand their marketing to include approximately 30 potential strategic buyers, thus increasing the number of potential purchasers. Contemporaneously with these marketing efforts, the Debtors have decided in the interest of time to proceed with their sale to the Stalking Horse Bidder, subject to continued marketing to potential bidders with the goal of maximizing value for creditors. The Bidding Procedures provide a structure and format that encourages all bidders to submit the highest and best offers for all of the Debtors' Assets. The Debtors may select any combination of bids that provides the highest and best value to the Debtors and their estates as the Successful Bid(s). And notably, the Stalking Horse Bidder is not seeking a break-up fee, which is a significant benefit to the Debtors' estates. Accordingly, the Debtors submit that the Bidding Procedures are in the best interests of the Debtors, their estates and their creditors.

*F.*     *Notice of Sale Hearing, Auction, Bidding Procedures, and Objection Dates*

35.     The Debtors seek to have the Sale Hearing scheduled for on or about June 6, 2008, with an objection deadline for such Sale Hearing set for May 30, 2008 at 4:00 p.m. (Eastern Time).

36.     Not later than three (3) days after the entry of an Order approving this Motion, the Debtors will cause the Auction and Sale Notice, in a form substantially similar to the form attached hereto as Exhibit 2, to be sent by first-class mail, postage-prepaid, to (i) all entities that claim any interest in or lien on the Assets; (ii) all parties to Designated Contracts assumed and sold and assigned pursuant to this Order; (iii) all governmental taxing authorities that have, or as a result of the sale of the Assets may have, claims, contingent or otherwise, against the Debtors; (iv) all parties that filed requests for notices under Bankruptcy Rule 9010(b) or were entitled to notice under Bankruptcy Rule 2002; (v) all creditors (whether liquidated, contingent or unmatured) of the Debtors; (vi) all interested governmental, pension, and environmental

entities; (vii) the Office of the United States Trustee; and (viii) all entities that have, within the past 12 months, expressed to the Debtors an interest in purchasing the Assets.

37.  Not later than five (5) days after the entry of an Order approving this Motion, the Debtors shall cause the Auction and Sale Notice, in a form substantially similar to the form attached hereto as Exhibit 2, to be published in the national edition of one of the following: The Wall Street Journal, The New York Times, or The USA Today, as to be determined by Debtors, pursuant to Bankruptcy Rule 2002(l). Such publication notice shall be sufficient and proper notice to any other interested parties, including those whose identities are unknown to Debtors.

38.  Further, to facilitate the sale, assumption, and assignment of any Designated Contracts, the Debtors will serve, via first class mail, a notice (the "Cure Amount Notice"), similar to the form attached hereto as Exhibit 3, not later than three (3) days after the entry of an Order approving the Motion on each counterparty to a Designated Contract. If the Stalking Horse Bidder is not the Successful Bidder, and an alternative Successful Bidder is seeking to have certain Designated Contracts assumed and assigned as part of an alternative transaction, the Debtors will provide financial information for the alternative bidder to all non-debtor parties to such Designated Contracts immediately following the Auction via facsimile or Federal Express.

39.  The Debtors will attach to the Cure Amount Notice their calculation of the undisputed cure amounts that they believe must be paid to cure all defaults under all Designated Contracts (the "Cure Costs"). If no amount is listed on the Cure Amount Notice, the Debtors believe that there is no Cure Cost. Unless the non-debtor party to a Designated Contract files an objection (the "Cure Amount Objection") to their scheduled Cure Cost by May 30, 2008, at 4:00

27

p.m. (Eastern Time) and serves the objection on (a) Diamond Glass, Inc. and DT Subsidiary

Corp., 220 Division Street, Kingston, PA 18704, Attn: William Cogswell, President; (b) co-

counsel to the Debtors, Foley & Lardner LLP, 90 Park Avenue, New York, NY 10016, Attn:

Michael P. Richman, and Young Conaway Stargatt & Taylor, The Brandywine Building, 1000

West Street, 17th Floor, Wilmington, DE 19801, Attn: Michael Nestor; (c) counsel to Stalking

Horse Bidder, Allen & Overy LLP, 1221 Avenue of the Americas, New York, NY 10020, Attn:

Ken Coleman and Daniel Guyder; and Buchanan Ingersoll & Rooney PC, The Brandywine

Building, 1000 West Street, Suite 1410, Wilmington, DE 19801-1054, Attn: Mary F. Caloway;

and (d) counsel to any committee, then the Debtors may assume and assign such contract to

Stalking Horse Bidder or the Successful Bidder and such non-debtor party shall (i) be forever

barred from objecting to the Cure Cost and from asserting any additional cure or other amounts

with respect to such Designated Contract, and the Debtors shall be entitled to rely solely on the

Cure Cost; and (ii) be forever barred and estopped from asserting or claiming against the

Debtors, the Stalking Horse Bidder, or such other Successful Bidder or any other assignee of the

relevant Designated Contract that any additional amounts are due or defaults exist under such

Designated Contract. In addition, non-debtor parties to any Designated Contract must file and

serve objections, if any, the adequate assurance of future performance under the Designated

Contract (if and as assumed) so as to be received by the foregoing parties by May 30, 2008, at

4:00 p.m. (Eastern Time).

40.     If a Cure Amount Objection is timely filed, the Cure Amount Objection

must set forth (a) the basis for the objection; (b) with specificity, the amount the party asserts as

the Cure Cost; and (c) appropriate documentation in support of the Cure Cost.

41.     Hearings on Cure Amount Objections (and objections to the adequate
assurance of future performance under the Designated Contract (if and as assumed)) may be held
(a) at the Sale Hearing, or (b) on such other date that the Debtors determine in their sole
discretion; provided, however, that if the subject Designated Contract is assumed and assigned,
the Cure Cost asserted by the objecting party (or such lower amount as may be fixed by this
Court) shall be deposited and held in a segregated account by the Successful Bidder or any other
assignee pending further order of this Court or mutual agreement of the parties.

42.     The Debtors' decision to assume and assign Designated Contracts shall be
subject to Court approval and consummation of the Proposed Sale of the Assets. Absent
consummation of the Proposed Sale of the Assets, each of the Designated Contracts shall neither
be deemed assumed nor assigned and shall in all respects be subject to further administration
under the Bankruptcy Code.

43.     Except to the extent otherwise provided in the APA or the agreement with
the Successful Bidder, subject to any prepetition cure amount payments, the assignee of any
assumed Designated Contract will not be subject to any liability to the assigned Designated
Contract counterparty that accrued or arose before the closing date of the Proposed Sale of the
Assets, and the Debtors shall be relieved of all liability accruing or arising thereafter pursuant to
section 365(k) of the Bankruptcy Code.

44.     Objections, if any, to the relief requested in the Sale Motion, including any
objections under section 365(b)(1)(C) of the Bankruptcy Code, must: (a) be in writing; (b)
comply with the Bankruptcy Rules and the Local Bankruptcy Rules; (c) be filed with the Clerk
of the Bankruptcy Court for the District of Delaware, 3rd Floor, 824 Market Street, Wilmington,
Delaware 19801, on or before 4:00 p.m. (Eastern Time) on May 30, 2008; and (d) be served so

29

as to be received no later than 4:00 p.m. (Eastern Time) on the same day, on (a) Diamond Glass, Inc. and DT Subsidiary Corp., 220 Division Street, Kingston, PA 18704, Attn: William Cogswell, President; (b) counsel to the Debtors, Foley & Lardner LLP, 90 Park Avenue, New York, NY 10016, Attn: Michael P. Richman, and Young Conaway Stargatt & Taylor, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington, DE 19801, Attn: Michael Nestor; (c) counsel to Stalking Horse Bidder, Allen & Overy LLP, 1221 Avenue of the Americas, New York, NY 10020, Attn: Ken Coleman and Daniel Guyder, and Buchanan Ingersoll & Rooney PC, The Brandywine Building, 1000 West Street, Suite 1410, Wilmington, DE 19801-1054, Attn: Mary F. Caloway; and (d) counsel to any Committee; provided, however, if Stalking Horse Bidder is not the Successful Bidder and an alternative Successful Bidder is seeking to have certain unexpired leases, license agreements, and executory contracts assumed and assigned as part of an alternative transaction, the non-debtor parties to such unexpired leases, license agreements, and executory contracts shall have until 4:00 p.m. the day prior to the Sale Hearing to raise objections under section 365(b)(1)(C) of the Bankruptcy Code. The failure of any person to timely file its objection shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Motion or the Debtors' assumption and assignment of any Designated Contract or the consummation of the Proposed Sale and performance under the APA (or any alternative agreement entered into with the Successful Bidder), including the transfer of the Assets free and clear of all Encumbrances (other than permitted encumbrances provided for expressly in the APA or alternative purchase agreement entered into with the Successful Bidder).

45.     The Debtors request that the Sale Hearing be held before this Court on or before June 6, 2008. The Sale Hearing may be adjourned, from time to time, without further

066831.1001

notice to creditors or other parties-in-interest other than by announcement of said adjournment before this Court or on this Court's calendar on the date scheduled for said hearing.

46. The Debtors request that the Court approve the notices to be issued in connection with the Proposed Sale of the Assets substantially in the form of the notices attached hereto as Exhibits 2 and 3.

47. To facilitate the Bid Procedures, the Debtors respectfully request that Bid Deadline be set for no later than June 3, 2008; the Auction be scheduled for no later than June 5, 2008; and the Sale Hearing be scheduled, at the convenience of the Court, no later than June 6, 2008.

## BASIS FOR RELIEF

48. Section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). As described above, approval of the Bid Procedures will greatly assist the Debtors in maximizing the value that they may obtain for the Assets. Consequently, the Debtors respectfully submit that granting the requested relief is "appropriate" under the circumstance.

49. Once the Debtors articulate a valid business justification, "[t]he business judgment rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." *In re S.N.A. Nut Company*, 186 B.R. 98 (Bankr. N.D. Ill. 1995) (internal quotation, citation omitted); *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992); *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions.").

31

50. Indeed, when applying the "business judgment" rule, courts show great deference to the debtor's decision-making. *See Summit Land Co. v. Allen (In re Summit Land Co.)*, 13 B.R. 310, 315 (Bankr. D. Utah 1981). Thus, this Court should grant the relief requested in this Motion if the Debtors demonstrate a sound business justification therefor. *See Schipper*, 933 F.2d at 515; *In re Lionel Com.*, 722 F.2d at 1071; *In re Delaware Hudson Ry. Co.*, 124 B.R. 169 at 179.

51. The Bid Procedures are designed to encourage competitive bidding in an orderly manner to maximize value for the Debtors' estates for their creditors, customers and employees. The proposed procedures contain terms typical for a process through which a Sale of this nature is consummated, and the adoption of the Bid Procedures represents a sound exercise of the Debtors' business judgment.

52. The Debtors have sound business justifications for seeking approval of the Bid Procedures at this juncture. The Debtors believe it is in the best interests of their estates, creditors, customers and employees to commence an auction process immediately, as the Debtors have limited funding and resources, to try to maximize the value of their assets and maintain a core workforce. While the Debtors have undertaken certain efforts to reduce expenses and are in the process of stabilizing their business, it is questionable whether they will be able to continue operating beyond the period of this proposed bidding process without additional funding, which may not be forthcoming. In addition, the Sale of the Assets provides a realistic means for the continuation of services for the Debtors' customers with minimal interruption and inconvenience. Absent a Sale, the Debtors may be forced to cease operations and wind down their affairs, leaving customers scrambling to find alternative suppliers. For these reasons, the Debtors have determined, based upon their business judgment, that the best option for maximizing the value of

DB02:6700828.5　　　　　　　　　　　　　　　　　　　　066831.1001

their estates for the benefit of their creditors, customers, employees and other parties in interest is through a sale of the Assets pursuant to the Bid Procedures.

53.     In addition, the Debtors' request for approval of the Expense Reimbursement Fee and bidding incentives should be approved as an appropriate exercise of the Debtors' business judgment, and because they provide a benefit to the bankruptcy estates by encouraging competitive bidding and incentivizing the Stalking Horse Bidder to serve as a stalking horse bidder in these cases. For example, in *Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.)*, 181 F. 3d 527 (3d Cir. 1999), the Third Circuit held that even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions of section 503(b) of the Bankruptcy Code govern in the bankruptcy context. Accordingly, to be approved, bidding incentives must provide some benefit to the debtor's estate. *Id.* at 533.

54.     The Third Circuit identified at least two instances in which bidding incentives may benefit the estate. First, benefit may be found if the bidding procedures and protections "promote[] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537. Second, where the availability of bidding incentives induce a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*

55.     Whether evaluated under Section 105(a) of the Bankruptcy Code, the business judgment rule, or the Third Circuit "administrative expense" standard, approval of the Bidding Procedures, including the Expense Reimbursement and other bidding protections,

33

described above are appropriate and necessary to maximizing the value Debtors may obtain for all or portions of their Assets.

56.     The Bidding Procedures are designed to encourage competitive bidding. The Debtors and the Stalking Horse Bidder are not seeking break-up fees (even though such fees are commonly approved in this Court) and, moreover, Guggenheim has offered to provide the Acquisition Facility to qualified interested parties to ensure all such parties have a meaningful opportunity to participate in the Bidding Process to purchase the Assets. Instead, the Debtors and the Stalking Horse Bidder are only seeking reimbursement for actual expenses incurred by the Stalking Horse Bidder in connection with the Sale, and only if the Stalking Horse Bidder is not the Successful Bidder. The Expenses Reimbursement is intended to cover the Stalking Horse Bidder's costs in conducting due diligence of the Debtors and the costs of negotiating and documenting the Stalking Horse Bids, including the negotiation and documentation of the APA. This bid will serve as a floor for other bids and will induce other bids that otherwise would not have been made or otherwise would have been limited. Thus, the Expense Reimbursement (to some extent if not in total) will be covered by the proceeds that will be realized from the alternative transaction with the higher and better bidder. This is obviously a benefit to the Debtors' estates.

57.     The minimum overbid requirements described in the Bidding Procedures are appropriate under the circumstances as well. They are rather modest minimum overbid requirements given the size of this transaction, and the Debtors believe that it is unlikely that they will deter a serious competing bidder. Consequently, the Debtors' believe the overbid requirement adequately protects this added value.

58.     Moreover, absent authorization of the Expense Reimbursement and the minimum overbid requirements, the Debtors may lose the opportunity to obtain the highest and best offer for the Assets.  If the protections are not approved, the Stalking Horse Bidder may not go forward with the Sale.

59.     Finally, the Expense Reimbursement and minimum overbid requirements were negotiated in good faith and were the product of arm's-length negotiations.

60.     In addition, as discussed above, Guggenheim as Agent under the Acquisition Facility has agreed to make available to any Qualified Bidder the Financing Commitment which would enable such Qualify Bidder, if it so desires, to borrow up to $25 million.  The Financing Commitment would be made available upon execution of a Commitment Letter by both Guggenheim as Agent and the Successful Bidder, as Borrower, on terms and conditions acceptable to Guggenheim in its sole discretion, to fund in part the loan proceeds made available and drawn under the Facility, with the remaining balance to be paid through a significant cash investment made by the Successful Bidder.  This funding commitment serves to enhance bidding and, therefore, maximizes value for creditors and other parties in interest, by providing an immediate source of funding for Qualified Bidders.

61.     Accordingly, the Debtors request that the Court authorize payment of the Bidding Procedures, the Expense Reimbursement and approve the other bidder protections.

## NOTICE

62.     The Debtors propose to give notice of this Motion by overnight or hand delivery or facsimile to: (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel to Guggenheim, the Debtors' prepetition secured lender and proposed postpetition secured lender; (iii) creditors holding the thirty (30) largest unsecured claims against the Debtors'

DB02:6700828.5                                                                    066831.1001

estates (on a consolidated basis); (iv) counsel to the Indenture Trustee under the Indenture; (v) counsel to certain of the Noteholders; and (vi) those parties requesting notice pursuant to Bankruptcy Rule 2002, in accordance with Del. Bankr. L.R. 2002-1(b). In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

63. Notice of the Auction will be served on the parties identified in Paragraph F of the Sale Order.

DB02:6700828.5

066831.1001

**WHEREFORE**, the Debtors respectfully request that the Court enter an Order,

substantially in the form annexed as <u>Exhibit 4</u> hereto, granting this Motion and such other and

further relief as the Court deems just and proper.

Dated: Wilmington, Delaware
April __1__, 2008

FOLEY & LARDNER LLP
Michael P. Richman *(pro hac vice pending)*
Keith C. Owens
Erika Morabito *(pro hac vice pending)*
90 Park Avenue
New York, NY 10005
(212) 682-7474 (Telephone)
(212) 687-2329 (Facsimile)

-and-

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Michael R. Nestor (No. 5526)
Joseph M. Barry (No. 4221)
Donald J. Bowman (No. 4383)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6758
Facsimile: (302) 571-1253

*Proposed Attorneys for the Debtors
and Debtors in Possession*

DB02:6700828.5                    066831.1001

# EXHIBIT 1

# BIDDING PROCEDURES

The following procedures (the "Bidding Procedures") shall govern the proposed sale of substantially all the property and assets (collectively, the "Assets") of Diamond Glass, Inc. and DT Subsidiary Corp. (collectively, the "Debtors").

### Assets for Sale

Debtors are offering to sell in one or more transactions the Assets, which include all or substantially all of their assets. The Assets for sale do not include the Excluded Assets.

### Bid Deadline

All Bids (as defined below) must be submitted in writing so that they are actually received no later than 12:00 noon (Eastern time) **on June ___, 2008** (the "Bid Deadline"). Prior to the Bid Deadline, a Qualified Bidder that wants to make an offer, solicitation, or proposal (a "Bid") shall deliver written copies of its bid to: (a) the Debtors, 220 Division Street, Kingston, PA 18704, Attn: William Cogswell, President; (b) counsel to the Debtors, Foley & Lardner LLP, 90 Park Avenue, New York, NY 10016, Attn: Michael P. Richman, and Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington, DE 19801, Attn: Michael Nestor; (c) investment bankers for the Debtors, National City Investments, Inc., 300 Barr Harbor Drive, West Conshohocken, PA 19428, Attn: J. Scott Victor; (d) counsel to Stalking Horse Bidder, Allen & Overy LLP, 1221 Avenue of the Americas, New York, NY 10020, Attn: Ken Coleman and Daniel Guyder, and Buchanan Ingersoll & Rooney PC, The Brandywine Building, 1000 West Street, Suite 1410, Wilmington, DE 19801-1054, Attn: Mary F. Caloway; and (e) counsel to any official committee of unsecured creditors appointed in these cases (collectively, the "Notice Parties"), by the Bid Deadline. A Bid received after the Bid Deadline (unless extended by the Debtors in their sole discretion) shall not constitute a Qualified Bid. Interested bidders requesting information about the qualification process, including a form asset purchase agreement, and information in connection with their due diligence, should contact J. Scott Victor, Senior Managing Director & Co-Head Special Situations Group, National City Investment Banking, 300 Barr Harbor Drive, West Conshohocken, PA 19428, (610) 940-5802. The Bid Deadline may be extended by the Debtors in their sole discretion for any party.

### Participation Requirements

To participate in the bidding process and to otherwise be considered for any purpose hereunder, a person interested in all or portions of the Assets (a "Potential Bidder") must first deliver (unless previously delivered) to Debtors and their counsel, not later than April ___, 2008:

  a.   Identification of Potential Bidder. Identification of the Potential Bidder and any Principals (defined below), and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated transaction;

b.     <u>Non-Binding Expression of Interest</u>.  An executed non-binding indication of interest satisfactory to the Debtors that must reasonably identify the contemplated transaction, including the assets proposed to be acquired, the proposed purchase price, contingencies, and conditions precedent to closing;

c.     <u>Corporate Authority</u>.  Written evidence of the Potential Bidder's chief executive officer or other appropriate senior executive's approval of the contemplated transaction; provided, however, that, if the Potential Bidder is an entity specially formed for the purpose of effectuating the contemplated transaction, then the Potential Bidder must furnish written evidence reasonably acceptable to the Debtors of the approval of the contemplated transaction by the equity holder(s) of such Potential Bidder (the "<u>Principals</u>"); and

d.     <u>Proof of Financial Ability to Perform</u>.  Written evidence upon which the Debtors may reasonably conclude that the Potential Bidder has the necessary financial ability to close the contemplated transaction and provide adequate assurance of future performance under all contracts to be assumed in such contemplated transaction.  Such information should include, among other things, the following:

     (i)     the Potential Bidder's current financial statements (audited if they exist);

     (ii)     contact names and numbers for verification of financing sources;

     (iii)     evidence of the Potential Bidder's internal resources and proof of any debt or equity funding commitments that are needed to close the contemplated transaction;

     (iv)     any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors demonstrating that such Potential Bidder has the ability to close the contemplated transaction; provided, however, that the Debtors shall determine, in their reasonable discretion, in consultation with their advisors, whether the written evidence of such financial wherewithal is reasonably acceptable, and shall not unreasonably withhold acceptance of a Potential Bidder's financial qualifications; and

     (v)     If the Potential Bidder intends to seek financing under the Acquisition Facility, then, at least 20 days prior to the Bid Deadline, the Potential Bidder will contact Guggenheim Corporate Funding, LLC ("Guggenheim"), 135 E. 57th St., New York, NY 10022, Attn:  Tony Minella in writing to begin discussions regarding the potential financing contemplated under the Acquisition Facility (as defined below).

### *Designation as Qualified Bidder*

A "Qualified Bidder" is a Potential Bidder (or combination of Potential Bidders whose bids for the assets of the Debtors do not overlap and who agree to have their bids combined for purposes of the determination of whether such Potential Bidders together constitute a Qualified Bidder, and who shall also be referred to herein as a single Qualified Bidder) that delivers the documents described in paragraph (b) above, and that the Debtors in their discretion and with assistance from their advisors determines is reasonably likely to submit a bona fide offer that would result in greater cash value being received for the benefit of the Debtors' creditors than under the APA and to be able to consummate a sale if selected as a Successful Bidder (defined below).

Upon the receipt from a Potential Bidder of the information required under paragraph (b) above, as soon as is practicable, the Debtors shall determine and notify the Potential Bidder with respect to whether such Potential Bidder is a Qualified Bidder.

The Stalking Horse Bidder is a Qualified Bidder.

### *Access to Due Diligence Materials*

Only Potential Bidders that execute the Confidentiality Agreement are eligible to receive due-diligence access or additional non-public information. If the Debtors determine that a Potential Bidder who has satisfied the Participation Requirements does not constitute a Qualified Bidder, then such Potential Bidder's right to receive due-diligence access or additional non-public information shall terminate. The Debtors will designate an employee or other representative to coordinate all reasonable requests for additional information and due-diligence access from such Qualified Bidders. The Debtors shall not be obligated to furnish any due diligence information after the Bid Deadline (as hereinafter defined). The Debtors are not responsible for, and will bear no liability with respect to, any information obtained by Qualified Bidders in connection with the sale of the Assets.

### *Due Diligence From Bidders*

Each Potential Bidder and Qualified Bidder (collectively, a "Bidder") shall comply with all reasonable requests for additional information and due-diligence access by the Debtors or their advisors regarding such Bidder and its contemplated transaction. Failure by a Potential Bidder to comply with requests for additional information and due-diligence access will be a basis for the Debtors to determine that the Potential Bidder is not a Qualified Bidder. Failure by a Qualified Bidder to comply with requests for additional information and due-diligence access will be a basis for the Debtors to determine that a bid made by a Qualified Bidder is not a Qualified Bid.

### *Bid Process*

The Debtors and their advisors shall: (a) determine whether a Potential Bidder is a Qualified Bidder; (b) coordinate the efforts of Bidders in conducting their due-diligence

investigations, as permitted by the provisions herein; (c) receive offers from Qualified Bidders; and (d) negotiate any offers made to purchase the Assets (collectively, the "Bid Process"). The Debtors shall have the right to adopt such other rules for the Bid Process (including rules that may depart from those set forth herein) that, in their sole discretion, will better promote the goals of the Bid Process.

### Bid Requirements

To participate in the Auction, each Bid and Qualified Bidder submitting such a Bid must be determined by the Debtors to satisfy each of the following conditions:

a.  Written Submission of APA and Commitment to Close. Qualified Bidders must submit by the Bid Deadline a blackline of the asset purchase agreement (the "APA") by and among the Debtors and Diamond Glass Acquisition, LLC (the "Stalking Horse Bidder") reflecting their proposed changes, and a written commitment that they intend to close on the terms and conditions set forth therein.

b.  Irrevocable. A Bid must be irrevocable until two (2) business days after the Assets have been sold pursuant to the Closing of the sale or sales approved by the Bankruptcy Court in a final, non-appealable order (the "Termination Date");

c.  Contingencies: A Bid may not be conditioned on obtaining financing or any internal approval or on the outcome or review of due diligence. Any other contingencies associated with a Bid may not be more burdensome than those set forth in the APA;

d.  Financing Sources: A Bid must contain written evidence of a commitment for financing or other evidence of the ability to consummate the sale satisfactory to the Debtors with appropriate contact information for such financing sources. If a Bid will rely on the Acquisition Facility, the Bid must include a definitive commitment letter entered into between the Qualified Bidder and Guggenheim set forth the terms and conditions of such Facility;

e.  No Fees payable to Qualified Bidder: A Bid may not request or entitle the Qualified Bidder to any break-up fee, expense reimbursement or similar type of payment. Further, by submitting a Bid, a Bidder shall be deemed to waive its right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code or in any way related to the submission of its Bid or the Bid Procedures;

f.  Good-Faith Deposit. Each Bid must be accompanied by a deposit (the "Good Faith Deposit") in the form of a certified check or cash payable to the order of Debtors in the amount of $1,000,000.00.

g.   Minimum Overbid. The consideration proposed by the Bid must be cash. The aggregate consideration must equal or exceed the sum of the Purchase Price plus $200,000.00.

A Bid received from a Qualified Bidder before the Bid Deadline that meets the above requirements, and that satisfies the Bid-Deadline requirement above, shall constitute a "Qualified Bid," if Debtors believes, in their reasonable discretion, that such Bid would be consummated if selected as the Successful Bid. For purposes herein, the APA shall constitute a Qualified Bid. All Qualified Bids received prior to the commencement of the Auction (as defined below) shall be considered such Qualified Bidder's "Baseline Bid."

If any Potential Bidder is determined by Debtors not to be a Qualified Bidder, the Potential Bidder shall be refunded its deposit and all accumulated interest thereon within three (3) business days after that determination.

### Financing Option

An important feature of the Bid Procedures includes the offer by Guggenheim to provide up to $25,000,000 of acquisition and working capital financing to any Qualified Bidder to support its competing bid to acquire the Assets (the "Acquisition Facility"). Subject to the "Summary of Terms and Conditions" annexed hereto as Exhibit A, and the entry into a definitive commitment between Guggenheim (as agent for the lenders under the Acquisition Facility) and such Qualified Bidder, the lenders under the Acquisition Facility would provide financing on the terms provided in such commitment. The Summary of Terms and Conditions contemplates that such any such Qualified Bidder who accepts the Acquisition Facility and becomes the Successful Bidder, having submitted the "highest and best" offer for the Assets as compared to all other bidders, including the Purchaser, at any Auction, would pay in cash the purchase price for the Assets at closing. Such cash consideration would be funded in part by the loan proceeds made available and drawn under the Acquisition Facility, with the remaining balance paid through a cash investment made by such Successful Bidder. The Sale Order would provide, among other things, that any such cash proceeds would be paid directly to Guggenheim and applied by Guggenheim (on a dollar-for-dollar basis) in the following order: (a) to reduce the then outstanding amount of the Obligations (as defined in the DIP Financing) (as defined in the APA) until such Obligations have been fully satisfied in accordance with the DIP Financing (as defined in the APA), and next (b) to reduce the then outstanding amount of the obligations (including any accrued and unpaid interest and adequate protection payments owing as of the Closing Date) under the Credit Agreement (as defined in the APA) until such obligations under the Credit Agreement (as defined in the APA) have been fully satisfied in accordance with the Credit Agreement (as defined in the APA); provided that Guggenheim in its sole and absolute discretion may deem any such obligations to have been satisfied based on any advances and loans made, or deemed to be made, to the Successful Bidder, as borrower under the Acquisition Facility. Annexed as Exhibit A to the "Summary of Terms and Conditions" is a schedule that demonstrates the foregoing "sources and uses" of funds in a sample transaction where the would-be Successful Bidder would draw the entire amount of funds available under the Acquisition Facility in connection with its successful bid to purchase of the Assets.

### Auction

Only if a Qualified Bid (other than the Stalking Horse Bidder) is received by the Bid Deadline, shall the Debtors conduct an auction (the "Auction") to determine the highest and/or best bid with respect to the Assets. The Auction shall commence on June ___, 2008, at 9:00 a.m. (Eastern Time); at the offices of Young Conaway Stargatt & Taylor, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington, DE 19801.

If no such Qualified Bid is received by the Bid Deadline, then the Auction will not be held. The Stalking Horse Bidder will be the Successful Bidder, the APA will be the Successful Bid, and, at the June ___, 2008 Sale Hearing, the Debtors will seek approval of and authority to consummate the Proposed Sale contemplated by the APA.

The Auction shall be conducted according to the following procedures:

(a)     Participation At The Auction

Only a Qualified Bidder that has submitted a Qualified Bid is eligible to participate at the Auction. Only the authorized representatives of each of the Qualified Bidders, Debtors and the official committee of unsecured creditors shall be permitted to attend. During the Auction, bidding shall begin initially with the highest Qualified Bid and subsequently continue in minimum increments of at least $100,000 (or such other amount the Debtors determine to facilitate the Auction).

(b)     Debtors Shall Conduct The Auction

The Debtors and their professionals shall direct and preside over the Auction. At the start of the Auction, the Debtors shall describe the terms of the highest and best Qualified Bid. The determination of which Qualified Bid constitutes the highest and best Qualified Bid shall take into account any factors the Debtors reasonably deem relevant to the value of the Qualified Bid to the estates, including, among other things, the following: (i) the amount and nature of the consideration; (ii) the proposed assumption of any liabilities, if any; (iii) the ability of the Qualified Bidder to close the proposed transaction; (iv) the proposed Closing Date and the likelihood, extent and impact of any potential delays in Closing; (v) any purchase-price adjustments; (vi) the impact of the contemplated transaction on any actual or potential litigation; (vii) the net economic effect of any changes from the APA, if any, contemplated by the Contemplated Transaction Documents, (viii) the net after-tax consideration to be received by the Debtors' estates; and (ix) such other considerations the Debtors deem relevant in their sole discretion (collectively, the "Bid Assessment Criteria"). All Bids made thereafter shall be Overbids (as defined below), and shall be made and received on an open basis, and all material terms of each Bid shall be fully disclosed to all other Qualified Bidders. The Debtors shall maintain a transcript of all Bids made and announced at the Auction, including the Baseline Bid, all Overbids and the Successful Bid.

(c)     Terms of Overbids

An "Overbid" is any Bid made at the Auction subsequent to the Debtors' announcement of the highest and best Qualified Bid. To submit an Overbid for purposes of this Auction, a Qualified Bidder must comply with the following conditions:

(i)     Minimum Overbid Increment

Any Overbid after the highest and best Qualified Bid shall be made in increments of at least $100,000 (or such other amount the Debtors determine to facilitate the Auction). Additional consideration in excess of the amount set forth in the Baseline Bid may include only cash; provided, however, notwithstanding the foregoing, the Credit Bid Component of any Overbid by the Stalking Horse Bidder may be increased up to an amount not to exceed the aggregate amount of its claims under the DIP Financing and Diamond Credit Agreement.

(ii)     Remaining Terms are the same as for Qualified Bids

Except as modified herein, an Overbid must comply with the conditions for a Qualified Bid set forth above, provided, however, that the Bid Deadline and the Initial Minimum Overbid Increment shall not apply. Any Overbid made by a Qualified Bidder must remain open and binding on the Qualified Bidder until and unless (a) the Debtors accept a higher Qualified Bid as an Overbid and (b) such Overbid is not selected as the Back-up Bid (as defined below).

To the extent not previously provided (which shall be determined by the Debtors), a Qualified Bidder submitting an Overbid must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors) demonstrating such Qualified Bidder's ability to close the transaction proposed by such Overbid.

(iii)     Announcing Overbids

The Debtors shall announce at the Auction the material terms of each Overbid, the basis for calculating the total consideration offered in each such Overbid, and the resulting benefit to the Debtors' estates based on, among other things, the Bid Assessment Criteria.

(iv)     Consideration of Overbids

The Debtors reserve the right, in their reasonable business judgment, to make one or more adjournments in the Auction to, among other things: (a) facilitate discussions between the Debtors and individual Qualified Bidders; (b) allow individual Qualified Bidders to consider how they wish to proceed; and (c) give Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment, may require that the Qualified Bidder (other than Stalking Horse Bidder) has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed transaction at the prevailing Overbid amount.

(d)     Additional Procedures

In their reasonable discretion, the Debtors may adopt rules for the Auction at or prior to the Auction that will better promote the goals of the Auction and that are not inconsistent with any of the provisions of the Bid Procedures Order. All such rules will provide that all Bids shall be made and received in one room, on an open basis, and all other Qualified Bidders shall be entitled to be present for all bidding with the understanding that the true identity of each Qualified Bidder – i.e., Principals submitting the Bid – shall be fully disclosed to all other

Qualified Bidders and that all material terms of each Qualified Bid will be fully disclosed to all other Qualified Bidders throughout the entire Auction.

(e)     Closing the Auction

Upon conclusion of the bidding, the Auction shall be closed, and the Debtors shall (i) immediately review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Proposed Sale, and (ii) identify the highest, best, and/or otherwise financially superior offer for the Assets (the "Successful Bid") and the entity submitting such Successful Bid, the "Successful Bidder"), which highest, best and/or otherwise financially superior offer will provide the greatest amount of net value to the Debtors, and the next highest or otherwise best offer after the Successful Bid (the "Back-up Bid"), and advise the Qualified Bidder of such determination. If the Stalking Horse Bidder's final bid is deemed to be highest and best at the conclusion of the Auction, the Stalking Horse Bidder will be the Successful Bidder, and such bid, the Successful Bid.

(f)     Consent to Jurisdiction as Condition to Bid.

All Qualified Bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to the Auction, and the construction and enforcement of the Bidder's Contemplated Transaction Documents, as applicable.

(g)     Terms of Expense Reimbursement

If (i) the APA terminates because the Debtors have accepted or selected, and the Bankruptcy Court has approved, the bid or bids (including a credit bid) of any bidder(s) other than Stalking Horse Bidder to purchase all or any portion of the Debtors' business or Assets, and such transaction or transactions contemplated by any such bid or bids has been consummated, or (ii) the Debtors withdraw their support for the transactions contemplated by the APA and seek to have a stand-alone plan of reorganization confirmed by the Court, the Debtors shall reimburse Stalking Horse Bidder for all actual out-of-pocket costs and expenses (including professional fees) reasonably incurred by Stalking Horse Bidder in connection with the transactions contemplated by the APA, up to a maximum of 2.0% of the Purchase Price (excluding the Assumed Liabilities) (the aggregate amount of such reimbursement being the "Expense Reimbursement"), in accordance with the terms of the APA.

(h)     Inclusion of Expense Reimbursement in Initial Minimum Overbid Amount:

The Expense Reimbursement shall be deemed to be included in the stated amount of any bid equal to or greater than the Initial Minimum Overbid Amount.

## Acceptance of Successful Bid

The Debtors shall sell the Assets to the Successful Bidder upon the approval of the Successful Bid by the Bankruptcy Court after the Sale Hearing. The Debtors' presentation of

a particular Qualified Bid to the Bankruptcy Court for approval does not constitute the Debtors' acceptance of the Bid. The Debtors will be deemed to have accepted a Bid when the Bid has been approved by the Bankruptcy Court at the Sale Hearing. All interested parties reserve their right to object to the Debtors' selection of the Successful Bidder (including the assignment of any of such objector's Assumed Executory Contract thereto, provided, however, that any objection to such assignment on the basis of the Cure Cost must be made and/or reserved as set forth in the order approving these Bid Procedures).

## Credit Bidding

The Stalking Horse Bidder may, for itself, on behalf of its affiliates and the Lenders and as directed by Guggenheim, may credit bid some or all of its claims (and the claims of its affiliates and the Lenders as if the Stalking Horse Bidder is the owner and assignee of all such claims) against the Debtors under the DIP Financing and Diamond Credit Agreement to the fullest extent permitted under the Bid Procedures Order and section 363(k) of the Bankruptcy Code.

## "As Is, Where Is"

The Sale of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their agents or estates except to the extent set forth in the APA or the purchase agreement of another Successful Bidder. The Stalking Horse Bidder and each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer, that it has relied solely on its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its Bid, and that it did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in these Bid Procedures or, (a) as to the Stalking Horse Bidder, the terms of the sale of the Assets shall be set forth in the APA, or (b) as to another Successful Bidder, the terms of the sale of the Assets shall be set forth in the applicable purchase agreement.

## Free Of Any And All Encumbrances

Except as otherwise provided in the APA or another Successful Bidder's purchase agreement, all of the Debtors' right, title, and interest in and to the Assets subject thereto shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests thereon and there against (collectively, the "Encumbrances") in accordance with 11 U.S.C. § 363, with such Encumbrances to attach to the net proceeds of the sale of the Assets.

## Sale Hearing

The Sale Hearing shall be conducted by the Bankruptcy Court on June ___, 2008, at __:__ __.m. (Eastern Time), located at 824 North Market Street, __th Floor, Wilmington, Delaware. Following the approval of the sale of the Assets to the Successful Bidder at the Sale Hearing, if such Successful Bidder fails to consummate an approved sale within thirty (30) days

after entry of an Order approving the Sale, the Debtors shall be authorized, but not required, to deem the Back-up Bid, as disclosed at the Sale Hearing, the Successful Bid or Back-up Bid, as applicable, and the Debtors shall be authorized, but not required, to consummate the sale with the Qualified Bidder submitting such Bid without further notice or order of the Bankruptcy Court. The Sale Hearing may be adjourned or rescheduled without notice other than by announcement of the adjourned date at the Sale Hearing.

### Return of Good Faith Deposit:

Good Faith Deposits of the Successful Bidder shall be applied to the purchase price of such transaction at Closing. Good Faith Deposits of all other Qualified Bidders shall be held in an interest-bearing escrow account until two (2) days after Closing of the transactions contemplated by the Successful Bid, and thereafter returned to the respective bidders. If a Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Debtors shall be entitled to retain the Good Faith Deposit as part of their damages resulting from the breach or failure to perform by the Successful Bidder.

### Modifications and Reservations

The Bid Procedures may be modified only upon the express written consent of the Debtors and the Stalking Horse Bidder, or by order of the Court.

The Debtors may (a) determine which Qualified Bid, if any, is the highest, best, and/or otherwise financially superior offer; and (b) reject at any time before entry of an order of the Bankruptcy Court approving a Qualified Bid, any Bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bid Procedures, or the terms and conditions of sale, or (iii) contrary to the best interests of the Debtors, their estates and creditors thereof.

At or before the Sale Hearing, the Debtors may impose such other terms and conditions as the Debtors may determine to be in the best interests of their estates and creditors and other parties in interest thereof.

### Reservation of Rights

The Debtors reserve the right as they may determine to be in the best interests of their estates to: (i) determine which bidders are Qualified Bidders; (ii) determine which Bids are Qualified Bids; (iii) determine which Qualified Bid is the highest and best proposal and which is the next highest and best proposal, (iv) reject any bid that is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bid Procedures Order or the requirements of the Bankruptcy Code or (c) contrary to the best interests of the Debtors and their estates; (v) waive terms and conditions set forth herein with respect to any or all potential bidders, (vi) impose additional terms and conditions with respect to any or all potential bidders, (vii) extend the deadlines set forth herein, (viii) adjourn or cancel the Auction and/or Sale Hearing in open court without further notice; (ix) remove some or all of the Assets from the Auction, and (x) modify the Bid Procedures as they may determine to be in the best interests of their estates or to withdraw the Sale Motion at any time with or without prejudice. Without limiting the generality

of the foregoing, the Debtors may determine to (a) distribute or not distribute copies of other Qualified Bids to other Qualified Bidders prior to or during the Auction, or (b) proceed with sealed bidding.

# Exhibit A to Bid Procedures

[PROPOSAL TO PROVIDE FINANCING TO QUALIFIED BIDDERS]

[N.B.: An important feature of the Bid Procedures includes the following offer by Guggenheim Corporate Funding, LLC ("Guggenheim") to provide up to $25,000,000 of acquisition and working capital financing to any Qualified Bidder to support its competing bid to acquire the Assets (the "Acquisition Facility"). Subject to the "Summary of Terms and Conditions" set forth below, and the entry into a definitive commitment between Guggenheim (as agent for the lenders under the Acquisition Facility) and any such Qualified Bidder, the lenders under the Acquisition Facility would provide financing on the terms provided in such commitment. The Summary of Terms and Conditions contemplates that any such Qualified Bidder who accepts the Acquisition Facility and becomes the Successful Bidder, having submitted the "highest and best" offer for the Assets as compared to all other bidders, including the Purchaser, at any Auction, would pay in cash at closing the purchase price for the Assets. Such cash consideration would be funded in part by the loan proceeds made available and drawn under the Acquisition Facility, with the remaining balance paid through a cash investment made by such Successful Bidder. The Sale Order would provide, among other things, that any such cash proceeds would be paid directly to Guggenheim and applied by Guggenheim (on a dollar-for-dollar basis) in the following order: (a) to reduce the then outstanding amount of the Obligations (as defined in the DIP Financing) until such Obligations have been fully satisfied in accordance with the DIP Financing, and next (b) to reduce the then outstanding amount of the obligations (including any accrued and unpaid interest and adequate protection payments owing as of the Closing Date) under the Credit Agreement until such obligations under the Credit Agreement have been fully satisfied in accordance therewith; provided that Guggenheim in its sole and absolute discretion may deem any such obligations to have been satisfied based on any advances and loans made, or deemed to be made, to the Successful Bidder, as borrower under the Acquisition Facility. Annexed as Exhibit A to the "Summary of Terms and Conditions" is a representative example of the sources/uses of funds available under the Acquisition Facility, paired with the cash investment of made by the borrower/purchaser might work under one scenario.]

ANNEX I
TO COMMITMENT LETTER

[$25,000,000] SENIOR SECURED LOAN FACILITY

SUMMARY OF TERMS AND CONDITIONS

This Summary of Terms and Conditions outlines certain terms of a proposed Credit Facility referred to in the Commitment Letter dated [_____], 2008 and addressed to [BORROWER – TBA] from Guggenheim Corporate Funding, LLC, as agent (the "Agent") (the "Commitment Letter").[1] This Summary of Terms and Conditions is part of and subject to the Commitment Letter. Certain capitalized terms used herein are defined in the Commitment Letter. This Summary of Terms and Conditions shall not be deemed to be a binding or enforceable commitment to enter into any transaction and no such commitment shall arise except to the extent expressly stated in the Commitment Letter to which this Term

---

[1]  The Agent also is agent to the lenders under: (i) the Senior Secured Debtor In Possession Credit Facility, dated on or about April 1, 2008, between the Sellers, the Agent, and the financial institutions identified as lenders therein (the "DIP Financing"), and (ii) the Credit Agreement dated as of January 12, 2007, as entered into by and among Diamond Glass, and DT (as guarantor), the Agent and the financial institutions listed therein as lenders, and Guggenheim, as agent for such lenders (as has been amended, modified and supplemented from time to time, the "Credit Agreement").

Sheet is attached, and then only upon the execution of the Commitment Letter by both the Agent and the Borrower on terms and conditions acceptable to the Agent in its sole discretion.

**Borrower:**

If not Buyer, [[TBA], (the "Borrower")], a wholly owned subsidiary or affiliate of Buyer.

**Buyer:**

[TBA], as the successful bidder and purchaser of substantially all of the assets of Diamond Glass, Inc. f/k/a Diamond Glass Companies, Inc. ("Diamond") and Diamond's wholly-owned subsidiary, DT Subsidiary Corp. ("DT" and together with Diamond, the "Debtors"); each of the Debtors is a debtor and debtor-in-possession under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in cases pending before the United States Bankruptcy Court for the District of Delaware.

[N.B.: For the avoidance of doubt, the facility described herein would only be available to the sole successful bidder and purchaser of substantially all of the assets of the Debtors. Nothing herein shall be construed to be mean there could be more than a single facility made available to such bidder on the terms herein.]

**Subsidiary Guarantor:**

[TBA], as subsidiary guarantor (the "Subsidiary Guarantor") (if applicable)

**Lender:**

A lender or group of lenders to be determined by the Agent (together with the Agent and its affiliates in their respective capacities as a lender, each a "Lender" and collectively, the "Lenders"). The Agent shall act as the collateral agent for the Lenders.

**Facility:**

Senior secured financing in the form of a term loan facility (the "Term Loan Facility"), and a revolving facility (the "Revolving Loan Facility," and together with the Term Loan Facility, the "Facility").

**Commitments to Advance Loans:**

Term Loan Commitment: not to exceed [$15,000,000], and

Revolving Loan Commitment: not to exceed [$10,000,000] (the "Revolving Loan Commitment"), including a sub-limit for the issuance of letters of credit not to exceed [$6,000,000], and subject to the condition precedent. During the term of the Facility, each Lender agrees to make revolving advances to the Company in an amount at any one time outstanding not to exceed such Lender's Pro Rata Share of any amount equal to the Revolving Loan Commitment, *less* the aggregate amount of (i) drawings available under all outstanding letters of credit, *plus* (ii) the aggregate amount of drawings under letters of credit not theretofore reimbursed to the Agent (the "Letter of Credit Usage").

At closing, any extension of credit under the Revolving Facility will be limited to approximately $5,135,060 in the form of: (i) issued

letters of credit (against the [$6,000,000] sub-limit) which replace the existing letters of credit issued on account of Diamond Glass and DT (whether such letters of credit are undrawn under Diamond Credit Agreement or have been deemed to be issued under the DIP Financing and remain undrawn); or (ii) cash drawn on the Revolving Facility used to replace any cash drawn under such letters of credit and return any cash drawn thereon to the issuers of such letters of credit.

**Price:**  [100% of principal amount.]

**Interest Rate:**  Interest on Term Loan Facility: Cash interest accruing at the rate of [LIBOR *plus* 800 basis points] per annum, payable monthly.

Interest on Revolving Loan Facility: Cash interest accruing at the rate of [LIBOR *plus* 500 basis points] per annum, payable monthly.

LIBOR floor of 3.50%.

**Use of Proceeds:**  Borrower shall use the proceeds of all Loans under the Facility: (a) to fund in part Borrower's purchase of all or substantially all of the assets (the "Acquired Assets") of the Debtors, pursuant to a sale (free and clear of any interests in the Acquired Assets) approved by the Bankruptcy Court under sections 105, 363, and 365 of the Bankruptcy Code (subject to Borrower being the successful bidder under Bankruptcy Court-approved bidding and auction procedures), and (b) provide Borrower general working capital following the consummation of the purchase of the Acquired Assets to, among other things, ensure raw material supply and product and service delivery and to make appropriate capital investments.

**Maturity Date:**  The loans and revolving advances made under the Facility shall become due and payable in full in cash on [_____, 2011], three years after the closing date of the Facility (the "Closing Date").

**Prepayment:**  Borrower may prepay the loans under the Facility, in whole or in part, upon not less than 10 days' written notice. The Facility will not be subject to a prepayment penalty or premium.

**Closing Fee:**  The Company shall pay non-refundable closing fees to the Lenders on the Closing Date equal to 3% of each of the Term Loan Commitment and the Revolving Loan Commitment

**Servicing Fee:**  $25,000 per quarter, payable in advance.

**Collateral:**  The Facility (including the Subsidiary Guaranty) will be secured by first priority, perfected, continuing, valid, binding, enforceable, nonavoidable, security interest and lien in all of Borrower's and the Subsidiary Guarantor's property, including, without limitation, the Borrower's accounts receivable, inventory, property, plant and equipment, machinery and equipment and all intangible assets,

I-3

[subject only to valid and enforceable liens of record as of the date of the commencement of the Debtors' chapter 11 cases and only to the extent such obligations are expressly assumed by Borrower in connection with the sale of the Acquired Assets].

**Representations And Warranties:**

The loan documents will contain representations and warranties customarily found in loan agreements for similar financings and others appropriate to the specific transaction.

**Covenants:**

The loan documents will contain affirmative and negative covenants customary in loan agreements for similar financings, including, without limitation, covenants limiting the ability of Borrower to incur indebtedness (other than the loans and advances under the Facility).

**Financial Covenants:**

The loan documents will contain financial covenants customary in loan agreements for similar financings and acceptable to the Agent and the Borrower, including:

Minimum Fixed Charge Coverage Ratio;

Maximum Leverage Ratio;

Minimum Consolidated EBITDA; and

Maximum Consolidated Capital Expenditures.

**Assignment/Participation:**

The loan documents will include provisions allowing for assignments and participations in the Loan Facility as are customarily found in loan agreements for similar financings.

**Conditions Precedent:**

The conditions to the closing of the Facility will be those customarily found in loan agreements for similar financings and others appropriate to the specific transaction, including, without limitation:

a. The closing of the Facility shall occur simultaneously with the closing of the Buyer's purchase of the Acquired Assets.

b. Borrower consummates the purchase of the Acquired Assets on or before June [___], 2008, and, as a condition to such closing, and upon the Closing Date, the Agent, on behalf of the lenders under each of the DIP Financing and the Diamond Credit Agreement, shall receive all the cash proceeds of the sale of the Acquired Assets, which proceeds the Agent shall apply (on a dollar-for-dollar basis) in the following order: (a) to reduce the then outstanding amount of the Obligations (as defined in the DIP Financing) until such Obligations have been fully satisfied, and next (b) to reduce the then outstanding amount of the obligations (including any accrued and unpaid interest and adequate

protection payments owing as of the Closing Date) under the Diamond Credit Agreement until such obligations under the Credit Agreement have been fully satisfied; <u>provided that</u> the Agent may in its sole and absolute discretion deem any such obligations to have been satisfied based on advances and loans made, or deemed to be made, to Borrower under the Facility.

c.    The Agent shall have received such financial and other information regarding the Borrower and/or the Buyer as the Agent may reasonably request

d.    The Lenders' approval of the Buyer, at its sole discretion, according to its internal policies.

e.    Terms and conditions of the purchase agreement of between the Debtors and the Borrower shall be satisfactory to the Agent.

f.    Terms and conditions of the Borrower's customer and supply contracts, including those assumed in connection with purchase of the Acquired Assets, shall be satisfactory to the Agent.

g.    Satisfactory background reviews the Borrower's current and proposed senior management.

h.    The corporate, capital, and legal structure of the Borrower shall be acceptable to the Agent; and the Agent shall be satisfied with the nature and status of all contracts, securities, labor, tax, litigation, environmental matters and other matters involving or affecting the Borrower.

i.    The Facility will be subject to the negotiation, execution and delivery of a definitive credit agreement and all related documentation, all in form and substance acceptable to the Agent in its sole discretion. Such documentation will contain provisions typical for a transaction of this type, as well as those required by the Agent, including but not limited to those set forth in this Summary of Terms.

j.    The Agent shall have received satisfactory opinions of the Borrower's independent counsel as to the transactions contemplated hereby and such corporate resolutions, certificates and other documents as the Agent shall reasonably request.

k.    Payment of all closing costs and fees and all unpaid expenses of the Agent.

l.    No material adverse change in the business, financial

DB02:6706406.1 066831.1001

performance, operations, or in the condition of the assets of the Borrower and/or the Buyer shall have occurred since the date on which the Borrower and the Agent execute a proposal letter that incorporates this Summary of Terms.

m. The transactions contemplated in this section must close upon the date that Borrower closes the purchase of the Acquired Assets from the Debtors.

**Indemnity:**

Customary and appropriate provisions relating to indemnity and related matters in a form reasonably satisfactory to the Lender.

**Expenses:**

Borrower shall reimburse the Agent for all reasonable out-of-pocket expenses incurred in connection with the transaction, including, without limitation, related due diligence and preparation, negotiation, execution, delivery, administration and enforcement of the definitive documentation including fees and expenses of the Agent's counsel.

**Press Releases:**

The Agent shall have the right to review any press release or announcement in connection with this transaction. Any such press release or announcements shall require the prior consent of the Agent.

**Governing Law:**

All documentation in connection with the Facility shall be governed by the laws of the State of New York applicable to agreements made and performed in such state.

DB02:6706406.1                                                                 066831.1001

**Diamond Glass, Inc.**
Example -- Sources/Uses of Bidder Financing Facility

Stalking Horse (Guggenheim) Purchase Price under APA
Base credit bid (amount of prepetition secured debt refinanced under DIP Financing)                                                 34,000,000.00

PLUS (in addition to payment of "Assumed Liabilities" in accordance with terms):
Estimated DIP Revolving Facility Drawn at Closing Date                                                                                7,000,000.00
Chapter 11 Wind-down Costs                                                                                                            1,500,000.00
Legal Budget Excess (estimated here only for purpose of demonstrating cash flows)                                                                -
Nat City Fee                                                                                                                           750,000.00
                                                                                                                                     9,250,000.00

Total Stalking Horse (Guggenheim) Bid                                                                                               43,250,000.00

Successful Bidder Bid Topping Stalking Horse Bid
Funded Term Loan Under Proposed Bidder Facility                                                                                      15,000,000.00
Issued LCs Under Bidder Facility to Replace Outstanding Diamond Glass L/Cs                                                            5,135,060.00
Total Financing at Close                                                                                                            20,135,060.00

Additional Capital/Cash Required to Top Stalking Horse (Guggenheim) Bid                                                             $23,114,940.00
PLUS: Overbid Amount                                                                                                                   250,000.00

Total Successful Bidder Bid Topping Stalking Horse (Guggenheim) Bid                                                                 $43,500,000.00

Use of Proceeds of Successful Bidder Bid at Closing
Repay (Estimated) DIP Revolving Facility Drawn at Closing Date                                                                       (7,000,000.00)
Repay DIP Term Loan                                                                                                                 (34,000,000.00)
Capped Chapter 11 Wind-down Costs (including distribution, if any, available to unsecured creditors)                                 (1,500,000.00)
Legal Budget Excess (estimated here only for purpose of demonstrating cash flows)                                                               -
Nat City Fee                                                                                                                          (750,000.00)
Available for Repayment of Remaining Guggenheim Prepetition Secured Debt                                                              250,000.00

**EXHIBIT 2**

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| DIAMOND GLASS, INC., *et al.*,[1] | ) | |
| | ) | Case No 08-_____ |
| Debtors. | ) | (Jointly Administered) |

## NOTICE OF AUCTION AND SALE

      **PLEASE TAKE NOTICE** that, on April ___, 2008, Diamond Glass, Inc. ("Diamond Glass"), and DT Subsidiary Corp. ("DT Subsidiary") (collectively, the "Debtors") filed their motion for entry of an order (A) approving certain bid procedures, which are attached hereto as Exhibit 1 (the "Bid Procedures"), for the proposed sale of substantially all of Debtors' Assets, as more fully set forth in that certain asset purchase agreement (the "APA") by and between Debtors and Diamond Glass Acquisition, LLC or its assignee(s) or designee(s) (the "Stalking Horse Bidder"); (B) scheduling a hearing (the "Sale Hearing") and approving the form and manner of notice of the Auction and the Bid Procedures; (C) establishing procedures for assumption and assignment of certain Designated Contracts, including notice of proposed cure amounts; (D) authorizing Debtors to pay to Stalking Horse Bidder an expense reimbursement under certain terms and conditions set forth more particularly below; and (E) granting related relief (the "Bid Procedures Motion"), and (ii) Motion for an Order Pursuant to Sections 105(a), 363, and 365 of the Bankruptcy Code and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (A) Authorizing the Sale of Substantially All of Its Assets; (B) Approving an Asset Purchase Agreement, Subject to Higher and Better Offers; (C) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (D) Granting Related Relief (the "Sale Motion") with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").[2] By order dated April ___, 2008, the Bankruptcy Court entered an order (the "Bid Procedure Order") approving the Bid Procedure Motion which, among other things, established procedures for the submission of Bids, Auction Process and Sale Hearing regarding the Sale of substantially all of the Debtors' Assets. Although the Debtors entered into the APA with the Stalking Horse Bidder to sell substantially all of the Debtors' Assets, the APA and the Proposed Sale is subject to further offers pursuant to the Bid Procedure Order.

      Any party that wishes to take part in this process and submit a bid for the Assets or any portion thereof must submit their competing Bid prior to June ___, 2008, at 12:00 noon (Eastern

---

[1]     The Debtors in these proceedings are: Diamond Glass, Inc. (Tax ID No. XX-XXX8853) and DT Subsidiary Corp. (Tax ID No. XX-XXX8853). The Debtors' corporate address is 220 Division Street, Kingston, PA 18704. Diamond Glass, Inc. is formerly known as Diamond Glass Companies, Inc. and Diamond Triumph Auto Glass, Inc.

[2]     All capitalized terms not defined herein shall be given the meaning ascribed to them in the Bid Procedures Order (as hereinafter defined).

Time), to (a) Debtors, 220 Division Street, Kingston, PA 18704, Attn: William Cogswell, President; (b) co-counsel to Debtors, Foley & Lardner LLP, 90 Park Avenue, New York, NY 10016, Attn: Michael P. Richman, and Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington, DE 19801, Attn: Michael Nestor; (c) counsel to the Stalking Horse Bidder, Allen & Overy LLP, 1221 Avenue of the Americas, New York, NY 10020, Attn: Ken Coleman and Daniel Guyder, and Buchanan Ingersoll & Rooney PC, The Brandywine Building, 1000 West Street, Suite 1410, Wilmington, DE 19801-1054, Attn: Mary F. Caloway; and (d) counsel to the official committee of unsecured creditors (the "Committee") appointed in these cases.

Only those parties that submit Qualified Bids may participate in the Auction. If you are interested in determining how to submit such a Qualified Bid, you must comply with the terms of the Bid Procedures as referenced in the Bid Procedures Order and attached hereto. Only the authorized representatives or agents of each of the Qualified Bidders, the Committee, and Debtors shall be permitted to attend the Auction. At the Auction, Qualified Bidders will be permitted to increase their bids. The bidding at the Auction shall start at the Purchase Price plus $200,000, and shall continue in increments of at least $100,000.00. The highest or otherwise best Qualified Bid shall be determined by Debtors in their sole discretion, in consultation with the Committee or as determined by the Bankruptcy Court if there is a dispute.

If you seek to object to the sale of the Assets or any portion thereof, you must comply with the terms for making such objections as set forth in the Bid Procedures and the Bid Procedures Order. Such objections must be filed with the Bankruptcy Court and served on the parties set forth in the Bid Procedures Order. If any party fails to timely file and serve an objection in accordance with the Bid Procedures Order, the Bankruptcy Court may disregard such objection. The failure of any person to timely file its objection shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Motion or the Debtors' assumption and assignment of any Designated Contract or the consummation of the Proposed Sale and performance under the APA (or any alternative agreement entered into with the Successful Bidder), including the transfer of the Assets free and clear of Encumbrances (other than permitted Encumbrances provided for expressly in the APA or alternative purchase agreement entered into with the Successful Bidder).

FOLEY & LARDNER LLP
Michael P. Richman
Keith Owens
Erika Morabito
90 Park Avenue
New York, NY 10016
(212) 682-7474 (Telephone)
(212) 687-2329 (Facsimile)

YOUNG CONAWAY STARGATT &
TAYLOR, LLP
Michael R. Nestor
Joseph M. Barry
The Brandywine Building
1000 West Street, 17th Floor,
Wilmington, DE 19801
(302) 571-6758 (Telephone)
(302) 571-1253 (Facsimile)

**EXHIBIT 3**

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| DIAMOND GLASS, INC., *et al.,*[1] | Case No. 08 - _____ ( ___ ) |
| | (Joint Administration Requested) |
| Debtors. | **Hearing Date:** _____, 2008 at __:__ _.m.<br>**Objections Due:** _____, 2008 at 4:00 p.m. |

## NOTICE OF CURE AMOUNTS FOR POSSIBLE ASSUMPTION, SALE, AND ASSIGNMENT OF CERTAIN UNEXPIRED LEASES AND EXECUTORY CONTRACTS AND SALE HEARING

**PLEASE TAKE NOTICE** that, on April __, 2008, Diamond Glass, Inc. ("Diamond Glass") and DT Subsidiary Corp. (collectively, the "Debtors") filed their motion with this Court (this "Motion"), pursuant to §§ 105(a), 363, 365, 503 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for entry of an order (A) approving certain bid procedures (the "Bid Procedures"), for the proposed sale of substantially all of Debtors' Assets, as more fully set forth in that certain asset purchase agreement (the "APA") by and between Debtors and Diamond Glass Acquisition, LLC or its assignee(s) or designee(s) (the "Stalking Horse Bidder"); (B) scheduling a hearing (the "Sale Hearing") and approving the form and manner of notice of the Auction and the Bid Procedures; (C) establishing procedures for assumption and assignment of certain Designated Contracts, including notice of proposed cure amounts; (D) authorizing Debtors to pay to Stalking Horse Bidder an expense reimbursement under certain terms and conditions set forth more particularly below; and (E) granting related relief (the "Bid Procedures Motion") with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Debtors have received a Qualified Bid[2] from the Stalking Horse Bidder. An order approving the Bid Procedures Motion (the "Bid Procedures Order") was entered by the Bankruptcy Court on April ___, 2008, after a hearing held on April ___, 2008.

**PLEASE TAKE NOTICE** that the Bankruptcy Court scheduled a hearing to consider Debtors' Motion for an Order Pursuant to Sections 105(a), 363, and 365 of the Bankruptcy Code and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (A) Authorizing the Sale of Substantially All of Its Assets (the "Asset Sale"); (B) Approving an

---

[1]     The Debtors in these proceedings are: Diamond Glass, Inc. (Tax ID No. XX-XXX8853) and DT Subsidiary Corp. (Tax ID No. XX-XXX8853). The Debtors' corporate address is 220 Division Street, Kingston, PA 18704. Diamond Glass, Inc. is formerly known as Diamond Glass Companies, Inc. and Diamond Triumph Auto Glass, Inc.

[2]     All capitalized terms not defined herein shall be given the meaning ascribed to them in the Bid Procedures.

Asset Purchase Agreement (the "APA"), Subject to Higher and Better Offers; (C) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (D) Granting Related Relief (the "Sale Motion") for June ___, 2008, at ___:___ ___.m. (Eastern Time) (the "Sale Hearing"). You may obtain a copy of the APA by making a written request to the undersigned counsel to Debtors.

**PLEASE TAKE FURTHER NOTICE** that at the Sale Hearing or as soon thereafter as counsel can be heard, in connection with the Sale Motion, the Bankruptcy Court will consider whether to enter an order approving the Sale Motion.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Sale Motion, Debtors may assume, sell, and assign certain of their unexpired leases, license agreements, and executory contracts (collectively, the "Contracts") free and clear of all liens, claims, encumbrances, and interests on satisfaction of the cure amounts required under section 365(b)(1)(A) of the Bankruptcy Code (the "Cure Costs"). The Contracts that the Debtors may seek to assume, sell, and assign (the "Designated Contracts") and corresponding Cure Costs are listed on the attached Exhibit A.

**PLEASE TAKE FURTHER NOTICE** that any objections to the relief requested in the Sale Motion, including the assumption, sale and assignment of the Designated Contracts and the corresponding Cure Costs under section 365(b) of the Bankruptcy Code, must (a) be in writing, (b) comply with the Federal Rules of Bankruptcy Procedures and the Local Bankruptcy Rules, (c) be filed with the Clerk of the Bankruptcy Court for the District of Delaware, Third Floor, 824 Market Street, Wilmington, Delaware 19801, **no later than 4:00 p.m. (Eastern Time) on May 30, 2008 (the "Cure Objection Deadline")** and (d) be served so as to be received no later than 4:00 p.m. (Eastern Time) on the same day, on (i) Diamond Glass, Inc. and DT Subsidiary, Corp., 220 Division Street, Kingston, PA 18704, Attn: William Cogswell, President; (ii) co-counsel to Debtors, Foley & Lardner LLP, 90 Park Avenue, New York, NY 10016, Attn: Michael P. Richman, and Young Conaway Stargatt & Taylor, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington, DE 19801, Attn: Michael Nestor; (iii) counsel to Stalking Horse Bidder, Allen & Overy LLP, 1221 Avenue of the Americas, New York, NY 10020, Attn: Ken Coleman and Daniel Guyder, and Buchanan Ingersoll & Rooney, PC, The Brandywine Building, 1000 West Street, Suite 1410, Wilmington, DE 19801-1054, Attn: Mary F. Caloway; and (iv) counsel to the official committee of unsecured creditors appointed in these cases (the "Committee"); provided, however, if the Stalking Horse Bidder is not the Successful Bidder and the alternative Successful Bidder is seeking to have certain unexpired leases, license agreements, and executory contracts assumed and assigned as part of an alternative transaction, the non-debtor parties to such unexpired leases, license agreements and executory contracts shall have until the Sale Hearing to raise objections under section 365(b)(1)(C).

**PLEASE TAKE FURTHER NOTICE that any person or entity receiving notice of the Sale Hearing and this Notice that fails to file an objection on a timely basis shall (a) be forever barred from objecting to the Cure Costs and from asserting any additional cure or other amounts with respect to such unexpired lease, license agreement, or executory contract and Debtors shall be entitled to rely solely on the Cure Costs; and (b) be forever barred and estopped from asserting or claiming against Debtors or the**

Successful Bidder or any other assignee of the relevant Designated Contract that any additional amounts are due or defaults exist under such Designated Contract. **The failure of any person to timely file its objection shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Motion or Debtors' assumption and assignment of any Designated Contract or the consummation of the Proposed Sale and performance under the APA (or any alternative agreement entered into with the Successful Bidder), including the transfer of the Assets free and clear of Encumbrances (other than permitted Encumbrances provided for expressly in the APA or alternative purchase agreement entered into with the Successful Bidder).**

**PLEASE TAKE FURTHER NOTICE** that the Sale Hearing may be adjourned from time to time without further notice to creditors or parties-in-interest other than by announcement of said adjournment in the Bankruptcy Court or on the Bankruptcy Court's calendar on the date scheduled for the Sale Hearing.

FOLEY & LARDNER LLP
Michael P. Richman
Keith Owens
Erika Morabito
90 Park Avenue
New York, NY 10016
(212) 682-7474 (Telephone)
(212) 687-2329 (Facsimile)

YOUNG CONAWAY STARGATT &
TAYLOR, LLP
Michael R. Nestor
Joseph M. Barry
The Brandywine Building
1000 West Street, 17th Floor,
Wilmington, DE 19801
(302) 571-6758 (Telephone)
(302) 571-1253 (Facsimile)

# EXHIBIT 4

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|                              |   |                                  |
|------------------------------|---|----------------------------------|
| In re:                       | ) | Chapter 11                       |
|                              | ) |                                  |
| DIAMOND GLASS, INC., *et al.*,[1] | ) | Case No. 08-_____ (___)     |
|                              | ) |                                  |
|                    Debtors.  | ) | (Joint Administration Requested) |
|                              | ) |                                  |

## ORDER, PURSUANT TO 11 U.S.C. §§ 105(A), 363, 365, 503, AND 507 AND FEDERAL BANKRUPTCY RULES 2002, 6004, 6006, AND 9014, (A) APPROVING BID PROCEDURES FOR SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (B) SCHEDULING A HEARING TO CONSIDER THE SALE AND APPROVING THE FORM AND MANNER OF NOTICES; (C) ESTABLISHING PROCEDURES FOR ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS; (D) AUTHORIZING PAYMENT OF AN EXPENSE REIMBURSEMENT; AND (E) GRANTING RELATED RELIEF

Upon the Motion[2] of Diamond Glass, Inc. ("Diamond Glass"), and DT Subsidiary Corp.

("DT Subsidiary" and together with Diamond Glass, the "Debtors"), dated April 1, 2008,

requesting the entry of an order, pursuant to sections 105(a), 363, 365, 503, and 507 of the

United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"),

(A) approving certain bid procedures, which are attached hereto as Exhibit 1 (the "Bid

Procedures"), for the proposed sale of substantially all of Debtors' Assets, as more fully set forth

in that certain asset purchase agreement (the "APA") by and between Debtors and Diamond

Glass Acquisition, LLC or its assignee(s) or designee(s) (the "Stalking Horse Bidder");

(B) scheduling a hearing (the "Sale Hearing") and approving the form and manner of notice of

the Auction and the Bid Procedures; (C) establishing procedures for assumption and assignment

of certain Designated Contracts, including notice of proposed cure amounts; (D) authorizing the

---

[1] The Debtors in these proceedings are: Diamond Glass, Inc. (Tax ID No. XX-XXX8853); and DT Subsidiary Corp., a wholly owned subsidiary of Diamond Glass (Tax ID No. XX-XXX3494), each with a mailing address of 220 Division Street, Kingston, PA 18704. Diamond Glass, Inc. is formerly known as Diamond Glass Companies, Inc. and Diamond Triumph Auto Glass, Inc.

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the APA (defined below) or in the Bid Procedures (defined below), as applicable.

Debtors to pay to Stalking Horse Bidder an expense reimbursement under certain terms and

conditions set forth more particularly below; and (E) granting related relief (the "Motion"); and

the Court having determined that, to the extent set forth herein, the relief requested in the Motion

is in the best interests of Debtors, their estates, and the creditors and other parties-in-interest

thereof; due and appropriate notice of the Motion and the relief requested therein was provided

by Debtors pursuant to Rules 2002(a)(2), 6004(a), 6006 and 9014 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Bankruptcy Rule 9013-1(m), on the

following parties: (i) the Office of the United States Trustee for the District of Delaware; (ii)

counsel to Guggenheim Corporate Funding, LLC ("Guggenheim"), as agent for the Debtors'

prepetition secured lender and proposed postpetition secured lenders; (iii) creditors holding the

thirty (30) largest unsecured claims against the Debtors' estates (on a consolidated basis); (iv)

counsel to the Indenture Trustee under the Indenture; and (v) counsel to certain of the

Noteholders; and after due deliberation thereon; and good and sufficient cause appearing

therefore, it is hereby

### FOUND, CONCLUDED AND DECLARED THAT:[3]

A.      This Court has jurisdiction over this matter and over the property of Debtors and

their bankruptcy estates pursuant to 28 U.S.C. §§ 157(a) and 1334. This is a core proceeding

pursuant to 28 U.S.C. § 157(b)(2)(A), (L) and (O).

B.      Notice of the hearing on the Motion, the Motion, and the proposed entry of this

Order have been provided to the parties identified in the opening paragraph of this Order. Under

the circumstances, requisite notice of the Motion, the relief requested thereby and this Order has

been provided in accordance with Bankruptcy Rules 2002(a)(2), 6004(a), 6006 and 9014, which

---

[3]      When appropriate, findings of fact shall be construed as conclusions of law and conclusions of law shall be
construed as findings of fact. *See* Fed. R. Bankr. P. 7052.

notice is sufficient for all purposes under the Bankruptcy Code, including, without limitation, section 102(1) of the Bankruptcy Code. No further notice of, or hearing on, the Motion or this Order is necessary or required.

C.     The Debtors' proposed notices (in substantially the form attached to this Order as Exhibits "2" and "3") of (i) the Proposed Sale of the Assets, (ii) the assumption and assignment of the Designated Contracts and any Cure Costs payable thereon, as described or referred to in the APA, (iii) the APA, and the terms contained therein, and (iv) the Bid Procedures, are appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Proposed Sale of the Assets, the Auction, the assumption and assignment of the Designated Contracts, the APA, and the Bid Procedures to be employed in connection therewith.

D.     The Debtors have articulated good and sufficient reasons for this Court to grant the relief requested in the Motion regarding the Bid Procedures and the sale of the Assets. The Bid Procedures, including the proposed expense reimbursement payable to the Stalking Horse Bidder, were negotiated in good faith by the Debtors and the Stalking Horse Bidder and are reasonable and appropriate.

E.     The Stalking Horse Bidder has expended, and likely will continue to expend, considerable time, money, and energy pursuing the Proposed Sale and has engaged in extended arm's length and good faith negotiations. The APA is the culmination of these efforts. Recognizing this expenditure of time, energy, and resources, the Debtors have agreed to limited bid protections, including bid qualifications, an initial Overbid, and the expense reimbursement payable to the Stalking Horse Bidder. These bid protections (1) were a material inducement for, and a condition of, the Stalking Horse Bidder's entry into the APA, (2) are fair, reasonable and appropriate in view of the fact that such protections will increase the chances that the Auction

3

will be meaningful, (3) will not chill the bidding process, (4) were negotiated by the parties in good faith and at arm's length, and, thus, Debtors and their estates will receive the highest and/or best offer for the Assets. The expense reimbursement payable in accordance with the Bid Procedures are actual and necessary costs and expenses of preserving Debtors' estates, within the meaning of section 503(b) of the Bankruptcy Code, and commensurate to the real and substantial benefit conferred upon the Debtors' estates by the Stalking Horse Bidder. The Debtors have demonstrated a sound business justification for such bid protections proposed in the Bid Procedures.

F.     The APA represents the best offer the Debtors have received to date as a result of their prepetition efforts to market the Assets for sale, with the aid of their advisor, National City Investments, Inc. ("NatCity").

G.     The entry of this Order is in the best interests of the Debtors, their estates, and their creditors, and other parties-in-interest; and it is therefore

**ORDERED, ADJUDGED AND DECREED THAT:**

1.     Pursuant to sections 105(a), 363, 365, 503, and 507 of the Bankruptcy Code, the relief requested in the Motion is granted on the terms and conditions of this Order.

2.     The Bid Procedures, including the proposed expense reimbursement payable to the Stalking Horse Bidder, attached hereto as Exhibit "1", are hereby approved and fully incorporated into this Order, and shall apply with respect to the proposed sale of the Assets. The Debtors are authorized to take any and all actions necessary to implement the Bid Procedures.

3.     Payment of the Expense Reimbursement under the conditions set forth in the Bid Procedures is approved and directed upon the conditions set forth herein, and the Stalking Horse Bidder shall be entitled to the payment of such amounts to the extent set forth therein. If the APA is terminated for any reason by the Debtors (assuming that the Stalking Horse Bidder is

4

ready, willing and able to perform under the APA), and if payment of the Expense Reimbursement is triggered under the terms of the Bid Procedures, each of the Debtors is authorized and directed, without the need for any notice, application, motion or further order of this Court, to pay the Stalking Horse Bidder the Expense Reimbursement in the manner set forth in the Bid Procedures. The Expense Reimbursement shall constitute an allowed administrative expense claim arising in the chapter 11 cases of each of the Debtors under sections 503(b) and 507(a)(1) of the Bankruptcy Code. If the Auction results in the selection of a successful bidder other than the Stalking Horse Bidder (unless the Debtor previously terminated or breached the APA), the Debtors shall pay the Expense Reimbursement to the Stalking Horse Bidder pursuant to the Bid Procedures (to the extent not already paid) directly from the net proceeds of any sale of the Debtors' Assets to such successful bidder, regardless of any other competing liens on or claims to such sale proceeds. The Expense Reimbursement shall be deemed to be included in the stated amount of any bid equal to or greater than the Initial Minimum Overbid Amount.

4.      In conjunction with the Sale, Guggenheim, as agent, is authorized in its sole discretion to arrange for the benefit of any Qualified Bidder certain financial accommodations (the "Bidder Financing Proposal") that would enable such Qualified Bidder, if it so desires, to borrow up to $25 million, pursuant to and subject to the terms and conditions set forth on the "Summary of Terms and Conditions" annexed as Exhibit "A" to the Bid Procedures to support its Qualified Bid to purchase all of the Assets, but only if such bidder is determined to be the Successful Bidder after the Auction (the "Acquisition Facility"). The Bidder Financing Proposal and the Acquisition Facility contemplated thereunder would, in accordance with the Summary of Terms and Conditions, be made available only upon the execution of a definitive commitment letter (the "Commitment Letter") by both Guggenheim (as agent for the lenders under the

DB02:6700972.4                                                                    066831.1001

Acquisition Facility) and the Successful Bidder, as borrower, on terms and conditions acceptable to Guggenheim in its sole discretion. Proceeds of loans under the Acquistion Facility shall be used in accordance therewith to fund in part the purchase price under the Successful Bidder's asset purchase agreement, with the remaining balance of such purchase price to be paid by the Successful Bidder through a cash investment made by the Successful Bidder, with all such cash proceeds to be paid by the Successful Bidder directly to Guggenheim at the closing and applied by Guggenheim as described in the Summary of Terms and Conditions.

5.     A reasonable opportunity to object to the relief requested in the Motion, including the Sale Procedures, has been afforded to (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel to Guggenheim, the Debtors' prepetition secured lender and proposed postpetition secured lender; (iii) creditors holding the thirty (30) largest unsecured claims against the Debtors' estates (on a consolidated basis); (iv) counsel to the Indenture Trustee under the Indenture; (v) counsel to certain of the Noteholders; and (vi) those parties requesting notice pursuant to Bankruptcy Rule 2002, in accordance with Del. Bankr. L.R. 2002-1(b).

6.     All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled, as announced to the Court at the hearing on the Motion or by stipulation filed with the Court, are hereby overruled.

7.     A Qualified Bidder that wants to make a Bid shall deliver written copies of its Bid[4] to the Notice Parties not later than 12:00 p.m. (Eastern Time) on June ___, 2008 (the "Bid Deadline") and shall comply with the requirements set forth in the Bid Procedures for making such Bid.

---

[4]     Unless otherwise indicated, all defined terms have the meaning set forth in the APA.

8.     The Debtors and their advisors shall:  (a) determine whether a Potential Bidder is a Qualified Bidder; (b) coordinate the efforts of Bidders in conducting their due-diligence investigations, as permitted by the provisions herein; (c) receive offers from Qualified Bidders; and (d) negotiate any offers made to purchase the Assets (collectively, the "Bid Process").  The Debtors shall have the right to adopt such other rules for the Bid Process (including rules that may depart from those set forth herein) that, in their sole discretion, will better promote the goals of the Bid Process.

9.     Only if a Qualified Bid (other than a Bid submitted by the Stalking Horse Bidder) is received by the Bid Deadline, shall the Debtors conduct an Auction to determine the highest and/or best Bid with respect to the Assets.

10.     The Auction shall commence on June __, 2008, at 9:00 a.m. (Eastern Time); at the offices of Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington, DE 19801.

11.     The procedures as set forth in the Motion and Bid Procedures for conducting the Auction are hereby approved in their entirety.

12.     The Debtors shall have the right, as they may determine to be in the best interests of their estates to:  (i) determine which bidders are Qualified Bidders; (ii) determine which Bids are Qualified Bids; (iii) determine which Qualified Bid is the highest and best proposal and which is the next highest and best proposal, (iv) reject any Bid that is (a) inadequate or insufficient, (b) not in conformity with the requirements of this Order or the requirements of the Bankruptcy Code or (c) contrary to the best interests of the Debtors and their estates; (v) waive terms and conditions set forth herein with respect to any or all potential Bidders, (vi) impose additional terms and conditions with respect to any or all potential Bidders, (vii) extend the

7

deadlines set forth herein, (viii) adjourn or cancel the Auction and/or Sale Hearing in open court without further notice; (ix) remove some or all of the Assets from the Auction, and (x) modify the Bid Procedures as they may determine to be in the best interests of their estates or to withdraw the Sale Motion at any time with or without prejudice. Without limiting the generality of the foregoing, the Debtors may determine to (a) distribute or not distribute copies of other Qualified Bids to other Qualified Bidders prior to or during the Auction, or (b) proceed with sealed bidding.

13.     In their reasonable discretion, the Debtors may adopt additional rules for the Auction at or prior to the Auction that will better promote the goals of the Auction and that are not inconsistent with any of the provisions of this Order.

14.     The Debtors shall sell the Assets to the Successful Bidder upon approval of the Successful Bid by this Court after the Sale Hearing.

15.     All interested parties reserve their right to object to the Debtors' selection of the Successful Bidder (including the assignment of any of such objector's Assumed Executory Contract thereto, provided, however, that any objection to such assignment on the basis of the Cure Cost must be made and/or reserved as set forth in this Order.

16.     The Sale Hearing shall be held by the Bankruptcy Court on June 6, 2008, at ___: ___ __.m. (Eastern Time), located at 824 North Market Street, ___th Floor, Wilmington, DE. The Sale Hearing may be adjourned, from time to time, without further notice to creditors or other parties-in-interest other than by announcement of said adjournment before this Court or on this Court's calendar on the date scheduled for said hearing.

DB02:6700972.4                                                                              066831.1001

17.     At or before the Sale Hearing, the Debtors shall be authorized, but not required, to impose such other terms and conditions as the Debtors may determine to be in the best interests of their estates and creditors and other parties in interest thereof.

18.     Following the approval of the sale of the Assets to the Successful Bidder at the Sale Hearing, if such Successful Bidder fails to consummate an approved sale within thirty (30) days after entry of an Order approving the Sale, the Debtors shall be authorized, but not required, to deem the Back-up Bid, as the Successful Bid or Back-up Bid, and the Debtors shall be authorized, but not required, to consummate the sale with the Qualified Bidder submitting such Bid without further notice or order of the Bankruptcy Court. The Sale Hearing may be adjourned or rescheduled without notice other than by announcement of the adjourned date at the Sale Hearing.

19.     Good Faith Deposits of the Successful Bidder shall be applied to the purchase price of such transaction at Closing. Good Faith Deposits of all other Qualified Bidders shall be held in an interest-bearing escrow account until two (2) days after Closing of the transactions contemplated by the Successful Bid, and thereafter returned to the respective bidders. If a Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Debtors shall be entitled to retain the Good Faith Deposit as part of their damages resulting from the breach or failure to perform by the Successful Bidder.

20.     The Stalking Horse Bidder (for itself, as agent for its affiliates and the Lenders, and as designated and directed by Guggenheim) is for all purposes a secured creditor of the Debtors, and holds Liens and Claims in and against the Debtors and their estates. Pursuant to this Order, the Stalking Horse Bidder (for itself, as agent for its affiliates and the Lenders, and as

9

designated and directed by Guggenheim) has an allowed secured claim in an amount equal to the sum of: (i) the aggregate amount of the outstanding obligations owing under the debtor-in-possession credit agreement, dated on or about April 1, 2008, between Diamond Glass, as borrower, DT Subsidiary, as subsidiary guarantor, and Guggenheim, as agent for the financial institutions identified as lenders therein (the "DIP Financing"), plus (ii) the aggregate amount of the outstanding obligations due under the Credit Agreement, dated as of January 12, 2007, as entered into by and among Diamond Glass, the financial institutions listed therein, as lenders, and Guggenheim, as agent for the lenders, as amended, with DT Subsidiary, as subsidiary guarantor (the "Credit Agreement") ((i) and (ii) together, the "Allowed Claim"). Pursuant to this Order, the Stalking Horse Bidder is hereby authorized to credit bid a portion of the Allowed Claim as consideration for the Purchase Price in accordance with the APA, and, in connection with any higher bids as might be received at any Auction, may continue to credit bid, in its sole discretion, up to the aggregate amount of the Allowed Claim (determined as of the date of such Auction) and nothing in this Order shall be deemed to be a waiver or release of any unsecured deficiency claim arising under the DIP Financing or the Credit Agreement (whether such claim is held by the Stalking Horse Bidder or the Lenders or Guggenheim on behalf of the Lenders).

21.     Not later than three (3) days after the entry of this Order, the Debtors will cause the Auction and Sale Notice, in a form substantially similar to the form attached to this Order as Exhibit "2," to be sent by first-class mail, postage-prepaid, to (i) all entities that claim any interest in or lien on the Assets; (ii) all parties to Designated Contracts assumed and sold and assigned pursuant to this Order; (iii) all governmental taxing authorities that have, or as a result of the sale of the Assets may have, claims, contingent or otherwise, against the Debtors; (iv) all parties that filed requests for notices under Bankruptcy Rule 9010(b) or were entitled to notice

066831.1001

under Bankruptcy Rule 2002; (v) all creditors (whether liquidated, contingent or unmatured) of the Debtors; (vi) all interested governmental, pension, and environmental entities; (vii) the Office of the United States Trustee; and (viii) all entities that have, within the past 12 months, expressed to the Debtors an interest in purchasing the Assets.

22.     Not later than five (5) days after the entry of this, the Debtors shall cause the Auction and Sale Notice, in a form substantially similar to the form attached to this Order as Exhibit "2", to be published in the national edition of one of the following: The Wall Street Journal, The New York Times, or The USA Today, as to be determined by Debtors, pursuant to Bankruptcy Rule 2002(l). Such publication notice shall be sufficient and proper notice to any other interested parties, including those whose identities are unknown to Debtors.

23.     Further, to facilitate the sale, assumption, and assignment of any Designated Contracts, the Debtors will serve a notice (the "Cure Amount Notice"), similar to the form attached hereto as Exhibit "3," not later than five (5) days after the entry of this Order on each counterparty to a Designated Contract. If the Stalking Horse Bidder is not the Successful Bidder, and an alternative Successful Bidder is seeking to have certain Designated Contracts assumed and assigned as part of an alternative transaction, the Debtors will provide financial information for the alternative bidder to all non-debtor parties to such Designated Contracts immediately following the Auction via facsimile or Federal Express.

24.     The Debtors shall attach to the Cure Amount Notice their calculation of the undisputed cure amounts that they believe must be paid to cure all defaults under all Designated Contracts (the "Cure Costs"). If no amount is listed on the Cure Amount Notice, the Debtors will be deemed to believe that there is no Cure Cost. Unless the non-debtor party to a Designated Contract files an objection (the "Cure Amount Objection") to their scheduled Cure

11

Cost by June __, 2008, at 4:00 p.m. (Eastern Time) and serves the objection on (a) Diamond Glass, Inc. and DT Subsidiary Corp., 220 Division Street, Kingston, PA 18704, Attn: William Cogswell, President; (b) co-counsel to the Debtors, Foley & Lardner LLP, 90 Park Avenue, New York, NY 10016, Attn: Michael P. Richman, and Young Conaway Stargatt & Taylor, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington, DE 19801, Attn: Michael Nestor; (c) counsel to Stalking Horse Bidder, Allen & Overy LLP, 1221 Avenue of the Americas, New York, NY 10020, Attn: Ken Coleman and Daniel Guyder, and Buchanan Ingersoll & Rooney, PC, The Brandywine Building, 1000 West Street, Suite 1410, Wilmington, DE 19801-1054, Attn: Mary F. Caloway; and (d) counsel to any official committee of unsecured creditors appointed in these cases (if any, the "Committee"), then the Debtors may assume and assign such contract to Stalking Horse Bidder or the Successful Bidder and such non-debtor party shall (i) be forever barred from objecting to the Cure Cost and from asserting any additional cure or other amounts with respect to such Designated Contract, and the Debtors shall be entitled to rely solely on the Cure Cost; and (ii) be forever barred and estopped from asserting or claiming against the Debtors, the Stalking Horse Bidder, or such other Successful Bidder or any other assignee of the relevant Designated Contract that any additional amounts are due or defaults exist under such Designated Contract. In addition, non-debtor parties to any Designated Contract must file and serve objections, if any, to the adequate assurance of future performance under the Designated Contract (if and as assumed) so as to be received by the foregoing parties by June __, 2008, at 4:00 p.m. (Eastern Time).

25.     If a Cure Amount Objection is timely filed, the Cure Amount Objection must set forth (a) the basis for the objection; (b) with specificity, the amount the party asserts as the Cure Cost; and (c) attach appropriate documentation in support of the Cure Cost.

12

26.     Hearings on Cure Amount Objections (and objections to the adequate assurance

of future performance under the Designated Contract (if and as assumed)) may be held (a) at the

Sale Hearing, or (b) on such other date that the Debtors determine in their sole discretion;

provided, however, that if the subject Designated Contract is assumed and assigned, the Cure

Cost asserted by the objecting party (or such lower amount as may be fixed by this Court) shall

be deposited and held in a segregated account by the Successful Bidder or any other assignee

pending further order of this Court or mutual agreement of the parties.

27.     The Debtors' decision to assume and assign Designated Contracts shall be subject

to approval of this Court and consummation of the Proposed Sale of the Assets.  Absent

consummation of the Proposed Sale of the Assets, each of the Designated Contracts shall neither

be deemed assumed nor assigned and shall in all respects be subject to further administration

under the Bankruptcy Code.

28.     Except to the extent otherwise provided in the APA or the agreement with the

Successful Bidder, subject to any prepetition cure amount payments, the assignee of any

assumed Designated Contract will not be subject to any liability to the assigned Designated

Contract counterparty that accrued or arose before the closing date of the Proposed Sale of the

Assets, and the Debtors shall be relieved of all liability accruing or arising thereafter pursuant to

section 365(k) of the Bankruptcy Code.

29.     Objections, if any, to the relief requested in the Sale Motion, including any

objections under section 365(b)(1)(C) of the Bankruptcy Code, must:  (a) be in writing; (b)

comply with the Bankruptcy Rules and the Local Bankruptcy Rules; (c) be filed with the Clerk

of the Bankruptcy Court for the District of Delaware, 3rd Floor, 824 Market Street, Wilmington,

DE 19801, on or before 4:00 p.m. (Eastern Time) on June ___, 2008; and (d) be served so as to

13

be received no later than 4:00 p.m. (Eastern Time) on the same day, on (a) Diamond Glass, Inc. and DT Subsidiary Corp., 220 Division Street, Kingston, PA 18704, Attn: William Cogswell, President; (b) counsel to the Debtors, Foley & Lardner LLP, 90 Park Avenue, New York, NY 10016, Attn: Michael P. Richman, and Young Conaway Stargatt & Taylor, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington, DE 19801, Attn: Michael Nestor; (c) counsel to Stalking Horse Bidder, Allen & Overy LLP, 1221 Avenue of the Americas, New York, NY 10020, Attn: Ken Coleman and Daniel Guyder, and Buchanan Ingersoll & Rooney, PC, The Brandywine Building, 1000 West Street, Suite 1410, Wilmington, DE 19801-1054, Attn: Mary F. Caloway; and (d) counsel to any Committee; provided, however, if the Stalking Horse Bidder is not the Successful Bidder and an alternative Successful Bidder is seeking to have certain unexpired leases, license agreements, and executory contracts assumed and assigned as part of an alternative transaction, the non-debtor parties to such unexpired leases, license agreements, and executory contracts shall have until 4:00 p.m. the day prior to the Sale Hearing to raise objections under section 365(b)(1)(C) of the Bankruptcy Code. The failure of any person to timely file its objection shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Motion or the Debtors' assumption and assignment of any Designated Contract or the consummation of the Proposed Sale and performance under the APA (or any alternative agreement entered into with the Successful Bidder), including the transfer of the Assets free and clear of all liens, claims, encumbrances, and interests (other than permitted encumbrances provided for expressly in the APA or alternative purchase agreement entered into with the Successful Bidder).

30.     The notices to be issued in connection with the Proposed Sale of the Assets substantially in the form of the notices attached hereto as Exhibits "2" and "3" are hereby

14

approved.

31.     This Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon execution hereof.

32.     As provided by Bankruptcy Rules 6004 and 6006, this Order shall not be stayed for ten (10) days after the entry thereof and shall be effective and enforceable immediately upon its entry on this Court's docket.

33.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

34.     This Court shall retain jurisdiction over any matters related to or arising from the implementation of this Order and the Bid Procedures.

Dated: April ___, 2008
       Wilmington, Delaware

                                        _____
                                        UNITED STATES BANKRUPTCY
                                        JUDGE

DB02:6700972.4                                                    066831.1001

**EXHIBIT 1**

# BIDDING PROCEDURES

The following procedures (the "Bidding Procedures") shall govern the proposed sale of substantially all the property and assets (collectively, the "Assets") of Diamond Glass, Inc. and DT Subsidiary Corp. (collectively, the "Debtors").

### Assets for Sale

Debtors are offering to sell in one or more transactions the Assets, which include all or substantially all of their assets. The Assets for sale do not include the Excluded Assets.

### Bid Deadline

All Bids (as defined below) must be submitted in writing so that they are actually received no later than 12:00 noon (Eastern time) **on June ___, 2008** (the "Bid Deadline"). Prior to the Bid Deadline, a Qualified Bidder that wants to make an offer, solicitation, or proposal (a "Bid") shall deliver written copies of its bid to: (a) the Debtors, 220 Division Street, Kingston, PA 18704, Attn: William Cogswell, President; (b) counsel to the Debtors, Foley & Lardner LLP, 90 Park Avenue, New York, NY 10016, Attn: Michael P. Richman, and Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington, DE 19801, Attn: Michael Nestor; (c) investment bankers for the Debtors, National City Investments, Inc., 300 Barr Harbor Drive, West Conshohocken, PA 19428, Attn: J. Scott Victor; (d) counsel to Stalking Horse Bidder, Allen & Overy LLP, 1221 Avenue of the Americas, New York, NY 10020, Attn: Ken Coleman and Daniel Guyder, and Buchanan Ingersoll & Rooney PC, The Brandywine Building, 1000 West Street, Suite 1410, Wilmington, DE 19801-1054, Attn: Mary F. Caloway; and (e) counsel to any official committee of unsecured creditors appointed in these cases (collectively, the "Notice Parties"), by the Bid Deadline. A Bid received after the Bid Deadline (unless extended by the Debtors in their sole discretion) shall not constitute a Qualified Bid. Interested bidders requesting information about the qualification process, including a form asset purchase agreement, and information in connection with their due diligence, should contact J. Scott Victor, Senior Managing Director & Co-Head Special Situations Group, National City Investment Banking, 300 Barr Harbor Drive, West Conshohocken, PA 19428, (610) 940-5802. The Bid Deadline may be extended by the Debtors in their sole discretion for any party.

### Participation Requirements

To participate in the bidding process and to otherwise be considered for any purpose hereunder, a person interested in all or portions of the Assets (a "Potential Bidder") must first deliver (unless previously delivered) to Debtors and their counsel, not later than April ___, 2008:

    a.    <u>Identification of Potential Bidder</u>. Identification of the Potential Bidder and any Principals (defined below), and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated transaction;

b.  Non-Binding Expression of Interest. An executed non-binding indication of interest satisfactory to the Debtors that must reasonably identify the contemplated transaction, including the assets proposed to be acquired, the proposed purchase price, contingencies, and conditions precedent to closing;

c.  Corporate Authority. Written evidence of the Potential Bidder's chief executive officer or other appropriate senior executive's approval of the contemplated transaction; provided, however, that, if the Potential Bidder is an entity specially formed for the purpose of effectuating the contemplated transaction, then the Potential Bidder must furnish written evidence reasonably acceptable to the Debtors of the approval of the contemplated transaction by the equity holder(s) of such Potential Bidder (the "Principals"); and

d.  Proof of Financial Ability to Perform. Written evidence upon which the Debtors may reasonably conclude that the Potential Bidder has the necessary financial ability to close the contemplated transaction and provide adequate assurance of future performance under all contracts to be assumed in such contemplated transaction. Such information should include, among other things, the following:

(i)     the Potential Bidder's current financial statements (audited if they exist);

(ii)    contact names and numbers for verification of financing sources;

(iii)   evidence of the Potential Bidder's internal resources and proof of any debt or equity funding commitments that are needed to close the contemplated transaction;

(iv)    any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors demonstrating that such Potential Bidder has the ability to close the contemplated transaction; provided, however, that the Debtors shall determine, in their reasonable discretion, in consultation with their advisors, whether the written evidence of such financial wherewithal is reasonably acceptable, and shall not unreasonably withhold acceptance of a Potential Bidder's financial qualifications; and

(v)     If the Potential Bidder intends to seek financing under the Acquisition Facility, then, at least 20 days prior to the Bid Deadline, the Potential Bidder will contact Guggenheim Corporate Funding, LLC ("Guggenheim"), 135 E. 57th St., New York, NY 10022, Attn: Tony Minella in writing to begin discussions regarding the potential financing contemplated under the Acquisition Facility (as defined below).

### *Designation as Qualified Bidder*

A "Qualified Bidder" is a Potential Bidder (or combination of Potential Bidders whose bids for the assets of the Debtors do not overlap and who agree to have their bids combined for purposes of the determination of whether such Potential Bidders together constitute a Qualified Bidder, and who shall also be referred to herein as a single Qualified Bidder) that delivers the documents described in paragraph (b) above, and that the Debtors in their discretion and with assistance from their advisors determines is reasonably likely to submit a bona fide offer that would result in greater cash value being received for the benefit of the Debtors' creditors than under the APA and to be able to consummate a sale if selected as a Successful Bidder (defined below).

Upon the receipt from a Potential Bidder of the information required under paragraph (b) above, as soon as is practicable, the Debtors shall determine and notify the Potential Bidder with respect to whether such Potential Bidder is a Qualified Bidder.

The Stalking Horse Bidder is a Qualified Bidder.

### *Access to Due Diligence Materials*

Only Potential Bidders that execute the Confidentiality Agreement are eligible to receive due-diligence access or additional non-public information. If the Debtors determine that a Potential Bidder who has satisfied the Participation Requirements does not constitute a Qualified Bidder, then such Potential Bidder's right to receive due-diligence access or additional non-public information shall terminate. The Debtors will designate an employee or other representative to coordinate all reasonable requests for additional information and due-diligence access from such Qualified Bidders. The Debtors shall not be obligated to furnish any due diligence information after the Bid Deadline (as hereinafter defined). The Debtors are not responsible for, and will bear no liability with respect to, any information obtained by Qualified Bidders in connection with the sale of the Assets.

### *Due Diligence From Bidders*

Each Potential Bidder and Qualified Bidder (collectively, a "<u>Bidder</u>") shall comply with all reasonable requests for additional information and due-diligence access by the Debtors or their advisors regarding such Bidder and its contemplated transaction. Failure by a Potential Bidder to comply with requests for additional information and due-diligence access will be a basis for the Debtors to determine that the Potential Bidder is not a Qualified Bidder. Failure by a Qualified Bidder to comply with requests for additional information and due-diligence access will be a basis for the Debtors to determine that a bid made by a Qualified Bidder is not a Qualified Bid.

### *Bid Process*

The Debtors and their advisors shall: (a) determine whether a Potential Bidder is a Qualified Bidder; (b) coordinate the efforts of Bidders in conducting their due-diligence

investigations, as permitted by the provisions herein; (c) receive offers from Qualified Bidders; and (d) negotiate any offers made to purchase the Assets (collectively, the "Bid Process"). The Debtors shall have the right to adopt such other rules for the Bid Process (including rules that may depart from those set forth herein) that, in their sole discretion, will better promote the goals of the Bid Process.

### Bid Requirements

To participate in the Auction, each Bid and Qualified Bidder submitting such a Bid must be determined by the Debtors to satisfy each of the following conditions:

a. Written Submission of APA and Commitment to Close. Qualified Bidders must submit by the Bid Deadline a blackline of the asset purchase agreement (the "APA") by and among the Debtors and Diamond Glass Acquisition, LLC (the "Stalking Horse Bidder") reflecting their proposed changes, and a written commitment that they intend to close on the terms and conditions set forth therein.

b. Irrevocable. A Bid must be irrevocable until two (2) business days after the Assets have been sold pursuant to the Closing of the sale or sales approved by the Bankruptcy Court in a final, non-appealable order (the "Termination Date");

c. Contingencies: A Bid may not be conditioned on obtaining financing or any internal approval or on the outcome or review of due diligence. Any other contingencies associated with a Bid may not be more burdensome than those set forth in the APA;

d. Financing Sources: A Bid must contain written evidence of a commitment for financing or other evidence of the ability to consummate the sale satisfactory to the Debtors with appropriate contact information for such financing sources. If a Bid will rely on the Acquisition Facility, the Bid must include a definitive commitment letter entered into between the Qualified Bidder and Guggenheim set forth the terms and conditions of such Facility;

e. No Fees payable to Qualified Bidder: A Bid may not request or entitle the Qualified Bidder to any break-up fee, expense reimbursement or similar type of payment. Further, by submitting a Bid, a Bidder shall be deemed to waive its right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code or in any way related to the submission of its Bid or the Bid Procedures;

f. Good-Faith Deposit. Each Bid must be accompanied by a deposit (the "Good Faith Deposit") in the form of a certified check or cash payable to the order of Debtors in the amount of $1,000,000.00.

g. **Minimum Overbid**. The consideration proposed by the Bid must be cash. The aggregate consideration must equal or exceed the sum of the Purchase Price plus $200,000.00.

A Bid received from a Qualified Bidder before the Bid Deadline that meets the above requirements, and that satisfies the Bid-Deadline requirement above, shall constitute a "Qualified Bid," if Debtors believes, in their reasonable discretion, that such Bid would be consummated if selected as the Successful Bid. For purposes herein, the APA shall constitute a Qualified Bid. All Qualified Bids received prior to the commencement of the Auction (as defined below) shall be considered such Qualified Bidder's "Baseline Bid."

If any Potential Bidder is determined by Debtors not to be a Qualified Bidder, the Potential Bidder shall be refunded its deposit and all accumulated interest thereon within three (3) business days after that determination.

### *Financing Option*

An important feature of the Bid Procedures includes the offer by Guggenheim to provide up to $25,000,000 of acquisition and working capital financing to any Qualified Bidder to support its competing bid to acquire the Assets (the "Acquisition Facility"). Subject to the "Summary of Terms and Conditions" annexed hereto as Exhibit A, and the entry into a definitive commitment between Guggenheim (as agent for the lenders under the Acquisition Facility) and such Qualified Bidder, the lenders under the Acquisition Facility would provide financing on the terms provided in such commitment. The Summary of Terms and Conditions contemplates that such any such Qualified Bidder who accepts the Acquisition Facility and becomes the Successful Bidder, having submitted the "highest and best" offer for the Assets as compared to all other bidders, including the Purchaser, at any Auction, would pay in cash the purchase price for the Assets at closing. Such cash consideration would be funded in part by the loan proceeds made available and drawn under the Acquisition Facility, with the remaining balance paid through a cash investment made by such Successful Bidder. The Sale Order would provide, among other things, that any such cash proceeds would be paid directly to Guggenheim and applied by Guggenheim (on a dollar-for-dollar basis) in the following order: (a) to reduce the then outstanding amount of the Obligations (as defined in the DIP Financing) (as defined in the APA) until such Obligations have been fully satisfied in accordance with the DIP Financing (as defined in the APA), and next (b) to reduce the then outstanding amount of the obligations (including any accrued and unpaid interest and adequate protection payments owing as of the Closing Date) under the Credit Agreement (as defined in the APA) until such obligations under the Credit Agreement (as defined in the APA) have been fully satisfied in accordance with the Credit Agreement (as defined in the APA); provided that Guggenheim in its sole and absolute discretion may deem any such obligations to have been satisfied based on any advances and loans made, or deemed to be made, to the Successful Bidder, as borrower under the Acquisition Facility. Annexed as Exhibit A to the "Summary of Terms and Conditions" is a schedule that demonstrates the foregoing "sources and uses" of funds in a sample transaction where the would-be Successful Bidder would draw the entire amount of funds available under the Acquisition Facility in connection with its successful bid to purchase of the Assets.

### *Auction*

Only if a Qualified Bid (other than the Stalking Horse Bidder) is received by the Bid Deadline, shall the Debtors conduct an auction (the "<u>Auction</u>") to determine the highest and/or best bid with respect to the Assets. The Auction shall commence on June ___, 2008, at 9:00 a.m. (Eastern Time); at the offices of Young Conaway Stargatt & Taylor, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington, DE 19801.

If no such Qualified Bid is received by the Bid Deadline, then the Auction will not be held. The Stalking Horse Bidder will be the Successful Bidder, the APA will be the Successful Bid, and, at the June ___, 2008 Sale Hearing, the Debtors will seek approval of and authority to consummate the Proposed Sale contemplated by the APA.

The Auction shall be conducted according to the following procedures:

(a)    Participation At The Auction

Only a Qualified Bidder that has submitted a Qualified Bid is eligible to participate at the Auction. Only the authorized representatives of each of the Qualified Bidders, Debtors and the official committee of unsecured creditors shall be permitted to attend. During the Auction, bidding shall begin initially with the highest Qualified Bid and subsequently continue in minimum increments of at least $100,000 (or such other amount the Debtors determine to facilitate the Auction).

(b)    Debtors Shall Conduct The Auction

The Debtors and their professionals shall direct and preside over the Auction. At the start of the Auction, the Debtors shall describe the terms of the highest and best Qualified Bid. The determination of which Qualified Bid constitutes the highest and best Qualified Bid shall take into account any factors the Debtors reasonably deem relevant to the value of the Qualified Bid to the estates, including, among other things, the following: (i) the amount and nature of the consideration; (ii) the proposed assumption of any liabilities, if any; (iii) the ability of the Qualified Bidder to close the proposed transaction; (iv) the proposed Closing Date and the likelihood, extent and impact of any potential delays in Closing; (v) any purchase-price adjustments; (vi) the impact of the contemplated transaction on any actual or potential litigation; (vii) the net economic effect of any changes from the APA, if any, contemplated by the Contemplated Transaction Documents, (viii) the net after-tax consideration to be received by the Debtors' estates; and (ix) such other considerations the Debtors deem relevant in their sole discretion (collectively, the "<u>Bid Assessment Criteria</u>"). All Bids made thereafter shall be Overbids (as defined below), and shall be made and received on an open basis, and all material terms of each Bid shall be fully disclosed to all other Qualified Bidders. The Debtors shall maintain a transcript of all Bids made and announced at the Auction, including the Baseline Bid, all Overbids and the Successful Bid.

(c)    Terms of Overbids

An "Overbid" is any Bid made at the Auction subsequent to the Debtors' announcement of the highest and best Qualified Bid. To submit an Overbid for purposes of this Auction, a Qualified Bidder must comply with the following conditions:

(i)     Minimum Overbid Increment

Any Overbid after the highest and best Qualified Bid shall be made in increments of at least $100,000 (or such other amount the Debtors determine to facilitate the Auction). Additional consideration in excess of the amount set forth in the Baseline Bid may include only cash; provided, however, notwithstanding the foregoing, the Credit Bid Component of any Overbid by the Stalking Horse Bidder may be increased up to an amount not to exceed the aggregate amount of its claims under the DIP Financing and Diamond Credit Agreement.

(ii)     Remaining Terms are the same as for Qualified Bids

Except as modified herein, an Overbid must comply with the conditions for a Qualified Bid set forth above, provided, however, that the Bid Deadline and the Initial Minimum Overbid Increment shall not apply. Any Overbid made by a Qualified Bidder must remain open and binding on the Qualified Bidder until and unless (a) the Debtors accept a higher Qualified Bid as an Overbid and (b) such Overbid is not selected as the Back-up Bid (as defined below).

To the extent not previously provided (which shall be determined by the Debtors), a Qualified Bidder submitting an Overbid must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors) demonstrating such Qualified Bidder's ability to close the transaction proposed by such Overbid.

(iii)     Announcing Overbids

The Debtors shall announce at the Auction the material terms of each Overbid, the basis for calculating the total consideration offered in each such Overbid, and the resulting benefit to the Debtors' estates based on, among other things, the Bid Assessment Criteria.

(iv)     Consideration of Overbids

The Debtors reserve the right, in their reasonable business judgment, to make one or more adjournments in the Auction to, among other things: (a) facilitate discussions between the Debtors and individual Qualified Bidders; (b) allow individual Qualified Bidders to consider how they wish to proceed; and (c) give Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment, may require that the Qualified Bidder (other than Stalking Horse Bidder) has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed transaction at the prevailing Overbid amount.

(d)     Additional Procedures

In their reasonable discretion, the Debtors may adopt rules for the Auction at or prior to the Auction that will better promote the goals of the Auction and that are not inconsistent with any of the provisions of the Bid Procedures Order. All such rules will provide that all Bids shall be made and received in one room, on an open basis, and all other Qualified Bidders shall be entitled to be present for all bidding with the understanding that the true identity of each Qualified Bidder – i.e., Principals submitting the Bid – shall be fully disclosed to all other

Qualified Bidders and that all material terms of each Qualified Bid will be fully disclosed to all other Qualified Bidders throughout the entire Auction.

(e)     Closing the Auction

Upon conclusion of the bidding, the Auction shall be closed, and the Debtors shall (i) immediately review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Proposed Sale, and (ii) identify the highest, best, and/or otherwise financially superior offer for the Assets (the "Successful Bid") and the entity submitting such Successful Bid, the "Successful Bidder"), which highest, best and/or otherwise financially superior offer will provide the greatest amount of net value to the Debtors, and the next highest or otherwise best offer after the Successful Bid (the "Back-up Bid"), and advise the Qualified Bidder of such determination. If the Stalking Horse Bidder's final bid is deemed to be highest and best at the conclusion of the Auction, the Stalking Horse Bidder will be the Successful Bidder, and such bid, the Successful Bid.

(f)     Consent to Jurisdiction as Condition to Bid.

All Qualified Bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to the Auction, and the construction and enforcement of the Bidder's Contemplated Transaction Documents, as applicable.

(g)     Terms of Expense Reimbursement

If (i) the APA terminates because the Debtors have accepted or selected, and the Bankruptcy Court has approved, the bid or bids (including a credit bid) of any bidder(s) other than Stalking Horse Bidder to purchase all or any portion of the Debtors' business or Assets, and such transaction or transactions contemplated by any such bid or bids has been consummated, or (ii) the Debtors withdraw their support for the transactions contemplated by the APA and seek to have a stand-alone plan of reorganization confirmed by the Court, the Debtors shall reimburse Stalking Horse Bidder for all actual out-of-pocket costs and expenses (including professional fees) reasonably incurred by Stalking Horse Bidder in connection with the transactions contemplated by the APA, up to a maximum of 2.0% of the Purchase Price (excluding the Assumed Liabilities) (the aggregate amount of such reimbursement being the "Expense Reimbursement"), in accordance with the terms of the APA.

(h)     Inclusion of Expense Reimbursement in Initial Minimum Overbid Amount:

The Expense Reimbursement shall be deemed to be included in the stated amount of any bid equal to or greater than the Initial Minimum Overbid Amount.

**Acceptance of Successful Bid**

The Debtors shall sell the Assets to the Successful Bidder upon the approval of the Successful Bid by the Bankruptcy Court after the Sale Hearing. The Debtors' presentation of

a particular Qualified Bid to the Bankruptcy Court for approval does not constitute the Debtors' acceptance of the Bid. The Debtors will be deemed to have accepted a Bid only when the Bid has been approved by the Bankruptcy Court at the Sale Hearing. All interested parties reserve their right to object to the Debtors' selection of the Successful Bidder (including the assignment of any of such objector's Assumed Executory Contract thereto, provided, however, that any objection to such assignment on the basis of the Cure Cost must be made and/or reserved as set forth in the order approving these Bid Procedures).

## Credit Bidding

The Stalking Horse Bidder may, for itself, on behalf of its affiliates and the Lenders and as directed by Guggenheim, may credit bid some or all of its claims (and the claims of its affiliates and the Lenders as if the Stalking Horse Bidder is the owner and assignee of all such claims) against the Debtors under the DIP Financing and Diamond Credit Agreement to the fullest extent permitted under the Bid Procedures Order and section 363(k) of the Bankruptcy Code.

## "As Is, Where Is"

The Sale of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their agents or estates except to the extent set forth in the APA or the purchase agreement of another Successful Bidder. The Stalking Horse Bidder and each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer, that it has relied solely on its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its Bid, and that it did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in these Bid Procedures or, (a) as to the Stalking Horse Bidder, the terms of the sale of the Assets shall be set forth in the APA, or (b) as to another Successful Bidder, the terms of the sale of the Assets shall be set forth in the applicable purchase agreement.

## Free Of Any And All Encumbrances

Except as otherwise provided in the APA or another Successful Bidder's purchase agreement, all of the Debtors' right, title, and interest in and to the Assets subject thereto shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests thereon and there against (collectively, the "Encumbrances") in accordance with 11 U.S.C. § 363, with such Encumbrances to attach to the net proceeds of the sale of the Assets.

## Sale Hearing

The Sale Hearing shall be conducted by the Bankruptcy Court on June ___, 2008, at __:__ __.m. (Eastern Time), located at 824 North Market Street, __th Floor, Wilmington, Delaware. Following the approval of the sale of the Assets to the Successful Bidder at the Sale Hearing, if such Successful Bidder fails to consummate an approved sale within thirty (30) days

after entry of an Order approving the Sale, the Debtors shall be authorized, but not required, to deem the Back-up Bid, as disclosed at the Sale Hearing, the Successful Bid or Back-up Bid, as applicable, and the Debtors shall be authorized, but not required, to consummate the sale with the Qualified Bidder submitting such Bid without further notice or order of the Bankruptcy Court. The Sale Hearing may be adjourned or rescheduled without notice other than by announcement of the adjourned date at the Sale Hearing.

## Return of Good Faith Deposit:

Good Faith Deposits of the Successful Bidder shall be applied to the purchase price of such transaction at Closing. Good Faith Deposits of all other Qualified Bidders shall be held in an interest-bearing escrow account until two (2) days after Closing of the transactions contemplated by the Successful Bid, and thereafter returned to the respective bidders. If a Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Debtors shall be entitled to retain the Good Faith Deposit as part of their damages resulting from the breach or failure to perform by the Successful Bidder.

## Modifications and Reservations

The Bid Procedures may be modified only upon the express written consent of the Debtors and the Stalking Horse Bidder, or by order of the Court.

The Debtors may (a) determine which Qualified Bid, if any, is the highest, best, and/or otherwise financially superior offer; and (b) reject at any time before entry of an order of the Bankruptcy Court approving a Qualified Bid, any Bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bid Procedures, or the terms and conditions of sale, or (iii) contrary to the best interests of the Debtors, their estates and creditors thereof.

At or before the Sale Hearing, the Debtors may impose such other terms and conditions as the Debtors may determine to be in the best interests of their estates and creditors and other parties in interest thereof.

## Reservation of Rights

The Debtors reserve the right as they may determine to be in the best interests of their estates to: (i) determine which bidders are Qualified Bidders; (ii) determine which Bids are Qualified Bids; (iii) determine which Qualified Bid is the highest and best proposal and which is the next highest and best proposal, (iv) reject any bid that is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bid Procedures Order or the requirements of the Bankruptcy Code or (c) contrary to the best interests of the Debtors and their estates; (v) waive terms and conditions set forth herein with respect to any or all potential bidders, (vi) impose additional terms and conditions with respect to any or all potential bidders, (vii) extend the deadlines set forth herein, (viii) adjourn or cancel the Auction and/or Sale Hearing in open court without further notice; (ix) remove some or all of the Assets from the Auction, and (x) modify the Bid Procedures as they may determine to be in the best interests of their estates or to withdraw the Sale Motion at any time with or without prejudice. Without limiting the generality

of the foregoing, the Debtors may determine to (a) distribute or not distribute copies of other Qualified Bids to other Qualified Bidders prior to or during the Auction, or (b) proceed with sealed bidding.

# Exhibit A to Bid Procedures

[PROPOSAL TO PROVIDE FINANCING TO QUALIFIED BIDDERS]

[N.B.: An important feature of the Bid Procedures includes the following offer by Guggenheim Corporate Funding, LLC ("Guggenheim") to provide up to $25,000,000 of acquisition and working capital financing to any Qualified Bidder to support its competing bid to acquire the Assets (the "Acquisition Facility"). Subject to the "Summary of Terms and Conditions" set forth below, and the entry into a definitive commitment between Guggenheim (as agent for the lenders under the Acquisition Facility) and any such Qualified Bidder, the lenders under the Acquisition Facility would provide financing on the terms provided in such commitment. The Summary of Terms and Conditions contemplates that any such Qualified Bidder who accepts the Acquisition Facility and becomes the Successful Bidder, having submitted the "highest and best" offer for the Assets as compared to all other bidders, including the Purchaser, at any Auction, would pay in cash at closing the purchase price for the Assets. Such cash consideration would be funded in part by the loan proceeds made available and drawn under the Acquisition Facility, with the remaining balance paid through a cash investment made by such Successful Bidder. The Sale Order would provide, among other things, that any such cash proceeds would be paid directly to Guggenheim and applied by Guggenheim (on a dollar-for-dollar basis) in the following order: (a) to reduce the then outstanding amount of the Obligations (as defined in the DIP Financing) until such Obligations have been fully satisfied in accordance with the DIP Financing, and next (b) to reduce the then outstanding amount of the obligations (including any accrued and unpaid interest and adequate protection payments owing as of the Closing Date) under the Credit Agreement until such obligations under the Credit Agreement have been fully satisfied in accordance therewith; provided that Guggenheim in its sole and absolute discretion may deem any such obligations to have been satisfied based on any advances and loans made, or deemed to be made, to the Successful Bidder, as borrower under the Acquisition Facility. Annexed as Exhibit A to the "Summary of Terms and Conditions" is a representative example of the sources/uses of funds available under the Acquisition Facility, paired with the cash investment of made by the borrower/purchaser might work under one scenario.]

ANNEX I
TO COMMITMENT LETTER

[$25,000,000] SENIOR SECURED LOAN FACILITY

SUMMARY OF TERMS AND CONDITIONS

This Summary of Terms and Conditions outlines certain terms of a proposed Credit Facility referred to in the Commitment Letter dated [_____], 2008 and addressed to [BORROWER – TBA] from Guggenheim Corporate Funding, LLC, as agent (the "Agent") (the "Commitment Letter").[1] This Summary of Terms and Conditions is part of and subject to the Commitment Letter. Certain capitalized terms used herein are defined in the Commitment Letter. This Summary of Terms and Conditions shall not be deemed to be a binding or enforceable commitment to enter into any transaction and no such commitment shall arise except to the extent expressly stated in the Commitment Letter to which this Term

---

[1] The Agent also is agent to the lenders under: (i) the Senior Secured Debtor In Possession Credit Facility, dated on or about April 1, 2008, between the Sellers, the Agent, and the financial institutions identified as lenders therein (the "DIP Financing"), and (ii) the Credit Agreement dated as of January 12, 2007, as entered into by and among Diamond Glass, and DT (as guarantor), the Agent and the financial institutions listed therein as lenders, and Guggenheim, as agent for such lenders (as has been amended, modified and supplemented from time to time, the "Credit Agreement").

Sheet is attached, and then only upon the execution of the Commitment Letter by both the Agent and the Borrower on terms and conditions acceptable to the Agent in its sole discretion.

| | |
|---|---|
| **Borrower:** | If not Buyer, [[TBA], (the "<u>Borrower</u>")], a wholly owned subsidiary or affiliate of Buyer. |
| **Buyer:** | [TBA], as the successful bidder and purchaser of substantially all of the assets of Diamond Glass, Inc. f/k/a Diamond Glass Companies, Inc. ("<u>Diamond</u>") and Diamond's wholly-owned subsidiary, DT Subsidiary Corp. ("<u>DT</u>" and together with Diamond, the "<u>Debtors</u>"); each of the Debtors is a debtor and debtor-in-possession under chapter 11 of the United States Bankruptcy Code (the "<u>Bankruptcy Code</u>") in cases pending before the United States Bankruptcy Court for the District of Delaware. |
| | [N.B.: For the avoidance of doubt, the facility described herein would only be available to the sole successful bidder and purchaser of substantially all of the assets of the Debtors. Nothing herein shall be construed to be mean there could be more than a single facility made available to such bidder on the terms herein.] |
| **Subsidiary Guarantor:** | [TBA], as subsidiary guarantor (the "<u>Subsidiary Guarantor</u>") (if applicable) |
| **Lender:** | A lender or group of lenders to be determined by the Agent (together with the Agent and its affiliates in their respective capacities as a lender, each a "<u>Lender</u>" and collectively, the "<u>Lenders</u>"). The Agent shall act as the collateral agent for the Lenders. |
| **Facility:** | Senior secured financing in the form of a term loan facility (the "<u>Term Loan Facility</u>"), and a revolving facility (the "<u>Revolving Loan Facility</u>," and together with the Term Loan Facility, the "<u>Facility</u>"). |
| **Commitments to Advance Loans:** | <u>Term Loan Commitment</u>: not to exceed [$15,000,000], and |
| | <u>Revolving Loan Commitment</u>: not to exceed [$10,000,000] (the "<u>Revolving Loan Commitment</u>"), including a sub-limit for the issuance of letters of credit not to exceed [$6,000,000], and subject to the condition precedent. During the term of the Facility, each Lender agrees to make revolving advances to the Company in an amount at any one time outstanding not to exceed such Lender's Pro Rata Share of any amount equal to the Revolving Loan Commitment, *less* the aggregate amount of (i) drawings available under all outstanding letters of credit, *plus* (ii) the aggregate amount of drawings under letters of credit not theretofore reimbursed to the Agent (the "<u>Letter of Credit Usage</u>"). |
| | At closing, any extension of credit under the Revolving Facility will be limited to approximately $5,135,060 in the form of: (i) issued |

letters of credit (against the [$6,000,000] sub-limit) which replace the existing letters of credit issued on account of Diamond Glass and DT (whether such letters of credit are undrawn under Diamond Credit Agreement or have been deemed to be issued under the DIP Financing and remain undrawn); or (ii) cash drawn on the Revolving Facility used to replace any cash drawn under such letters of credit and return any cash drawn thereon to the issuers of such letters of credit.

**Price:** [100% of principal amount.]

**Interest Rate:** Interest on Term Loan Facility: Cash interest accruing at the rate of [LIBOR *plus* 800 basis points] per annum, payable monthly.

Interest on Revolving Loan Facility: Cash interest accruing at the rate of [LIBOR *plus* 500 basis points] per annum, payable monthly.

LIBOR floor of 3.50%.

**Use of Proceeds:** Borrower shall use the proceeds of all Loans under the Facility: (a) to fund in part Borrower's purchase of all or substantially all of the assets (the "Acquired Assets") of the Debtors, pursuant to a sale (free and clear of any interests in the Acquired Assets) approved by the Bankruptcy Court under sections 105, 363, and 365 of the Bankruptcy Code (subject to Borrower being the successful bidder under Bankruptcy Court-approved bidding and auction procedures), and (b) provide Borrower general working capital following the consummation of the purchase of the Acquired Assets to, among other things, ensure raw material supply and product and service delivery and to make appropriate capital investments.

**Maturity Date:** The loans and revolving advances made under the Facility shall become due and payable in full in cash on [_____, 2011], three years after the closing date of the Facility (the "Closing Date").

**Prepayment:** Borrower may prepay the loans under the Facility, in whole or in part, upon not less than 10 days' written notice. The Facility will not be subject to a prepayment penalty or premium.

**Closing Fee:** The Company shall pay non-refundable closing fees to the Lenders on the Closing Date equal to 3% of each of the Term Loan Commitment and the Revolving Loan Commitment

**Servicing Fee:** $25,000 per quarter, payable in advance.

**Collateral:** The Facility (including the Subsidiary Guaranty) will be secured by first priority, perfected, continuing, valid, binding, enforceable, nonavoidable, security interest and lien in all of Borrower's and the Subsidiary Guarantor's property, including, without limitation, the Borrower's accounts receivable, inventory, property, plant and equipment, machinery and equipment and all intangible assets,

[subject only to valid and enforceable liens of record as of the date of the commencement of the Debtors' chapter 11 cases and only to the extent such obligations are expressly assumed by Borrower in connection with the sale of the Acquired Assets].

**Representations And Warranties:**

The loan documents will contain representations and warranties customarily found in loan agreements for similar financings and others appropriate to the specific transaction.

**Covenants:**

The loan documents will contain affirmative and negative covenants customary in loan agreements for similar financings, including, without limitation, covenants limiting the ability of Borrower to incur indebtedness (other than the loans and advances under the Facility).

**Financial Covenants:**

The loan documents will contain financial covenants customary in loan agreements for similar financings and acceptable to the Agent and the Borrower, including:

Minimum Fixed Charge Coverage Ratio;

Maximum Leverage Ratio;

Minimum Consolidated EBITDA; and

Maximum Consolidated Capital Expenditures.

**Assignment/Participation:**

The loan documents will include provisions allowing for assignments and participations in the Loan Facility as are customarily found in loan agreements for similar financings.

**Conditions Precedent:**

The conditions to the closing of the Facility will be those customarily found in loan agreements for similar financings and others appropriate to the specific transaction, including, without limitation:

a. The closing of the Facility shall occur simultaneously with the closing of the Buyer's purchase of the Acquired Assets.

b. Borrower consummates the purchase of the Acquired Assets on or before June [___], 2008, and, as a condition to such closing, and upon the Closing Date, the Agent, on behalf of the lenders under each of the DIP Financing and the Diamond Credit Agreement, shall receive all the cash proceeds of the sale of the Acquired Assets, which proceeds the Agent shall apply (on a dollar-for-dollar basis) in the following order: (a) to reduce the then outstanding amount of the Obligations (as defined in the DIP Financing) until such Obligations have been fully satisfied, and next (b) to reduce the then outstanding amount of the obligations (including any accrued and unpaid interest and adequate

protection payments owing as of the Closing Date) under the Diamond Credit Agreement until such obligations under the Credit Agreement have been fully satisfied; provided that the Agent may in its sole and absolute discretion deem any such obligations to have been satisfied based on advances and loans made, or deemed to be made, to Borrower under the Facility.

c.  The Agent shall have received such financial and other information regarding the Borrower and/or the Buyer as the Agent may reasonably request

d.  The Lenders' approval of the Buyer, at its sole discretion, according to its internal policies.

e.  Terms and conditions of the purchase agreement of between the Debtors and the Borrower shall be satisfactory to the Agent.

f.  Terms and conditions of the Borrower's customer and supply contracts, including those assumed in connection with purchase of the Acquired Assets, shall be satisfactory to the Agent.

g.  Satisfactory background reviews the Borrower's current and proposed senior management.

h.  The corporate, capital, and legal structure of the Borrower shall be acceptable to the Agent; and the Agent shall be satisfied with the nature and status of all contracts, securities, labor, tax, litigation, environmental matters and other matters involving or affecting the Borrower.

i.  The Facility will be subject to the negotiation, execution and delivery of a definitive credit agreement and all related documentation, all in form and substance acceptable to the Agent in its sole discretion. Such documentation will contain provisions typical for a transaction of this type, as well as those required by the Agent, including but not limited to those set forth in this Summary of Terms.

j.  The Agent shall have received satisfactory opinions of the Borrower's independent counsel as to the transactions contemplated hereby and such corporate resolutions, certificates and other documents as the Agent shall reasonably request.

k.  Payment of all closing costs and fees and all unpaid expenses of the Agent.

l.  No material adverse change in the business, financial

performance, operations, or in the condition of the assets of the Borrower and/or the Buyer shall have occurred since the date on which the Borrower and the Agent execute a proposal letter that incorporates this Summary of Terms.

m. The transactions contemplated in this section must close upon the date that Borrower closes the purchase of the Acquired Assets from the Debtors.

**Indemnity:**

Customary and appropriate provisions relating to indemnity and related matters in a form reasonably satisfactory to the Lender.

**Expenses:**

Borrower shall reimburse the Agent for all reasonable out-of-pocket expenses incurred in connection with the transaction, including, without limitation, related due diligence and preparation, negotiation, execution, delivery, administration and enforcement of the definitive documentation including fees and expenses of the Agent's counsel.

**Press Releases:**

The Agent shall have the right to review any press release or announcement in connection with this transaction. Any such press release or announcements shall require the prior consent of the Agent.

**Governing Law:**

All documentation in connection with the Facility shall be governed by the laws of the State of New York applicable to agreements made and performed in such state.

**EXHIBIT A**

**Diamond Glass, Inc.**
Example – Sources/Uses of Bidder Financing Facility

Stalking Horse (Guggenheim) Purchase Price under APA
Base credit bid (amount of prepetition secured debt refinanced under DIP Financing)                     34,000,000.00

PLUS (in addition to payment of "Assumed Liabilities" in accordance with terms):
Estimated DIP Revolving Facility Drawn at Closing Date                                                   7,000,000.00
Chapter 11 Wind-down Costs                                                                               1,500,000.00
Legal Budget Excess (estimated here only for purpose of demonstrating cash flows)                                    -
Nat City Fee                                                                                               750,000.00
                                                                                                         9,250,000.00

Total Stalking Horse (Guggenheim) Bid                                                                   43,250,000.00

Successful Bidder Bid Topping Stalking Horse Bid
Funded Term Loan Under Proposed Bidder Facility                                                         15,000,000.00
Issued LCs Under Bidder Facility to Replace Outstanding Diamond Glass L/Cs                               5,135,060.00
Total Financing at Close                                                                                20,135,060.00

Additional Capital/Cash Required to Top Stalking Horse (Guggenheim) Bid                                $23,114,940.00
PLUS: Overbid Amount                                                                                      250,000.00

Total Successful Bidder Bid Topping Stalking Horse (Guggenheim) Bid                                    $43,500,000.00

Use of Proceeds of Successful Bidder Bid at Closing
Repay (Estimated) DIP Revolving Facility Drawn at Closing Date                                          (7,000,000.00)
Repay DIP Term Loan                                                                                    (34,000,000.00)
Capped Chapter 11 Wind-down Costs (including distribution, if any, available to unsecured creditors)    (1,500,000.00)
Legal Budget Excess (estimated here only for purpose of demonstrating cash flows)                                    -
Nat City Fee                                                                                             (750,000.00)
Available for Repayment of Remaining Guggenheim Prepetition Secured Debt                                  250,000.00

4/1/2008

**EXHIBIT 2**

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| DIAMOND GLASS, INC., *et al.*,[1] | ) | |
| | ) | Case No 08-_____ |
| Debtors. | ) | (Jointly Administered) |

## NOTICE OF AUCTION AND SALE

**PLEASE TAKE NOTICE** that, on April ___, 2008, Diamond Glass, Inc. ("Diamond Glass"), and DT Subsidiary Corp. ("DT Subsidiary") (collectively, the "Debtors") filed their motion for entry of an order (A) approving certain bid procedures, which are attached hereto as Exhibit 1 (the "Bid Procedures"), for the proposed sale of substantially all of Debtors' Assets, as more fully set forth in that certain asset purchase agreement (the "APA") by and between Debtors and Diamond Glass Acquisition, LLC or its assignee(s) or designee(s) (the "Stalking Horse Bidder"); (B) scheduling a hearing (the "Sale Hearing") and approving the form and manner of notice of the Auction and the Bid Procedures; (C) establishing procedures for assumption and assignment of certain Designated Contracts, including notice of proposed cure amounts; (D) authorizing Debtors to pay to Stalking Horse Bidder an expense reimbursement under certain terms and conditions set forth more particularly below; and (E) granting related relief (the "Bid Procedures Motion"), and (ii) Motion for an Order Pursuant to Sections 105(a), 363, and 365 of the Bankruptcy Code and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (A) Authorizing the Sale of Substantially All of Its Assets; (B) Approving an Asset Purchase Agreement, Subject to Higher and Better Offers; (C) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (D) Granting Related Relief (the "Sale Motion") with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").[2]  By order dated April ___, 2008, the Bankruptcy Court entered an order (the "Bid Procedure Order") approving the Bid Procedure Motion which, among other things, established procedures for the submission of Bids, Auction Process and Sale Hearing regarding the Sale of substantially all of the Debtors' Assets.  Although the Debtors entered into the APA with the Stalking Horse Bidder to sell substantially all of the Debtors' Assets, the APA and the Proposed Sale is subject to further offers pursuant to the Bid Procedure Order.

Any party that wishes to take part in this process and submit a bid for the Assets or any portion thereof must submit their competing Bid prior to June ___, 2008, at 12:00 noon (Eastern

---

[1]     The Debtors in these proceedings are: Diamond Glass, Inc. (Tax ID No. XX-XXX8853) and DT Subsidiary Corp. (Tax ID No. XX-XXX8853). The Debtors' corporate address is 220 Division Street, Kingston, PA 18704. Diamond Glass, Inc. is formerly known as Diamond Glass Companies, Inc. and Diamond Triumph Auto Glass, Inc.

[2]     All capitalized terms not defined herein shall be given the meaning ascribed to them in the Bid Procedures Order (as hereinafter defined).

Time), to (a) Debtors, 220 Division Street, Kingston, PA 18704, Attn: William Cogswell, President; (b) co-counsel to Debtors, Foley & Lardner LLP, 90 Park Avenue, New York, NY 10016, Attn: Michael P. Richman, and Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington, DE 19801, Attn: Michael Nestor; (c) counsel to the Stalking Horse Bidder, Allen & Overy LLP, 1221 Avenue of the Americas, New York, NY 10020, Attn: Ken Coleman and Daniel Guyder, and Buchanan Ingersoll & Rooney PC, The Brandywine Building, 1000 West Street, Suite 1410, Wilmington, DE 19801-1054, Attn: Mary F. Caloway; and (d) counsel to the official committee of unsecured creditors (the "Committee") appointed in these cases.

Only those parties that submit Qualified Bids may participate in the Auction. If you are interested in determining how to submit such a Qualified Bid, you must comply with the terms of the Bid Procedures as referenced in the Bid Procedures Order and attached hereto. Only the authorized representatives or agents of each of the Qualified Bidders, the Committee, and Debtors shall be permitted to attend the Auction. At the Auction, Qualified Bidders will be permitted to increase their bids. The bidding at the Auction shall start at the Purchase Price plus $200,000, and shall continue in increments of at least $100,000.00. The highest or otherwise best Qualified Bid shall be determined by Debtors in their sole discretion, in consultation with the Committee or as determined by the Bankruptcy Court if there is a dispute.

If you seek to object to the sale of the Assets or any portion thereof, you must comply with the terms for making such objections as set forth in the Bid Procedures and the Bid Procedures Order. Such objections must be filed with the Bankruptcy Court and served on the parties set forth in the Bid Procedures Order. If any party fails to timely file and serve an objection in accordance with the Bid Procedures Order, the Bankruptcy Court may disregard such objection. The failure of any person to timely file its objection shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Motion or the Debtors' assumption and assignment of any Designated Contract or the consummation of the Proposed Sale and performance under the APA (or any alternative agreement entered into with the Successful Bidder), including the transfer of the Assets free and clear of Encumbrances (other than permitted Encumbrances provided for expressly in the APA or alternative purchase agreement entered into with the Successful Bidder).

FOLEY & LARDNER LLP
Michael P. Richman
Keith Owens
Erika Morabito
90 Park Avenue
New York, NY 10016
(212) 682-7474 (Telephone)
(212) 687-2329 (Facsimile)

YOUNG CONAWAY STARGATT &
TAYLOR, LLP
Michael R. Nestor
Joseph M. Barry
The Brandywine Building
1000 West Street, 17th Floor,
Wilmington, DE 19801
(302) 571-6758 (Telephone)
(302) 571-1253 (Facsimile)

**EXHIBIT 3**

# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| DIAMOND GLASS, INC., *et al.*,[1] | Case No. 08 - _____ ( _ ) |
| | (Joint Administration Requested) |
| Debtors. | **Hearing Date:** _____, 2008 at __:__ _.m. |
| | **Objections Due:** _____, 2008 at 4:00 p.m. |

## NOTICE OF CURE AMOUNTS FOR POSSIBLE ASSUMPTION, SALE, AND ASSIGNMENT OF CERTAIN UNEXPIRED LEASES AND EXECUTORY CONTRACTS AND SALE HEARING

**PLEASE TAKE NOTICE** that, on April __, 2008, Diamond Glass, Inc. ("Diamond Glass") and DT Subsidiary Corp. (collectively, the "Debtors") filed their motion with this Court (this "Motion"), pursuant to §§ 105(a), 363, 365, 503 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for entry of an order (A) approving certain bid procedures (the "Bid Procedures"), for the proposed sale of substantially all of Debtors' Assets, as more fully set forth in that certain asset purchase agreement (the "APA") by and between Debtors and Diamond Glass Acquisition, LLC or its assignee(s) or designee(s) (the "Stalking Horse Bidder"); (B) scheduling a hearing (the "Sale Hearing") and approving the form and manner of notice of the Auction and the Bid Procedures; (C) establishing procedures for assumption and assignment of certain Designated Contracts, including notice of proposed cure amounts; (D) authorizing Debtors to pay to Stalking Horse Bidder an expense reimbursement under certain terms and conditions set forth more particularly below; and (E) granting related relief (the "Bid Procedures Motion") with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Debtors have received a Qualified Bid[2] from the Stalking Horse Bidder. An order approving the Bid Procedures Motion (the "Bid Procedures Order") was entered by the Bankruptcy Court on April ___, 2008, after a hearing held on April ___, 2008.

**PLEASE TAKE NOTICE** that the Bankruptcy Court scheduled a hearing to consider Debtors' Motion for an Order Pursuant to Sections 105(a), 363, and 365 of the Bankruptcy Code and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (A) Authorizing the Sale of Substantially All of Its Assets (the "Asset Sale"); (B) Approving an

---

[1] The Debtors in these proceedings are: Diamond Glass, Inc. (Tax ID No. XX-XXX8853) and DT Subsidiary Corp. (Tax ID No. XX-XXX8853). The Debtors' corporate address is 220 Division Street, Kingston, PA 18704. Diamond Glass, Inc. is formerly known as Diamond Glass Companies, Inc. and Diamond Triumph Auto Glass, Inc.

[2] All capitalized terms not defined herein shall be given the meaning ascribed to them in the Bid Procedures.

Asset Purchase Agreement (the "APA"), Subject to Higher and Better Offers; (C) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (D) Granting Related Relief (the "Sale Motion") for June ___, 2008, at __:___ __.m. (Eastern Time) (the "Sale Hearing"). You may obtain a copy of the APA by making a written request to the undersigned counsel to Debtors.

**PLEASE TAKE FURTHER NOTICE** that at the Sale Hearing or as soon thereafter as counsel can be heard, in connection with the Sale Motion, the Bankruptcy Court will consider whether to enter an order approving the Sale Motion.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Sale Motion, Debtors may assume, sell, and assign certain of their unexpired leases, license agreements, and executory contracts (collectively, the "Contracts") free and clear of all liens, claims, encumbrances, and interests on satisfaction of the cure amounts required under section 365(b)(1)(A) of the Bankruptcy Code (the "Cure Costs"). The Contracts that the Debtors may seek to assume, sell, and assign (the "Designated Contracts") and corresponding Cure Costs are listed on the attached Exhibit A.

**PLEASE TAKE FURTHER NOTICE** that any objections to the relief requested in the Sale Motion, including the assumption, sale and assignment of the Designated Contracts and the corresponding Cure Costs under section 365(b) of the Bankruptcy Code, must (a) be in writing, (b) comply with the Federal Rules of Bankruptcy Procedures and the Local Bankruptcy Rules, (c) be filed with the Clerk of the Bankruptcy Court for the District of Delaware, Third Floor, 824 Market Street, Wilmington, Delaware 19801, **no later than 4:00 p.m. (Eastern Time) on May 30, 2008 (the "Cure Objection Deadline")** and (d) be served so as to be received no later than 4:00 p.m. (Eastern Time) on the same day, on (i) Diamond Glass, Inc. and DT Subsidiary, Corp., 220 Division Street, Kingston, PA 18704, Attn: William Cogswell, President; (ii) co-counsel to Debtors, Foley & Lardner LLP, 90 Park Avenue, New York, NY 10016, Attn: Michael P. Richman, and Young Conaway Stargatt & Taylor, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington, DE 19801, Attn: Michael Nestor; (iii) counsel to Stalking Horse Bidder, Allen & Overy LLP, 1221 Avenue of the Americas, New York, NY 10020, Attn: Ken Coleman and Daniel Guyder, and Buchanan Ingersoll & Rooney, PC, The Brandywine Building, 1000 West Street, Suite 1410, Wilmington, DE 19801-1054, Attn: Mary F. Caloway; and (iv) counsel to the official committee of unsecured creditors appointed in these cases (the "Committee"); provided, however, if the Stalking Horse Bidder is not the Successful Bidder and the alternative Successful Bidder is seeking to have certain unexpired leases, license agreements, and executory contracts assumed and assigned as part of an alternative transaction, the non-debtor parties to such unexpired leases, license agreements and executory contracts shall have until the Sale Hearing to raise objections under section 365(b)(1)(C).

**PLEASE TAKE FURTHER NOTICE that any person or entity receiving notice of the Sale Hearing and this Notice that fails to file an objection on a timely basis shall (a) be forever barred from objecting to the Cure Costs and from asserting any additional cure or other amounts with respect to such unexpired lease, license agreement, or executory contract and Debtors shall be entitled to rely solely on the Cure Costs; and (b) be forever barred and estopped from asserting or claiming against Debtors or the**

2

Successful Bidder or any other assignee of the relevant Designated Contract that any additional amounts are due or defaults exist under such Designated Contract. **The failure of any person to timely file its objection shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Motion or Debtors' assumption and assignment of any Designated Contract or the consummation of the Proposed Sale and performance under the APA (or any alternative agreement entered into with the Successful Bidder), including the transfer of the Assets free and clear of Encumbrances (other than permitted Encumbrances provided for expressly in the APA or alternative purchase agreement entered into with the Successful Bidder).**

**PLEASE TAKE FURTHER NOTICE** that the Sale Hearing may be adjourned from time to time without further notice to creditors or parties-in-interest other than by announcement of said adjournment in the Bankruptcy Court or on the Bankruptcy Court's calendar on the date scheduled for the Sale Hearing.

FOLEY & LARDNER LLP
Michael P. Richman
Keith Owens
Erika Morabito
90 Park Avenue
New York, NY 10016
(212) 682-7474 (Telephone)
(212) 687-2329 (Facsimile)

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Michael R. Nestor
Joseph M. Barry
The Brandywine Building
1000 West Street, 17th Floor,
Wilmington, DE 19801
(302) 571-6758 (Telephone)
(302) 571-1253 (Facsimile)