# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DIAMOND GLASS, INC., *et al.*,[1] | ) | Case No. 08-10601 (CSS) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |
| | ) | **Hearing Date: TBD** |
| | ) | **Objections Due: TBD** |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. §§ 105(A), 363 AND 365 AND FEDERAL BANKRUPTCY RULES 2002, 6004, 6006, AND 9014, (A) APPROVING ASSET PURCHASE AGREEMENT AND AUTHORIZING THE SALE OF ASSETS OF DEBTORS OUTSIDE THE ORDINARY COURSE OF BUSINESS; (B) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES; (C) AUTHORIZING THE ASSUMPTION AND SALE AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (D) GRANTING RELATED RELIEF

Diamond Glass, Inc. ("Diamond") and DT Subsidiary Corp. ("DT Subsidiary" and, together with Diamond, the "Debtors"), by and through their undersigned counsel, hereby file this motion (the "Motion") for entry of an order: (A) approving that certain Asset Purchase Agreement (the "Agreement" or the "APA") entered into or to be entered into by and between the Debtors and Diamond Glass Acquisition, LLC or its assignee(s) or designee(s) (the "Stalking Horse Bidder") in substantially the form annexed hereto as Exhibit A; (B) approving the sale (the "Sale") of substantially all of the Debtors' assets (the "Assets") outside the ordinary course of business and free and clear of all liens, claims, interests and encumbrances (collectively, the "Encumbrances"), and subject to higher or better bids; (C) authorizing and approving the assumption and assignment of certain executory contracts and unexpired leases (the "Designated Contracts"); and (D) granting

---

[1] The Debtors in these proceedings are: Diamond Glass, Inc. (Tax ID No. XX-XXX8853); and DT Subsidiary Corp., a wholly owned subsidiary of Diamond Glass (Tax ID No. XX-XXX3494), each with a mailing address of 220 Division Street, Kingston, PA 18704. Diamond Glass, Inc. is formerly known as Diamond Glass Companies, Inc. and Diamond Triumph Auto Glass, Inc.

related relief. The facts and circumstances supporting this Motion are set forth in the concurrently filed Declaration of William Cogswell in Support of Chapter 11 Petitions and First Day Motions (the "Cogswell Declaration"). In further support of the Motion, the Debtors respectfully state as follows:

## JURISDICTION

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief sought herein are sections 105(a), 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## GENERAL BACKGROUND

2. On the date hereof (the "Petition Date"), the Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code. The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of Title 11 of the United States Code (the "Bankruptcy Code").

3. No request for appointment of a chapter 11 trustee or examiner has been made and, as of the date hereof, no official committee has been appointed.

### History and Operations

4. The Debtors collectively constitute one of the nation's oldest and leading providers of automotive glass replacement and repair services. Founded as a one-man shop by Avram Levine, a Russian immigrant in 1923, the "Diamond Glass Works" grew steadily as a family business throughout most of the twentieth century, adapting repeatedly to revolutionary transformations in automobile glass technology, including the introduction of laminated windshields, and tempered glass for back and side windows.

5.    The Debtors rapidly expanded in the 1980s. They opened their first additional branch in 1982 in Monticello, New York. With the success of the Monticello facility, the Debtors began a successful campaign of expansion. Through the early to mid 1980s, the Debtors added approximately one to two new branches per year, reaching 10 branches in 1987. As the Debtors refined and standardized their store-opening model, they dramatically increased the number of new branch openings each year through the late 1980s and into the 1990s, reaching 140 stores in 1996.

6.    While remaining true to their roots as a family enterprise, the Debtors recognized that the great increase in the scope of their operations required them to recruit professional leadership with a strong history of experience in the modern auto glass industry, as well as increased financial resources, and they acted accordingly. In 1998, the Debtors and Leonard Green Partners, LLP came together in a leveraged financing transaction that, together with the recruitment of new management with vast auto glass industry experience, gave the Debtors a much higher profile.

7.    In the past decade, the Debtors have grown into a truly national network of auto glass stores with a coast-to-coast presence in most major markets throughout the United States. Headquartered in Kingston, Pennsylvania, this family-owned company has grown from a one-man shop into a network of 217 service centers and approximately 900 mobile installation vehicles in 42 states, serviced by three distribution facilities located in Kingston, Pennsylvania; Columbus, Ohio; and Atlanta, Georgia. The Debtors currently have approximately 1,620 full and part-time employees including field technicians, customer service representatives, sales associates, and corporate associates.

8.    The United States auto glass replacement market is estimated to be approximately $3.0 to $3.5 billion annually. The Debtors' share of the market is approximately 7%.

The Debtors' revenue today comes primarily from three sources: (a) insurance sales (work paid for by insurance companies in respect to auto glass replacement for covered policyholders), which comprises approximately 30% of the Debtors' dollar sales; (b) commercial sales (work performed on behalf of local body shops, new and used car dealerships, rental car fleets, company fleets, or other business entities), which comprises approximately 43% of the Debtors' dollar sales; and (c) cash/retail (work performed directly for individual consumers who pay for auto glass replacement without involving an insurance company), which comprises approximately 27% of the Debtors' dollar sales.

9.     The Debtors compete with local, regional and national service providers in a mature, highly fragmented market where it is estimated that more than 75% of participants operate fewer than three locations. Notwithstanding that the barriers of entry are low, the Debtors' size and distribution network has enabled them to leverage their buying power and provide low cost glass to their stores on a just-in-time basis, resulting in higher profit margins and lower store inventory levels. In addition, the Debtors have been able to develop long-standing customer relationships and significant brand recognition due to their longevity in the marketplace.

**Existing Indebtedness**

10.     Diamond Glass, as Borrower,[2] is a party to that certain Credit Agreement dated January 12, 2007 (as amended, supplemented or otherwise modified, the "Existing Credit Agreement") with Guggenheim Corporate Funding, LLC (the "Guggenheim").[3] Pursuant to the

---

[2]     Diamond Glass's predecessor, Diamond Triumph Auto Glass, Inc., is the borrower under the Existing Credit Agreement. Unless otherwise indicated, all references to "Diamond Glass" shall include "Diamond Triumph Auto Glass, Inc."

[3]     Guggenheim is the agent for the financial institutions identified as lenders under the Existing Credit Agreement and the DIP Facility (as defined below) (including their respective successors and assigns) (the "Lenders"). Orpheus Holdings, LLC ("Holdings") is the predecessor in interest to Orpheus Funding, LLC, as the Lender under the Credit Agreement. Holdings also is the original proposed lender under the DIP Facility. The Stalking Horse Bidder, Diamond Glass Acquisition, LLC, is a Delaware limited liability company, a wholly-owned subsidiary of Holdings, and the proposed acquisition vehicle through which Guggenheim, as agent, would acquire (or direct the acquisition of, on behalf

Existing Credit Agreement, Guggenheim provided the Debtors with a term loan and revolving loan in the aggregate principal amount of approximately $35 million (the "Prepetition Loans").

11. In connection with the Prepetition Loans, Diamond Glass and Guggenheim entered into a Security Agreement dated January 12, 2007, pursuant to which Diamond Glass and DT Subsidiary (as guarantor) granted Guggenheim a security interest in substantially all of their assets.[4]

12. As part of the Existing Credit Agreement, Security Agreement, and related credit documents (collectively, the "Prepetition Loan Documents"), Kenneth Levine (whose family founded the Debtors, and who until October 25, 2007 was the Debtors' Chief Executive Officer and remains its principal stockholder) executed a Pledge Agreement (the "Levine Pledge Agreement") and Guaranty (the "Levine Guaranty") to further secure the Secured Obligations of Diamond Glass under the Prepetition Loan Documents. Mr. Levine's obligations and liabilities under the Levine Guaranty are limited to his equity interests, cash collateral and the proceeds thereof in an aggregate amount of approximately ten million dollars ($10,000,000) pledged by Mr. Levine to Guggenheim pursuant to the Levine Pledge Agreement.

13. On or about May 2, 2007, Guggenheim and Diamond Glass entered into a First Amendment to the Existing Credit Agreement, pursuant to which Guggenheim agreed to decrease the minimum liquidity requirement from $5 million to $3 million, such that the Revolving Loan Commitment available for borrowing by Diamond Glass was increased by $2 million.

14. On or about November 7, 2007, Guggenheim and Diamond Glass entered into a Second Amendment to the Existing Credit Agreement, pursuant to which Guggenheim agreed to (a) advance to the Debtors an additional $9,687,456.99, (b) extend the maturity date on the Prepetition

---

of the Lenders) all or substantially all of the Debtors' business and assets in the transactions contemplated herein, including with respect to effecting any credit bid on account of the Lenders' claims against the Debtors at any auction or otherwise for the purchase and sale of the Debtors' business and related assets.
[4] The Prepetition Loan Documents (defined above) contemplated that other guarantors might be added in the future.

Loans to February 29, 2008, and (c) limit the guarantee obligations of any DT Subsidiary to an amount not to exceed $37 million.

15.     On or about January 31, 2008, Guggenheim and Diamond Glass entered into a Third Amendment to the Existing Credit Agreement, pursuant to which Guggenheim agreed to extend the payment date for interest due under the Existing Credit Agreement from January 31, 2008 to February 29, 2008. Guggenheim subsequently agreed to successive grace periods for Diamond Glass to pay the Prepetition Loan through April 1, 2008.

16.     As of the Petition Date, the Debtors estimate that the outstanding indebtedness on the Prepetition Loans is approximately $45 million.

17.     In addition to the Prepetition Indebtedness, the Debtors' predecessor, Diamond Triumph Auto Glass, Inc., issued $100 million in unsecured 9 ¼% Senior Notes Due 2008 (the "Notes") in favor of various noteholders (the "Noteholders") pursuant to an Indenture dated March 31, 1998 (as amended) (the "Indenture"). The Debtors estimate that as of the Petition Date they owe approximately $45,215,000 in principal, and $2,091,193.75 in accrued interest to the Noteholders in connection with the Indenture. The Notes were scheduled to mature on April 1, 2008. The Noteholder claims are unsecured and *pari passu* with other unsecured claims.

18.     In addition to the aforementioned institutional debt, as of the Petition Date, the Debtors estimate that they have approximately $13.1 million in unsecured trade debt outstanding.[5]

## Events Leading to Commencement of Chapter 11 Cases

19.     Until 2006, the Debtors never had a year in which they suffered operating and financial losses. Among other things, the insurance segment of the market, which historically has been the most profitable and most influential in driving revenues, has experienced a steady decline in

---

[5]     Nothing contained herein is intended to be (nor shall it be deemed to be) an admission regarding the existence or amount of any indebtedness.

revenue per unit over the past few years as insurance companies have attempted to align their prices more closely with prices paid by customers in other segments of the market. There has also been a reduction in automotive glass replacement insurance claims as insurance companies have increased their deductibles to enhance their price competitiveness in the market. At the same time, certain of the Debtors' decisions to improve performance regrettably and inadvertently had the opposite effect. Thus, the Debtors brought in a fresh management team, implemented new and aggressive steps to increase revenue and decrease costs, rehired local sales representatives, closed unprofitable stores, cut overhead, increased revenue per unit, and resolved pending litigation. This led to immediate improvements in performance which continue to date.

20.     While the Debtors are confident that the measures employed by the current management will continue to yield positive results, the Debtors were faced with some insurmountable obstacles that necessitated the commencement of these chapter 11 cases. As set forth more fully above, the Debtors' Prepetition Loans with Guggenheim matured on April 1, 2008. In addition, the Debtors' indebtedness to the Noteholders pursuant to the Indenture was to mature on April 1, 2008. The likely inability to obtain further extensions in the maturity of the senior debt and the Notes, when combined with the recent deterioration in the nation's economy and, in particular, limited availability in the credit markets, made it practically impossible for the Debtors to satisfy or refinance their obligations. Thus, left with no viable alternative that would enable the Debtors to obtain continued financing to operate their business, the Debtors retained the investment banking firm of NatCity Investments, Inc. ("NatCity") and began a process of exploring strategic alternatives, including a potential sale or restructuring of the business.

21.     The Debtors, in consultation with NatCity, their other professionals, and other interested parties, considered a number of potential sales and restructuring alternatives in order to

develop a plan that would maximize value for their creditors and to ensure the long-term survival of their business. After considering their options and, in light of the aforementioned financial deadlines and restrictions, including a purchase offer from the Stalking Horse Bidder – an affiliate of Guggenheim's and Guggenheim's designee for purposes of effecting the transactions under the APA, including the credit bid contemplated therein, as further described herein - the Debtors determined that the floor established by a purchase of all or substantially all of their assets by the Stalking Horse Bidder, subject to higher and better bids pursuant to a Bankruptcy Court-approved, open auction process pursuant to section 363 of the Bankruptcy Code (the "Proposed Sale"), afforded them the best opportunity to maximize value for their creditors.

22. Had the Debtors not commenced these cases, their ability to finance, sell or restructure their business, maximize value and preserve and enhance the Debtors' financial health would likely have been severely compromised by litigation, either inside or outside of a bankruptcy proceeding, which would have risked serious interruption of the Debtors' business and significantly impacted the Debtors' going-concern value. The commencement of these cases and implementation of an orderly sale process under the supervision of this Court, with Guggenheim providing a floor against which interested parties may bid, will permit the Debtors to consummate a going-concern sale of all or substantially all of their assets and maximize value of their estates for all interested parties.

### RELIEF REQUESTED

23. By this Motion, the Debtors request that the Court enter an order:

(A) approving the sale the Assets to the Stalking Horse Bidder or to any other Successful Bidder(s)[6],

---

[6] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Debtors' Motion For Entry Of Order, Pursuant To 11 U.S.C. §§ 105(A), 363, 365, 503, And 507 And Federal Bankruptcy Rules 2002, 6004, 6006, And 9014, (A) Approving Bid Procedures For Sale Of Substantially All Of The Debtors' Assets; (B) Scheduling A Hearing To Consider The Sale And Approving The Form And Manner Of Notices; (C) Establishing Procedures For Assumption And Assignment Of Certain Contracts, Including Notice Of Proposed Cure Amounts; (D) Authorizing Payment Of An Expense Reimbursement; And (E) Granting Related Relief, filed on April 1, 2008 [Docket No. 14].

free and clear of all Encumbrances; (B) authorizing and approving the Agreement; (C) authorizing and approving the assumption and assignment of the Designated Contracts; and (D) granting such other and further relief as is just and proper.

24. The material terms of the Agreement are as follows:[7]

A. <u>Purchase and Sale of Assets.</u>

(a) Upon and subject to the terms and conditions of the Agreement, the Purchaser shall purchase from the Sellers, and the Sellers shall sell, transfer, convey, assign and deliver to the Purchaser, at the Closing, for the aggregate consideration specified below, all of the Sellers' right, title and interest in and to the assets of the Sellers set forth in Section 2.1 of the Agreement (the "<u>Purchased Assets</u>").

(b) Notwithstanding the provisions of Section 2.1 of the Agreement, the Acquired Assets shall not include the following assets (collectively, the "<u>Excluded Assets</u>"):

(i) the equity interests issued by Sellers;

(ii) all of the Seller Contracts and Real Property Leases that are not Designated Contracts;

(iii) all rights of Sellers under the Agreement, the Bill of Sale and the Assignment and Assumption Agreement;

(iv) the personal property and assets expressly designated in Schedule 2.2(d) of the Seller Disclosure Schedule;

(v) claims against third parties to the extent related solely to any Excluded Asset or Retained Liabilities;

(vi) all rights under insurance policies to the extent relating to claims for losses related exclusively to any Excluded Asset or otherwise non-assignable as a matter of law;

(vii) Sellers' corporate seals, stock Record books, corporate Record books containing minutes of meetings of directors and stockholders, and such other Records having to do solely with Sellers' organization or stock capitalization or Excluded Assets or Retained Liabilities;

---

[7] This summary of the Agreement is provided for the Court's convenience only. To the extent that the summary differs in any way from the terms of the Agreement, the terms of the Agreement shall control. Capitalized terms used but not defined in this summary shall have the meanings given in the Agreement.

(viii) all personnel Records and other Records that Sellers are required by law to retain in their possession; and

(ix) Sellers' claims, causes of action and rights of recovery pursuant to Sections 544 through 550 and Section 553 of the Bankruptcy Code and any other avoidance action under any other applicable provisions of the Bankruptcy Code.

B. <u>Purchase Price</u>. The aggregate consideration for the Purchased Assets (the "<u>Purchase Price</u>") shall be the sum of:

(a) $34.0 million, *plus*

(b) the Assumed Liabilities, including the payment by Purchaser:

(i) to NatCity Investments, Inc. the fee payable pursuant to the NatCity Retention Letter,

(ii) of the cure payments to non-debtor parties to the Designated Contracts that are assigned to Purchaser and assumed by Purchaser in accordance with section 7.5 of the Agreement (if such cure payments have not been satisfied by the Sellers using the proceeds of Loans under the DIP Financing),

(iii) to the Sellers the amount of $1.5 million, which the Sellers shall use to fund: (A) $670,000.00 into a segregated escrow account for the benefit of participants under a management incentive program to be proposed by the Sellers in the Chapter 11 Cases (and subject to the entry of an order of the Bankruptcy Court approving any such plan; such plan to pay up to $670,000.00 of benefits, with the excess, if any, returned to Purchaser within five days after final distributions are made to Sellers' creditors under a confirmed chapter 11 plan), and (B) the amount of $830,000.00 to be held in the Sellers' general funds to satisfy in part the costs of administration and winding down the Chapter 11 Cases (and subject to any orders of the Bankruptcy Court, including any order confirming a chapter 11 plan entered after the Closing Date), and

(iv) to the Sellers the amount equal to the sum of (A) the positive difference, if any, between (1) initial aggregate budgeted amount, pursuant to the budget as approved by Guggenheim under the DIP Financing, for the reasonable fees and costs incurred during the Chapter 11 Cases by the professionals retained by the Sellers, the official committee of unsecured creditors appointed in the Sellers' Chapter 11 Cases, and Guggenheim, and (2) the actual aggregate amount of such fees and costs incurred during such period by such professionals, which amount (if any) will be held and used by the Sellers pursuant to sub-section 2.3(b)(iii)(B) of the Agreement; plus

(c) an amount equal to the aggregate outstanding Revolving Loans (included in the DIP Obligations) determined as of the Effective Time.

Except with respect to the components of the Purchase Price identified in sub-section 2(b)(ii) and (iii) of the Agreement, which amounts the Purchaser will pay in cash at the Closing, sub-section 2(b)(i), which amount the Purchaser will pay on terms and conditions agreed to with NatCity Investments, Inc., and sub-section 2(b)(iv) of the Agreement, which amount (if any) the Purchaser will pay upon the confirmation of a chapter 11 plan for the Sellers, such Purchase Price will be satisfied in the form of a credit bid (in whole or in part) under section 363(k) of the Bankruptcy Code and in accordance with the Bid Procedures Order (defined below) and Sale Order on account of, and applied in the following order (on a dollar-for-dollar basis) against, (a) the then outstanding amount of the DIP Obligations until such obligations have been fully satisfied in accordance with the DIP Financing, and next (b) the then outstanding amount of the Prepetition Obligations until such obligations have been fully satisfied in accordance with the Credit Agreement, whether such obligations are owing to the Purchaser, the Agent or the Lenders (including their successors and assigns) under either the DIP Financing or the Credit Agreement.

C.    The Closing.  The closing of the transactions contemplated by the Agreement (the "Closing") shall take place at the offices of Allen & Overy LLP in New York, New York commencing at 10:00 a.m. local time on June 12, 2008, or as soon thereafter following the satisfaction or waiver of all conditions to the obligations of the parties hereto to consummate the transactions contemplated hereby (other than conditions with respect to actions the respective parties will take at the Closing itself) or such other date as Purchaser and Sellers may mutually determine (the "Closing Date").  The parties hereto shall use their commercially reasonable efforts to consummate the transactions contemplated hereby within fifteen (15) calendar days after the Bankruptcy Court has entered the Sale Order approving such sale to Purchaser.

D.    Condition of Acquired Assets.  Except as expressly set forth in the Agreement, the Purchaser is purchasing the Purchased Assets and Assumed Liabilities in their **"AS IS, WHERE IS CONDITION."**  *Any representations and warranties contained in the Agreement shall not survive the Closing.*

E.    Expense Provisions.  In the event of a termination of the Agreement due to (x) (i) Sellers accepting or selecting, and the Bankruptcy Court shall having approved, the bids or bids (including a credit bid) of any Person or Persons other than Purchaser or any of its Affiliates to purchase all or any portion of the businesses and Purchased Assets of Sellers and (ii) such transaction or transactions contemplated by any such bid or bids shall have been consummated, or (y) if Sellers withdraw their support for the transactions contemplated by the Agreement and seek to have a stand alone plan of reorganization approved by the Bankruptcy Court, Sellers will reimburse the Purchaser for all actual out-of-pocket costs and expenses (including professional fees) reasonably incurred by the Purchaser and its affiliates in connection with the transactions contemplated by the Agreement, up to a maximum of 2.0% of the Purchase Price (excluding the Assumed Liabilities).

F.    Conditions to Obligations.  The obligation of the Sellers and Purchaser to consummate the transactions to be performed by them in connection with the Closing are subject to the satisfaction or waiver or various closing conditions contained in Article 9 and Article 10 of the Agreement, which include but are not limited to the Bankruptcy Court entering the Bid Procedures Order and Sale Order.

G. <u>Termination of Agreement</u>. Certain of the parties may terminate the Agreement as provided below:

(a)     Purchaser and Sellers may terminate the Agreement by mutual written consent at any time prior to the Closing;

(b)     Purchaser may terminate the Agreement by giving written notice to Sellers at any time prior to the Closing if (A) Sellers have within the then previous ten (10) business days given Purchaser any notice pursuant to Section 5.1 of the Agreement and (B) the development that is the subject of the notice has caused the representations and warranties in Article 3 above not to be true and correct in all material respects (except to the extent that any such representation or warranty is qualified by terms such as "material" and "Material Adverse Effect," in which case if such development that is the subject of the notice has caused the representation or warranty in Article 3 above not to be true and correct in all respects) and such result has not been cured within fifteen (15) days of the date of such notice;

(c)     Purchaser may terminate the Agreement by giving written notice to Sellers at any time prior to the Closing (A) in the event Sellers have Breached any material representation, warranty, or covenant contained in the Agreement in any material respect, Purchaser has notified Sellers of the Breach, and the Breach has continued without cure for a period of fifteen (15) days after the notice of Breach or (B) if the Closing shall not have occurred on or before June 30, 2008, by reason of the failure of any condition precedent under Section 10 of the Agreement (unless the failure results primarily from Purchaser itself Breaching any representation, warranty, or covenant contained in the Agreement);

(d)     Purchaser may terminate the Agreement by giving written notice to the Sellers at any time prior to Closing (A) if the Bid Procedures Order shall not have been entered by the Bankruptcy Court within twenty (20) days following the Petition Date, (B) (i) if Sellers have accepted or selected, and the Bankruptcy Court shall have approved, the bids or bids (including a credit bid) of any Person or Persons other than Purchaser or any of its Affiliates to purchase all or any portion of the businesses and Purchased Assets of Sellers and (ii) such transaction or transactions contemplated by any such bid or bids shall have been consummated, or (C) if Sellers withdraw their support for the transactions contemplated by the Agreement and seek to have a stand alone plan of reorganization approved by the Bankruptcy Court;

(e)     Sellers may terminate the Agreement by giving written notice to Purchaser at any time prior to the Closing (A) if Purchaser has Breached any material representation, warranty, or covenant contained in the Agreement in any material respect, Sellers have notified Purchaser of the Breach, and the breach has continued without cure for a period of fifteen (15) days after the notice of Breach or (B) if the Closing shall not have occurred on or before June 30, 2008, by reason of the failure of any condition precedent under Article 9 hereof (unless the failure results primarily from Sellers Breaching any representation, warranty, or covenant contained in the Agreement);

(f)     (A) Purchaser may also terminate the Agreement by giving written notice to Sellers at any time prior to the Closing but within two (2) business days

following April 1, 2008 if the Petition Date is not on or before April 1, 2008; (B) to the extent that Purchaser does not terminate the Agreement within such two (2) day period pursuant to Section 11.1(f)(A) of the Agreement, Purchaser may terminate the Agreement by giving written notice to Sellers at any time prior to the Closing but within two (2) business days following April 21, 2008 if the date of entry of the Bid Procedure Order is not on or before April 21, 2008; (C) to the extent that Purchaser does not terminate the Agreement within such two (2) day period pursuant to Section 11.1(f)(B) above, Purchaser may terminate the Agreement by giving written notice to Sellers at any time prior to the Closing but within two (2) business days following June 6, 2008 if the date of entry of the Sales Order is not on or before June 6, 2008; and (D) to the extent that Purchaser does not terminate the Agreement within such two (2) day period pursuant to Section 11.1(f)(C) above, Purchaser may terminate the Agreement by giving written notice to Sellers at any time prior to the Closing but within two (2) business days following June 30, 2008 if the Closing Date is not on or before June 30, 2008;

(g)     Purchaser may terminate the Agreement by giving written notice to Sellers to the extent Purchaser rejects any part of the Seller Disclosure Schedules following the Disclosure Schedule Resolution Period in accordance with Section 5.12 of the Agreement.

## BASIS FOR RELIEF REQUESTED

### A.     The Agreement and Sale Should be Approved

25.     The relief requested by this Motion is appropriate and within the Court's authority to approve transactions under section 363(b) of the Bankruptcy Code and within the Court's equitable powers under section 105(a) of the Bankruptcy Code.

26.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the disposition of a debtor's assets prior to confirmation of a plan. However, courts in this Circuit and others have required that the decision to sell assets outside the ordinary course of business be based upon the sound business judgment of the debtors. *See In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143 (3d Cir. 1986*); see also Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir.

1983); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991).

27.    The "sound business judgment" test requires a debtor to establish four elements in order to justify the sale of assets outside the ordinary course of business, namely:  (a) that a "sound business purpose" justifies the sale of assets outside the ordinary course of business; (b) that adequate and reasonable notice has been provided to interested persons; (c) that the debtors have obtained a fair and reasonable price; and (d) good faith.  *See Abbotts Dairies*, 788 F.2d at 143; *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Sovereign Estates, Ltd.*, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989).

28.    In addition, the relief requested by this Motion is appropriate and within the Court's equitable powers under section 105(a) of the Bankruptcy Code.  Section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under title 11.  Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [title 11]."  11 U.S.C. § 105(a).  Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper.  *See In re Fesco Plastics Corp.*, 996 F.2d 152, 154 (7th Cir. 1993*); Pincus v. Graduate Loan Ctr. (In re Pincus)*, 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002).  Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets.  *See, e.g., Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liq. Trust, Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn.

1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws").

29. A debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. *Lionel*, 722 F.2d at 1071; *see also Montgomery Ward*, 242 B.R. at 155.

30. The Debtors submit that more than ample business justification exists to sell the Assets to the Stalking Horse Bidder or any other Successful Bidder, as the case may be, pursuant to the terms of the proposed Bidding Procedures Order. The Debtors and NatCity have carefully considered and analyzed the Stalking Horse Bidder's offer as set forth in the Agreement, and in light of the circumstances described herein, have concluded that a sale of the Debtors' Assets is in the best interests of the estates and will maximize the value of the Debtors' estates. Thus a sound business purpose justifies the sale of the Assets. The Debtors have limited cash and believe that a prompt sale at the outset of these bankruptcy cases is vital to preserving the "going concern" value of the Debtors' business and to maximize recovery to creditors and other parties in interest. Thus, the Sale presents the best opportunity to realize value for the Debtors' creditors. As described above, the Debtors (through NatCity) have already begun marketing the Assets to potential bidders, and there will be ample time and opportunity for potential qualified bidders to submit overbids. The Debtors, in the exercise of their business judgment, and in consultation with NatCity and other professionals, believe that the proposed Sale to the Stalking Horse Bidder, or any other Successful Bidder, will constitute the highest and best offer for the Assets.

31.     The sale of the Debtors' Assets will be in exchange for fair and reasonable value. Pursuant to the APA, the Stalking Horse Bidder has agreed to provide consideration for the Assets equal to the following: (a) $34.0 million (in the form of a credit bid (the "Credit Bid Component")), plus (b) the Assumed Liabilities, including the payment by Purchaser: (i) to NatCity the fee payable pursuant to the NatCity Retention Letter, (ii) of the cure payments to non-debtor parties to the Designated Contracts that are assigned to Purchaser and assumed by Purchaser in accordance with section 7.5 of the APA (if such cure payments have not been satisfied by the Sellers using the proceeds of Loans under the DIP Financing), (iii) to the Sellers the amount of $1.5 million, which the Sellers shall use to fund: (A) $670,000.00 into a segregated escrow account for the benefit of participants under a management incentive program to be proposed by the Sellers in the Chapter 11 Cases (and subject to the entry of an order of the Bankruptcy Court approving any such plan), and (B) the amount of $830,000.00 to be held in the Sellers' general funds to satisfy in part the costs of administration and winding down the Chapter 11 Cases (and subject to any orders of the Bankruptcy Court, including any order confirming a chapter 11 plan entered after the Closing Date), and (iv) to the Sellers the amount equal to the sum of (A) the positive difference, if any, between (1) initial aggregate budgeted amount, pursuant to the budget as approved by Guggenheim under the DIP Financing, for the reasonable fees and costs incurred during the Chapter 11 Cases by the professionals retained by the Sellers, the official committee of unsecured creditors appointed in the Sellers' Chapter 11 Cases, and Guggenheim, and (2) the actual aggregate amount of such fees and costs incurred during such period by such professionals, which amount (if any) will be held and used by the Sellers pursuant to section 2.3(b)(iii)(B) of the APA; plus (c) an amount equal to the aggregate outstanding Revolving Loans (included in the DIP Obligations) determined as of the Effective Time. Except with respect to the components of the Purchase Price identified above in sub-section (b)(ii)

and (iii), which amounts the Purchaser will pay in cash at the Closing, sub-section (b)(i), which amount the Purchaser will pay on terms and conditions agreed to with NatCity, and sub-section (b)(iv), which amount (if any) the Purchaser will pay upon the confirmation of a chapter 11 plan for the Sellers, such Purchase Price will be satisfied in the form of a credit bid (in whole or in part) under section 363(k) of the Bankruptcy Code and in accordance with the order approving this Motion and Sale Order on account of, and applied in the following order (on a dollar-for-dollar basis) against, (a) the then outstanding amount of the DIP Obligations until such obligations have been fully satisfied in accordance with the DIP Financing, and next (b) the then outstanding amount of the Prepetition Obligations until such obligations have been fully satisfied in accordance with the Credit Agreement, whether such obligations are owing to the Purchaser, the Agent or the Lenders (including their successors and assigns) under either the DIP Financing or the Credit Agreement. The Debtors submit that this constitutes significant consideration for the Assets, and the proposed Sale is further subject to an open market process through the solicitation of competing bids in a Court-supervised auction (the "Auction"). Pursuant to the Bidding Procedures Order, all potentially interested bidders will receive adequate and reasonable notice of the opportunity to submit a competing bid prior to the Auction, and the Bidding Procedures will facilitate an open and competitive bidding process in which all parties will participate in good faith.

32.     Moreover, the Agreement was the product of good faith, arm's length negotiations between the Debtors, on the one hand, and the Stalking Horse Bidder, on the other, and was negotiated with the active involvement of the Debtors' officers and professionals. The Stalking Horse Bidder is a wholly-owned subsidiary of the original lender under the Credit Agreement, and also is the designee of Guggenheim, as the agent for the lenders under the Credit Agreement and the DIP Financing, for the purposes of effecting the transactions under the APA, including the credit

bidding of the allowed secured claims of such lenders, as is contemplated under the APA and the Bid Procedures Order. The Debtors believe and submit that the sale of the Debtors' assets to the Stalking Horse Bidder pursuant to the APA is not the product of collusion or bad faith. No evidence exists to suggest that the APA is anything but the product of arm's length negotiations between the Debtors, the Stalking Horse Bidder, and their respective professional advisors. The Stalking Horse Bidder does not share common ownership with any of the Debtors, and is independently controlled and operated, and is not otherwise affiliated with the Debtors or their officers and directors. For these reasons, the Sale satisfies the good faith element of the "sound business purpose" test. *Compare In re After Six, Inc.*, 154 B.R. 876, 883 (Bankr. E.D. Pa. 1993) (good faith found where officers, directors and employees of debtor had no apparent connection to purchasers) *with Abbotts Dairies*, 788 F.2d at 147-48 ("Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *In re Industrial Valley Refrigeration and Air Conditioning Supplies, Inc.*, 77 B.R. 15, 22 (Bankr. E.D. Pa. 1987) (evidence of inside dealing fatal to good faith requirement).

**B.     The Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code**

33.     Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell all or any part of its property free and clear of any and all liens, claims or interests in such property if (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party asserting such a lien, claim or interest consents to such sale; (iii) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (iv) the interest is the subject of a *bona fide* dispute; or (v) the party asserting the lien, claim or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest. *See* 11 U.S.C.

§ 363(f); *Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that section 363(f) is written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met). The Debtors expect that they will satisfy the requirements of section 363(f) of the Bankruptcy Code.

34. Furthermore, courts have held that they have the equitable power to authorize sales free and clear of interests that are not specifically covered by section 363(f). *See, e.g., In re Trans World Airlines, Inc.*, 2001 WL 1820325 at *3, 6 (Bankr. D. Del. March 27, 2001) (explaining that "courts have long had the authority to authorize the sale of estate assets free and clear even in the absence of §363(f)"); *Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) (authorizing sale free and clear of tort claims even if such claims are not covered specifically by the provisions of §363(f)). As the *Trans World Airlines* court explained, "[t]he authority to sell free and clear is broad. It reflects a compelling policy to encourage bankruptcy sales subject only to claims of a specific and recognized nature in the subject property." *Trans World*, 2001 WL 1820325, at *3. Thus, even in the case of general unsecured claimants, including tort claimants, who arguably have no specific interest in a debtor's property (and, therefore, section 363 of the Bankruptcy Code would not be applicable to such claims), courts have held that the authority to conduct sales free and clear of such claims is still within their equitable powers. *White Motor Credit.*, 75 B.R. at 948.

35. A sale of the Assets other than one free and clear of Encumbrances would have a material adverse impact on the Debtors' bankruptcy estates and would yield substantially less value for the Debtors' estates with less certainty than the proposed Sale. Accordingly, this alternative would be of substantially less benefit to the estates of the Debtors. Moreover, the Stalking Horse Bidder will not consummate the Sale if the Sale and the assignment of the Designated Contracts to

the Stalking Horse Bidder is not free and clear of all Encumbrances. Therefore, the Sale should be approved free and clear of Encumbrances, as being in the best interests of the Debtors, their estates and creditors, and all other parties in interest.

### C. The Assumption and Assignment of the Designated Contracts Should be Approved

36. By this Motion, the Debtors also seek an order pursuant to sections 365(a) and (f) of the Bankruptcy Code, authorizing the Debtors to assume and assign the Designated Contracts. Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. *See, e.g., In re Stable Mews Assoc., Inc.*, 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984). If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract. *See Group of Institutional Investors v. Chicago M. St. P. & P.R.R. Co.*, 318 U.S. 523 (1943) (applying Bankruptcy Act section 77 subsection (b), the predecessor to Bankruptcy Code section 365); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39-40 (3d Cir. 1989). The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp. v. West Penn. Power Co. (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting *Stable Mews Assoc.*, 41 B.R. at 596). Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate and threaten the court's ability to control a case impartially. *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

37.     Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract. *See L.R.S.C. Co. v. Rickel Home Ctrs. (In re Rickel Home Ctrs., Inc.)*, 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate"); *see also Leonard v. Gen. Motors Corp. (In re Headquarters Dodge, Inc.)*, 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of section 365(f) is to assist trustee in realizing the full value of the debtor's assets).

38.     Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *Accord In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtors has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

39.     Here, the Designated Contracts being assumed and assigned to the Stalking Horse Bidder, or any other Successful Bidder as the case may be, are an integral part of the Assets being purchased, and accordingly, the assumption, assignment and sale of the Designated Contracts will enhance the value of the Debtors' estates and is therefore reasonable. The Debtors respectfully submit that the proposed assumption and assignment and sale of the Designated Contracts pursuant to the terms of the assignment procedures are appropriate and reasonably tailored to provide the non-Debtor parties to the Designated Contracts with adequate notice of the proposed assumption and assignment of their applicable contract, the proposed cure amounts and the proposed assignee. Additionally, the Debtors believe that they can and will demonstrate that all requirements for assumption and assignment of the Designated Contracts will be satisfied at the hearing on this Motion. The Debtors will provide all non-debtor counterparties to the Designated Contracts an opportunity to be heard. Moreover, the Debtors, as required by the Bidding Procedures Order, will also evaluate the financial wherewithal of all potential bidders before qualifying such bidders to bid for the Assets. To the extent, under the Stalking Horse Bidder's designation rights, a Designated Contract is later designated by the Stalking Horse Bidder to be assumed and assigned, such designation will be the subject of a future motion and adequate notice and an opportunity to be heard will be given to the applicable contract party or landlord. For the reasons stated throughout this Motion, the Debtors, in exercising their sound business judgment, believe that selling the Assets and assuming and assigning and selling the Designated Contracts to the Stalking Horse Bidder or any other Successful Bidder, as the case may be, is in the best interests of their estates. Thus, the Debtors respectfully submit that by the conclusion of the Sale Hearing, assumption and assignment and sale of the Designated Contracts should be approved under applicable bankruptcy law.

**D.   Sale of the Assets and Assignment of the Designated Contracts are Proposed in "Good Faith" Under Section 363(m) of the Bankruptcy Code**

40.    The Debtors additionally request that the Court find that the Stalking Horse Bidder or any other Successful Bidder, as the case may be, is entitled to the protections provided by section 363(m) of the Bankruptcy Code in connection with the Sale. Section 363(m) of the Bankruptcy Code provides, in pertinent part: "The reversal or modification on appeal of an authorization under subsection (b) . . . of this section of a sale . . . of property does not affect the validity of a sale . . . under such authorization to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal." 11 U.S.C. § 363(m).

41.    Section 363(m) thus protects the purchaser of assets sold pursuant to section 363 from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal. By its terms, section 363(m) applies to sales of interests in tangible assets. The Third Circuit has indicated that section 363(m) also protects the assignee of a debtor's interest in executory contracts under section 365 of the Bankruptcy Code. *See Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc.*, 141 F.3d 490, 497-98 (3rd. Cir. 1998). In *Krebs*, the Court considered "whether assignments of [certain automobile dealership] franchises under section 365 are also sales of estate property subject to section 363(m)." *Id.* at 497. Despite the absence of an explicit reference to assignments of executory contracts under section 365 of the Bankruptcy Code, the Court in *Krebs* concluded that section 363(m) of the Bankruptcy Code protected an assignment of a debtor's interest in certain automobile franchise agreements pursuant to an auction sale. In addition, as with the franchise agreements protected in *Krebs*, the Designated Contracts are executory contracts and unexpired leases that will be assumed, to the extent they have not already been assumed, and assigned pursuant to section 365 of the Bankruptcy Code. In light of *Krebs*, the Debtors respectfully

submit that section 363(m) applies to protect the Stalking Horse Bidder or any other Successful Bidder with respect to both the Assets and the Designated Contracts.

42. Although the Bankruptcy Code does not define "good faith purchaser," the Third Circuit, construing section 363(m) of the Bankruptcy Code, has stated that "the phrase encompasses one who purchases in 'good faith' and for 'value'." *Abbotts Dairies*, 788 F.2d at 147. To constitute lack of good faith, a party's conduct in connection with the sale must usually amount to "fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders." *Id.* (citing *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978); *see also In re Bedford Springs Hotel, Inc.*, 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); *In re Perona Bros., Inc.*, 186 B.R. 833, 839 (D.N.J. 1995). Due to the absence of a bright line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings." *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting *Rock Indus. Machinery Corp.*, 572 F.2d at 1198 (7th Cir. 1978)).

43. As required by Section 363(m) of the Bankruptcy Code, both the Debtors and the Stalking Horse Bidder have acted in good faith in negotiating the sale of the Assets and the assignment of the Designated Contracts. There is no evidence of fraud or collusion in the terms of the Sale or the assignment of the Designated Contracts. To the contrary, as discussed throughout this Motion, the Sale will be the culmination of a lengthy solicitation and negotiation process in which all parties will be represented by sophisticated counsel and financial advisors. The Stalking Horse Bidder is not, nor would any other Successful Bidder be, an insider of the Debtors as that term is defined in section 101(31) of the Bankruptcy Code, and all negotiations have been and will continue to be conducted on an arms length, good faith basis. The Bidding Procedures are designed to ensure that no party is able to exert undue influence over the process. Furthermore, the Bidding Procedures

are designed to prevent the Debtors, the Stalking Horse Bidder or any other Successful Bidder from engaging in any conduct that would cause or permit the Sales to be avoided, or costs or damages to be imposed under, section 363(n) of the Bankruptcy Code.

44.     All creditors and parties in interest will receive notice of the Sale and will be provided an opportunity to be heard. Additionally, all non-debtor parties to the Designated Contracts will be provided with notice of the assumption and assignment and sale and an opportunity to be heard. The Debtors submit that such notice is adequate for entry of the Sale Order and satisfies the requisite notice provisions required under section 363(b) and 365 of the Bankruptcy Code. Under the circumstances, the Stalking Horse Bidder or any other Successful Bidder, as the case may be, should be afforded the benefits and protections that section 363(m) of the Bankruptcy Code provides to a good faith purchaser.

**E.     Relief from the Ten Day Waiting Periods Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate**

45.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise." The Debtors request that the Sale Order be effective immediately by providing that the ten (10) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

46.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and

eliminate or reduce the ten (10) day stay period, Collier on Bankruptcy suggests that the ten (10) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 COLLIER ON BANKRUPTCY 15th Ed. Rev., ¶6064.09 (L. King, 15th rev. ed. 1988). Furthermore, Collier on Bankruptcy provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

47.     The Debtors hereby request that the Court waive the ten (10) day stay period under Bankruptcy Rules 6004(h) and 6006(d).

48.     All creditors and parties in interest will receive notice of the Sale or a competing transaction and will be provided with an opportunity to be heard. Additionally, all non-debtor parties to Designated Contracts will receive notice of assumption and assignment and an opportunity to be heard. The Debtors submit that such notice is adequate for entry of the order approving this Motion and waiving the ten (10) day waiting periods under Bankruptcy Rules 6004(h) and 6006(d).

## NOTICE

49.     No trustee, examiner, or statutory committee has been appointed in these chapter 11 cases. The Debtors will serve notice of this Motion on: (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel to Guggenheim, the Debtors' prepetition secured lender and proposed postpetition secured lender; (iii) creditors holding the thirty (30) largest unsecured claims against the Debtors' estates (on a consolidated basis); (iv) counsel to the Indenture Trustee under the Indenture; and (v) counsel to certain of the Noteholders; and (vi) those parties requesting notice pursuant to Bankruptcy Rule 2002, in accordance with Del. Bankr. L.R. 2002-1(b). In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

**WHEREFORE**, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as Exhibit B: (A) approving the sale the Assets to the Stalking Horse Bidder or to any other Successful Bidder, as the case may be, free and clear of all Encumbrances; (B) authorizing and approving the Agreement; (C) authorizing and approving the assumption and assignment of the Designated Contracts; and (D) granting such other and further relief as is just and proper.

Dated: Wilmington, Delaware
April 1, 2008

Michael P. Richman (*pro hac vice* pending)
Keith C. Owens (*pro hac vice* pending)
Erica L. Morabito (*pro hac vice* pending)
FOLEY & LARDNER LLP
90 Park Avenue
New York, NY 10005
(212) 682-7474 (Telephone)
(212) 687-2329 (Facsimile)

-and-

YOUNG CONAWAY STARGATT & TAYLOR, LLP


Michael R. Nestor (No. 3526)
Joseph M. Barry (No. 4221)
Donald J. Bowman (No. 4383)
Kara Hammond Coyle (No. 4410)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6758
Facsimile: (302) 571-1253

*Proposed Attorneys for the Debtors
and Debtors in Possession*

# EXHIBIT A

# ASSET PURCHASE AGREEMENT

**APRIL 1, 2008**

**by and among**

**DIAMOND GLASS ACQUISITION, LLC**

**DIAMOND GLASS, INC.**

**and**

**DT SUBSIDIARY CORPORATION**

# CONTENTS

| Clause | | | Page |
|---|---|---|---|

| 1. | | Definitions and Usage of Certain Terms | 2 |
|---|---|---|---|
| | 1.1 | Definitions | 2 |
| | 1.2 | Usage | 6 |
| 2. | | Sale and Transfer of Purchased Assets; Closing | 7 |
| | 2.1 | Purchased Assets | 7 |
| | 2.2 | Excluded Assets | 8 |
| | 2.3 | Consideration | 9 |
| | 2.4 | Liabilities | 10 |
| | 2.5 | Tax Allocation of Purchase Price | 12 |
| | 2.6 | Closing | 12 |
| 3. | | Representations and Warranties of Sellers | 12 |
| | 3.1 | Organization and Good Standing | 12 |
| | 3.2 | Subsidiaries and Investments | 12 |
| | 3.3 | Power, Authorization and Non-Contravention | 13 |
| | 3.4 | No Violation of Charter Documents and Contracts; Compliance with Legal Authorizations; Governmental Authorizations | 13 |
| | 3.5 | Documents and Disclosures | 14 |
| | 3.6 | Seller Financial Statements; Internal Control Over Financial Reporting | 14 |
| | 3.7 | Accounts Receivable | 15 |
| | 3.8 | Litigation | 16 |
| | 3.9 | Taxes | 16 |
| | 3.10 | Sufficiency of Purchased Assets; Title to Properties | 16 |
| | 3.11 | Absence of Certain Changes or Events | 17 |
| | 3.12 | Intellectual Property | 19 |
| | 3.13 | Conformity of Products and Services | 20 |
| | 3.14 | Product and Service Warranties | 20 |
| | 3.15 | Products Liability or Recall | 20 |
| | 3.16 | List of Certain Employees, Suppliers and Customers | 21 |
| | 3.17 | Compliance with Laws | 21 |
| | 3.18 | Agreements and Commitments | 22 |
| | 3.19 | Cure Amount | 23 |
| | 3.20 | Employee Benefits Plans | 23 |
| | 3.21 | Relationships with Affiliates | 24 |
| | 3.22 | Environmental Matters | 25 |
| | 3.23 | Insurance | 26 |
| | 3.24 | Board of Directors and Officers | 26 |
| | 3.25 | Brokers | 26 |
| | 3.26 | Accuracy of Disclosure | 26 |
| | 3.27 | No Other Representations or Warranties | 26 |
| 4. | | Representations and Warranties of Purchaser | 26 |
| | 4.1 | Organization | 27 |
| | 4.2 | Power, Authorization and Non-Contravention | 27 |
| | 4.3 | No Violation of Charter Documents, Contracts or Laws | 27 |
| | 4.4 | No Other Representations or Warranties | 28 |

| | | | |
|---|---|---|---|
| 5. | | Covenants of Sellers | 28 |
| | 5.1 | Advice of Changes | 28 |
| | 5.2 | Conduct of Business | 28 |
| | 5.3 | Regulatory Approvals | 29 |
| | 5.4 | Necessary Consents | 29 |
| | 5.5 | Securities Laws | 29 |
| | 5.6 | Litigation | 30 |
| | 5.7 | Employment Matters | 30 |
| | 5.8 | Satisfaction of Closing Conditions | 31 |
| | 5.9 | Change of Name | 31 |
| | 5.10 | Access to Information | 31 |
| | 5.11 | Casualty | 31 |
| | 5.12 | Seller Disclosure Schedules | 31 |
| 6. | | Covenants of Purchaser | 32 |
| | 6.1 | Advice of Changes | 32 |
| | 6.2 | Litigation | 32 |
| | 6.3 | Satisfaction of Conditions Precedent | 32 |
| 7. | | Additional Covenants | 32 |
| | 7.1 | Non-Competition, Non-Solicitation and Non-Disparagement | 32 |
| | 7.2 | Further Assurances | 33 |
| | 7.3 | Filings | 34 |
| | 7.4 | Confidentiality | 34 |
| | 7.5 | Cure Payments | 35 |
| 8. | | Bankruptcy Procedures, etc. | 35 |
| | 8.1 | Motion and Notice Regarding Approval of Bid Procedures | 35 |
| | 8.2 | Sale Order | 36 |
| | 8.3 | No Talk/No Shop Provision | 36 |
| | 8.4 | Expense Reimbursement | 36 |
| | 8.5 | [RESERVED] | 36 |
| | 8.6 | Defense of Orders | 36 |
| 9. | | Conditions to Obligations of Sellers | 37 |
| | 9.1 | Accuracy of Representations and Warranties | 37 |
| | 9.2 | Covenants | 37 |
| | 9.3 | Compliance with Law | 37 |
| | 9.4 | Government Consents | 37 |
| | 9.5 | Absence of Litigation | 37 |
| | 9.6 | Sale Order | 37 |
| | 9.7 | Other Deliveries | 37 |
| 10. | | Conditions to Obligations of Purchaser | 38 |
| | 10.1 | Accuracy of Representations and Warranties | 38 |
| | 10.2 | Covenants | 38 |
| | 10.3 | Absence of Material Adverse Effect | 38 |
| | 10.4 | Compliance with Law | 38 |
| | 10.5 | Government Consents; No Injunction | 38 |
| | 10.6 | Third-Party Consents; Assignments; Other Documents | 38 |
| | 10.7 | Absence of litigation | 39 |
| | 10.8 | Sale Order; Allowance of Buyer Claim | 39 |
| | 10.9 | Other Deliveries | 39 |
| | 10.10 | Financial Statements | 40 |

|  | 10.11 | Key Employees .................................................................................................. 40 |
|---|---|---|
| 11. | | Termination ............................................................................................................. 40 |
|  | 11.1 | Termination of Agreement ................................................................................ 40 |
|  | 11.2 | Payment of Expense Reimbursement ................................................................ 42 |
|  | 11.3 | Effect of Termination ....................................................................................... 42 |
| 12. | | Miscellaneous ........................................................................................................ 42 |
|  | 12.1 | Entire Agreement ............................................................................................. 42 |
|  | 12.2 | Assignment; Binding Upon Successors and Assigns ........................................ 42 |
|  | 12.3 | No Third Party Beneficiaries ........................................................................... 43 |
|  | 12.4 | No Joint Venture .............................................................................................. 43 |
|  | 12.5 | Severability ...................................................................................................... 43 |
|  | 12.6 | Section Headings .............................................................................................. 43 |
|  | 12.7 | Amendment, Extension and Waivers ................................................................ 43 |
|  | 12.8 | Public Announcement ....................................................................................... 44 |
|  | 12.9 | Governing Law ................................................................................................. 44 |
|  | 12.10 | Jurisdiction; Venue; Waiver of Jury Trial ....................................................... 44 |
|  | 12.11 | Notices ............................................................................................................. 45 |
|  | 12.12 | Time is of the Essence ...................................................................................... 45 |
|  | 12.13 | Counterparts ..................................................................................................... 46 |
|  | 12.14 | Nonsurvival of Representations and Warranties .............................................. 46 |
|  | 12.15 | Disclosure Schedule ......................................................................................... 46 |
|  | 12.16 | Release .............................................................................................................. 46 |

**Exhibits**

Exhibit I          Bid Procedures

# ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this **Agreement**) is entered into as of April 1, 2008

## BY AND AMONG:

(1) **DIAMOND GLASS ACQUISITION, LLC**, a limited liability company organized under the laws of Delaware, as designated, authorized and directed by Guggenheim (defined below) in its capacity as the agent for the lenders under the DIP Financing and Credit Agreement (as such terms are defined below) (**Purchaser**);

(2) **DIAMOND GLASS, INC.** (f/k/a Diamond Glass Companies, Inc.), a Delaware corporation (**Diamond Glass**); and

(3) **DT SUBSIDIARY CORPORATION**, a Delaware corporation and wholly-owned subsidiary of Diamond Glass (**DT Subsidiary** and together with Diamond Glass, each individually a **Seller** and collectively, the **Sellers**).

Purchaser and Sellers are sometimes referred to herein individually as a **party** or collectively as the **parties**.

## WHEREAS:

(A) Sellers expect to file, as contemplated by the terms of this Agreement, in the United States Bankruptcy Court for the District of Delaware (the **Bankruptcy Court**), voluntary petitions to commence cases under chapter 11 of the Bankruptcy Code (as hereinafter defined).

(B) Sellers desire to sell, transfer, convey, assign and deliver to Purchaser, in accordance with sections 105(a), 363 and 365 and the other applicable provisions of the Bankruptcy Code, all of the Purchased Assets (as hereinafter defined), together with the Assumed Liabilities (as hereinafter defined), of Sellers upon the terms and subject to the conditions set forth in this Agreement.

(C) Purchaser desires to purchase and take delivery of such Purchased Assets and Assumed Liabilities upon such terms and subject to such conditions.

(D) The parties hereto expect that the Purchased Assets will be sold pursuant to a Sale Order (defined below) of the Bankruptcy Court approving such sale under section 363 of the Bankruptcy Code and such Sale Order will include the assumption and assignment of certain executory contracts, unexpired leases and liabilities thereunder under section 365 of the Bankruptcy Code and the terms and conditions of this Agreement.

(E) Purchaser is a wholly-owned subsidiary of Orpheus Holdings, LLC (**Holdings**), the predecessor in interest to Orpheus Funding, LLC, as the lender under the Credit Agreement; Holdings also is the original lender under the DIP Financing.

**NOW, THEREFORE,** in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties, and covenants herein contained, and intending to be legally bound, the parties hereto agree as follows:

# 1. DEFINITIONS AND USAGE OF CERTAIN TERMS

## 1.1 Definitions

For purposes of this Agreement, the following terms have the meanings specified or referred to in this Section 1.1:

**Accounts Receivable** means (i) all trade accounts receivable and other rights to payment from customers of Sellers and the full benefit of all security for such accounts or rights to payment, including all trade accounts receivable representing amounts receivable in respect of products sold or services rendered to customers of Sellers, and (ii) all other accounts or notes receivable of Sellers and the full benefit of all security for such accounts or notes, and (iii) any claim, remedy or other right related to any of the foregoing.

**Affiliate** means with respect to any Person, any Person that directly or indirectly, Controls, is Controlled by, or is under common Control with, such Person.

**Ancillary Agreements** means either of or both the "Seller Ancillary Agreements" and the "Purchaser Ancillary Agreements" as the context requires.

**Bankruptcy Code** means the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*, as amended, or any successor thereto, and any rules and regulations promulgated thereunder.

**Bankruptcy Court** has the meaning set forth in the preface above.

**Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure, as amended, or any successor rules.

**Breach** means any breach of, or any inaccuracy in, any representation or warranty or any breach of, or failure to perform or comply with, any covenant or obligation, in or of this Agreement or any other Contract, or any event that with the passing of time or the giving of notice, or both, would constitute such a breach, inaccuracy or failure.

**Business** means the business conducted by Sellers on the date hereof.

**Business Day** means any day other than (i) Saturday or Sunday or (ii) any other day on which banks in New York, New York are permitted or required to be closed.

**Chapter 11 Cases** means the voluntary cases that will be commenced by Sellers under chapter 11 of the Bankruptcy Code pursuant to this Agreement and the Bankruptcy Court.

**Closing Date** means the date on which the Closing actually takes place.

**Code** means the Internal Revenue Code of 1986, as amended.

**Contract** means, with respect to any Person, any written agreement, contract, subcontract, lease, license, sublicense, understanding, arrangement, instrument, note, guaranty, indemnity, representation, warranty, deed, assignment, power of attorney, purchase order, work order, commitment, covenant, obligation, promise or undertaking of any nature to which such Person is a party or by which its properties or assets may be bound.

**Control** (including with correlative meaning, Controlled by and under common Control with) shall mean, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by Contract or otherwise.

**Credit Agreement** means that certain Credit Agreement dated as of January 12, 2007, as entered into by and among Diamond Glass, the financial institutions listed therein, as lenders, and Guggenheim, as agent for such lenders (as has been amended, modified and supplemented from time to time).

**DIP Financing** means that certain $41 million debtor-in-possession credit agreement, dated on or about April 1, 2008, between Diamond Glass, as borrower, DT Subsidiary, as subsidiary guarantor, and Guggenheim, as agent for the financial institutions identified as lenders therein.

**DIP Obligations** means, as of any date of determination, the Obligations, as such term is defined in the DIP Financing.

**Effective Time** means 11:59 p.m. on the Closing Date.

**Encumbrance** means any charge, claim (as defined in section 101(5)(A) and (B) of the Bankruptcy Code), debt, Liability, community property interest, condition, equitable interest, lien, option, pledge, charge, defect, adverse claim, security interest, mortgage, right of way, easement, encroachment, servitude, right of first option, right of first refusal or similar restriction, including any restriction on use, voting (in the case of any security or equity interest), transfer, receipt of income, or exercise of any other attribute of ownership of any kind whatsoever, whether or not any of the foregoing is liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured or unsecured.

**Environmental Claim** means any investigation, claim, litigation, action, suit, proceeding, order, judgment, written notice or written demand arising under or relating to Environmental Law, including any such matter relating to (a) any actual, alleged or suspected failure to comply with any Environmental Law or to possess or comply with any Environmental Permit, (b) any actual, alleged or suspected presence, Release or threatened Release of or exposure to any Hazardous Substance at any location, including any requirement or obligation to investigate, clean up or remediate any property or condition, (c) any actual or alleged contractual or other obligations arising under or relating to Environmental Laws, or (d) any personal injury, property damage or diminution in value, natural resources damage or other investigation, claim, litigation, action, suit, proceeding, order, judgment, written notice or written demand and any fines or penalties relating to any of the foregoing.

**Environmental Law** means any Legal Requirement, directive, rule, order, administrative ruling, decree, decision, judgment, interpretive guidance or requirement of any Governmental Authority (including any state, local, foreign or international counterparts or equivalents and any transfer of ownership notification or approval statutes) relating to: (i) the protection, investigation or restoration of the environment, human health and safety, or natural resources, (ii) the generation, handling, use, storage, treatment, transport, disposal, Release or threatened Release of any Hazardous Substance or (iii) noise, odor, vibration or wetlands protection.

**Environmental Permit** means any Governmental Authorization issued pursuant to any Environmental Law.

**ERISA** means the Employee Retirement Income Security Act of 1974, as amended.

**ERISA Affiliate** means any entity that is a member of: (i) a "controlled group of corporations", as defined in Section 414(b) of the Code; (ii) a group of entities under "common control", as defined in Section 414(c) of the Code; or (iii) an "affiliated service group", as defined in Section 414(m) of the Code, or treasury regulations promulgated under Section 414(o) of the Code, any of which includes Sellers.

**Exchange Act** means the Securities Exchange Act of 1934, as amended.

**Expense Reimbursement** has the meaning ascribed to such term in Section 8.4 below.

**Final Order** shall mean an order or judgment, the operation or effect of which is not stayed, and as to which order or judgment (or any revision, modification or amendment thereof), the time to appeal or seek review or rehearing has expired, and as to which no appeal or petition for review or motion for reargument has been taken or been made and is pending for argument.

**GAAP** means U.S. generally accepted accounting principles, applied on a consistent basis from period to period.

**Governmental Authority** means any: (a) nation, state, commonwealth, province, territory, county, municipality or district; (b) federal, state, local, municipal, foreign or other government; or (c) governmental or quasi-governmental authority of any nature (including any governmental division, department, agency, commission, instrumentality, official, organization, unit, body or entity and any court or other tribunal).

**Governmental Authorization** means any approval, consent, ratification, waiver, license, permit or authorization issued, granted, given, or otherwise made available by or under the authority of any Governmental Authority or pursuant to any Legal Requirement.

**Guggenheim** means Guggenheim Corporate Funding, LLC.

**Hazardous Substance** means: (i) any material, substance or waste that is capable of causing harm to humans or another living organism, capable of damaging the environment, natural resources or public health or welfare, or otherwise is regulated or is classified as "hazardous," "toxic," a "pollutant," a "contaminant," "radioactive" or words of similar meaning or effect; or (ii) any petroleum product or by-product, asbestos, asbestos-containing material, polychlorinated biphenyls, radioactive materials, radon, mold, urea formaldehyde insulation, or chlorofluorocarbons or other ozone-depleting substances.

**Inventories** means all inventories of Sellers, wherever located, including all finished goods, work in process, raw materials, spare parts and all other materials and supplies to be used or consumed by Sellers in the production of finished goods.

**knowledge** when used with respect to any entity, means the actual knowledge after due inquiry of the executive officers of such entity and the persons listed on Schedule 1.1.

**Lease** means any Real Property Lease or any lease or rental agreement, license, right to use or installment and conditional sale agreement to which any Seller is a party and any other Seller Contract pertaining to the leasing or use of any Tangible Personal Property.

**Legal Requirement** means any federal, state, local, municipal, foreign, international, multinational, or other constitution, law, ordinance, by-law, principle of common law, regulation, statute, or treaty.

**Lenders** means the financial institutions identified as lenders under the Credit Agreement and the DIP Financing (including their respective successors and assigns).

**Liability** with respect to any Person, means any liability or obligation of such Person of any kind, character or description, whether known or unknown, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise and whether or not the same is required to be accrued on the financial statements of such Person.

**Material Adverse Effect** means any event, occurrence, or effect that has had or would be reasonably likely to have, individually or when taken as a whole with any other events, occurrences, or effects, a material adverse effect on the Business, operations, liabilities, profits, assets or condition (financial or otherwise) of Sellers, and/or the ability of Sellers to consummate the transactions contemplated by this Agreement.

**Order** means any order, injunction, judgment, decree, ruling, assessment or arbitration award of any Governmental Authority or arbitrator.

**Permitted Encumbrance** means any (i) Encumbrances described on Schedule 1.1; (ii) any easements and any rights of lessors under any leases included in the Designated Contracts; and (iii) statutory liens arising in the ordinary course that are unavoidable, not past due, and do not materially affect the value or use of the affected asset.

**Person** means any individual, corporation, partnership, limited liability company, joint venture, trust or unincorporated organization or any government or any agency or political subdivision thereof.

**Petition Date** means the date on which Sellers file the Chapter 11 Cases.

**Prepetition Obligations** means, as of any date of determination, all outstanding obligations due and owing under the Credit Agreement (including accrued and unpaid interest).

**Proceeding** means any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative judicial or investigative, whether formal or informal, whether public or private).

**Real Property** means all leasehold or subleasehold estates or other rights to use or occupy any land, buildings, structures, improvements, fixtures or other interests in real property.

**Real Property Lease** means any lease, including any sublease, license, concession or other agreement (written or oral) pursuant to which any Seller holds a leasehold or subleasehold estate in, or is granted the right to use or occupy any land, building, structure or improvement or other interest in Real Property.

**Record** means any information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

**Release** means any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, depositing, disposing of or migrating into or through the environment or any natural or man-made structure.

**Revolving Loans** has the meaning set forth in the DIP Financing.

**Securities Act** means the Securities Act of 1933, as amended.

**SEC** means the United States Securities and Exchange Commission.

**Seller Contract** means any Contract: (a) to which any Seller is a party; or (b) by which any Seller or any of their assets is bound or subject to any obligation.

**Seller Disclosure Schedule** means that Disclosure Schedule to this Agreement provided by Sellers to Purchaser in accordance with Section 5.12 of this Agreement.

**Seller Employee Plans** has the meaning set forth in Section 3.20(a) hereof.

**Subsidiary** means, when used with reference to any Person, any corporation more than fifty percent (50%) of the outstanding voting securities of which, or any partnership, limited liability company, joint venture or other entity more than fifty percent (50%) of the total equity interest of which, is directly or indirectly owned or Controlled by such Person.

**Tangible Personal Property** means all machinery, equipment, tools, furniture, office equipment, computer hardware, supplies, materials, vehicles and other items of tangible personal property (other than Inventories) of every kind owned or leased by a Person (wherever located and whether or not carried on such Person's books), together with any express or implied warranty by the manufacturers or Sellers or lessors of any item or component part thereof, and all maintenance records and other documents relating thereto.

**Third Party** means a Person that is not a party to this Agreement or an Affiliate of a party to this Agreement.

1.2     **Usage**

(a)     Interpretation. In this Agreement, unless a clear contrary intention appears:

(i)     the singular number includes the plural number and vice versa:

(ii)     references to any Person includes such Person's successors and assigns but, if applicable, only if such successors and assigns are not prohibited by this Agreement, and reference to a Person in a particular capacity excludes such Person in any other capacity or individually;

(iii)     reference to any gender includes each other gender;

(iv)     reference to any agreement, document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof;

(v)     reference to any Legal Requirement means such Legal Requirement as amended, modified, codified, replaced or reenacted, in whole or in part, and in effect from time to time, including rules and regulations promulgated thereunder and reference to any section or other provision of any Legal Requirement means that provision of such Legal Requirement from time to time in effect and constituting the substantive amendment, modification, codification, replacement and reenactment of such section or other provision; *provided, however,* that the foregoing shall not apply in instances in which the Legal Requirement refers to a specific date, time or period;

(vi)     **hereunder, hereof, hereto** and words of similar import shall be deemed references to this Agreement as a whole and not to any particular Article, Section or other provision thereof;

(vii)    **including** (and with correlative meaning **include**) means including without limiting the generality of any description preceding such term;

(viii)   **or** is used in the inclusive sense of **and/or**;

(ix)     with respect to the determination of any period of time, **from** means "from and including" and **to** means "to but excluding";

(x)      references to documents, instruments or agreements shall be deemed to refer as well to all addenda, exhibits, schedules or amendments thereto; and

(xi)     all references to **dollars** or **$** shall mean U.S. dollars.

(b)      Accounting Terms and Determinations.  Unless otherwise specified herein, all accounting terms used herein shall be interpreted and all accounting determinations hereunder shall be made in accordance with GAAP.

## 2.    SALE AND TRANSFER OF PURCHASED ASSETS; CLOSING

### 2.1   Purchased Assets

Upon the terms and subject to the conditions set forth in this Agreement, effective as of the Effective Time, Sellers shall sell, convey, assign, transfer and deliver to Purchaser, free and clear of all Encumbrances other than the Permitted Encumbrances, and Purchaser shall purchase and acquire from Sellers, Sellers' right, title and interest in and to all of Sellers' property and assets, real, personal or mixed, tangible and intangible, of every kind and description, wherever located, including the following (but excluding the Excluded Assets (as defined below)):

(a)      all Real Property Leases currently leased by Sellers pursuant to a Designated Contract (the **Assumed Real Property**);

(b)      all Tangible Personal Property of Sellers, including those items described in Schedule 2.1(b) of the Seller Disclosure Schedule, except as excluded under Section 2.2(d);

(c)      all Inventories of Sellers;

(d)      all Accounts Receivable of Sellers, including all intercompany receivables due to Sellers;

(e)      all Seller Contracts that may be assigned by Sellers to Purchaser pursuant to sections 363 and 365 of the Bankruptcy Code that are set forth on a list (identifying the name, parties and date of each such Seller Contract) provided by Purchaser to Sellers on or before the date that is ten days after delivery by Sellers to Purchaser of the Seller Disclosure Schedules in accordance with Section 5.12 (the **Designated Contracts**);

(f)      all Governmental Authorizations and all pending applications therefor or renewals thereof, in each case to the extent transferable to Purchaser, including those listed in Section 3.4(c) of the Seller Disclosure Schedule;

(g)     all data and Records related to the operations of Sellers, including client and customer lists and Records, referral sources, research and development reports and Records, production reports and Records, service and warranty Records, equipment logs, operating guides and manuals, financial and accounting Records, Tax Records, creative materials, advertising materials, promotional materials, studies, reports, correspondence and other similar documents and Records (all in the state in which such records and information currently exists) and, subject to Legal Requirements, copies of all personnel Records and other Records described in Section 2.2(h);

(h)     all of the intangible rights and property of Sellers, including Intellectual Property Rights (as defined in Section 3.12), goodwill, telephone and telecopy numbers to the extent transferable, and e-mail addresses, listings and those items listed in Section 3.12(b) of the Seller Disclosure Schedule, and further including all files, correspondence, records or other documentation associated therewith;

(i)      all insurance benefits, including rights and proceeds, arising from or relating to the Purchased Assets or the Assumed Liabilities prior to the Effective Time, except as excluded under Section 2.2(f);

(j)      all rights, privileges, claims, offsets, demands, choses in action and indemnification rights of Sellers against or with respect to any Person in connection with or otherwise relating to the Business, any of the Purchased Assets, and/or any of the Assumed Liabilities whether choate or inchoate, known or unknown, contingent or non-contingent;

(k)     any interest in and to any refunds of Taxes of whatever nature;

(l)      all rights of Sellers relating to deposits and prepaid expenses, claims for refunds, indemnification rights and rights to offset relating to the Purchased Assets;

(m)     all cash (including checks received prior to the Closing, whether or not deposited or cleared prior to the Closing), cash equivalents, and short-term investments (including all restricted cash and cash deposits to or for the benefit of utilities, including any such cash deposits maintained in escrow); and

(n)     all rights and assets with respect to employee benefit plans, programs and arrangements of Sellers listed on Schedule 2.1(n) that are not Retained Liabilities (the **Assumed Seller Employee Plans**).

All of the foregoing property and assets are herein referred to collectively as the **Purchased Assets**.

Notwithstanding the foregoing, the transfer of the Purchased Assets pursuant to this Agreement shall not include the assumption of any Liability in respect thereof unless the Purchaser expressly assumes such Liability pursuant to Section 2.4(a).

## 2.2     Excluded Assets

Notwithstanding anything to the contrary contained in Section 2.1 or elsewhere in this Agreement, the following assets of Sellers (collectively, the **Excluded Assets**) are not part of the sale and purchase contemplated hereunder, are excluded from the Purchased Assets, and shall remain the property of Sellers after the Closing:

(a)     the equity interests issued by Sellers;

(b)     all of the Seller Contracts and Real Property Leases that are not Designated Contracts;

(c)     all rights of Sellers under this Agreement, the Bill of Sale and the Assignment and Assumption Agreement;

(d)     the personal property and assets expressly designated in Schedule 2.2(d) of the Seller Disclosure Schedule;

(e)     claims against third parties to the extent related solely to any Excluded Asset or Retained Liabilities;

(f)     all rights under insurance policies to the extent relating to claims for losses related exclusively to any Excluded Asset or otherwise non-assignable as a matter of law;

(g)     Sellers' corporate seals, stock Record books, corporate Record books containing minutes of meetings of directors and stockholders, and such other Records having to do solely with Sellers' organization or stock capitalization or Excluded Assets or Retained Liabilities;

(h)     all personnel Records and other Records that Sellers are required by law to retain in their possession; and

(i)     Sellers' claims, causes of action and rights of recovery pursuant to Sections 544 through 550 and Section 553 of the Bankruptcy Code and any other avoidance action under any other applicable provisions of the Bankruptcy Code.

## 2.3     Consideration

The aggregate consideration for the Purchased Assets (the **Purchase Price**) shall be the sum of:

(a)     $34.0 million, *plus*

(b)     the Assumed Liabilities, including the payment by Purchaser:

    (i)     to NatCity Investments, Inc. the fee payable pursuant to the NatCity Retention Letter,

    (ii)     of the cure payments to non-debtor parties to the Designated Contracts that are assigned to Purchaser and assumed by Purchaser in accordance with section 7.5 of this Agreement (if such cure payments have not been satisfied by the Sellers using the proceeds of Loans under the DIP Financing),

    (iii)     to the Sellers the amount of $1.5 million, which the Sellers shall use to fund: (A) $670,000.00 into a segregated escrow account for the benefit of participants under a management incentive program to be proposed by the Sellers in the Chapter 11 Cases (and subject to the entry of an order of the Bankruptcy Court approving any such plan; such plan to pay up to $670,000.00 of benefits, with the excess, if any, returned to Purchaser within five days after final distributions are made to Sellers' creditors under a confirmed chapter 11 plan), and (B) the amount of $830,000.00 to be held in the Sellers' general funds to satisfy in part the costs of administration and winding down the

Chapter 11 Cases (and subject to any orders of the Bankruptcy Court, including any order confirming a chapter 11 plan entered after the Closing Date), and

(iv)     to the Sellers the amount equal to the sum of (A) the positive difference, if any, between (1) initial aggregate budgeted amount, pursuant to the budget as approved by Guggenheim under the DIP Financing, for the reasonable fees and costs incurred during the Chapter 11 Cases by the professionals retained by the Sellers, the official committee of unsecured creditors appointed in the Sellers' Chapter 11 Cases, and Guggenheim, and (2) the actual aggregate amount of such fees and costs incurred during such period by such professionals, which amount (if any) will be held and used by the Sellers pursuant to the foregoing sub-section 2.3(b)(iii)(B); plus

(c)     an amount equal to the aggregate outstanding Revolving Loans (included in the DIP Obligations) determined as of the Effective Time.

Except with respect to the components of the Purchase Price identified above in sub-section 2.3(b)(ii) and (iii), which amounts the Purchaser will pay in cash at the Closing, sub-section 2.3(b)(i), which amount the Purchaser will pay on terms and conditions agreed to with NatCity Investments, Inc., and sub-section 2.3(b)(iv), which amount (if any) the Purchaser will pay upon the confirmation of a chapter 11 plan for the Sellers, such Purchase Price will be satisfied in the form of a credit bid (in whole or in part) under section 363(k) of the Bankruptcy Code and in accordance with the Bid Procedures Order (defined below) and Sale Order on account of, and applied in the following order (on a dollar-for-dollar basis) against, (a) the then outstanding amount of the DIP Obligations until such obligations have been fully satisfied in accordance with the DIP Financing, and next (b) the then outstanding amount of the Prepetition Obligations until such obligations have been fully satisfied in accordance with the Credit Agreement, whether such obligations are owing to the Purchaser, the Agent or the Lenders (including their successors and assigns) under either the DIP Financing or the Credit Agreement.

**2.4     Liabilities**

(a)     <u>Assumed Liabilities</u>.  Subject to Sections 2.4(b) and 7.5 and effective as of the Effective Time, Purchaser shall assume and become responsible for and shall thereafter pay, perform, and discharge in accordance with their terms the following Liabilities of Sellers (the **Assumed Liabilities**):

(i)     any Liability arising after the Effective Time under the Assumed Real Property Leases;

(ii)     any Liability to Sellers' customers under written warranty agreements in the forms disclosed in Section 3.14 of the Seller Disclosure Schedule given by Sellers to its customers in the ordinary course of business prior to the Effective Time;

(iii)     any Liability arising after the Effective Time under the Designated Contracts; and

(iv)     trade accounts payable to the extent first arising after the Effective Time directly relating to the operation of the Business in the ordinary course.

(b)     <u>Retained Liabilities</u>.  The Retained Liabilities shall remain the sole responsibility of and shall be retained by Sellers.  **Retained Liabilities** shall mean every Liability of Sellers, other than the Assumed Liabilities, including:

(i)     any Liability arising out of or relating to products of Sellers to the extent manufactured or sold prior to the Effective Time other than to the extent assumed under Section 2.4(a)(ii) or (iii);

(ii)    any Liability for Taxes incurred prior to the Effective Time, including (A) any Taxes arising as a result of any Seller's operation of its business or ownership of the Purchased Assets prior to the Effective Time, (B) any Taxes that will arise as a result of the sale of the Purchased Assets pursuant to this Agreement and (C) any deferred Taxes of any nature;

(iii)   any Liability under any Seller Contract (other than the Designated Contracts) and including without limitation any Liability arising out of or relating to Sellers' credit facilities, trade payables, indebtedness for money borrowed, amounts due to Affiliates or any security interest related thereto;

(iv)    any Liability arising under or relating to Environmental Law, including any Environmental Claims, in each case to the extent relating to a fact, circumstance, condition or activity existing or occurring prior to the Effective Time relating to any Seller or its predecessors, Subsidiaries or Affiliates, the operation of the Business, or the leasing, ownership or operation of any Real Property, including any such Liabilities related to any Real Property listed on Schedule 3.10(c) of the Seller Disclosure Schedule;

(v)     any Liability under the Seller Employee Plans whether or not listed on Schedule 3.20 other than the Assumed Seller Employee Plans;

(vi)    any Liability, arising or related to time periods prior to the Closing Date in respect of any current or former employees of Sellers, or, relating to employment or termination of employment, including without limitation, relating to payroll, discrimination, harassment, workers' compensation or wrongful termination;

(vii)   any Liability of Sellers to any Affiliate of Sellers;

(viii)  any Liability to indemnify, reimburse or advance amounts to any officer, director, employee or agent of Sellers or any Affiliate;

(ix)    any Liability to distribute or otherwise apply all or any part of the consideration received hereunder;

(x)     any Liability arising out of any Proceeding pending as of the Effective Time, whether or not set forth in the Seller Disclosure Schedule;

(xi)    any Liability of Sellers under this Agreement or any other document executed in connection with the transactions contemplated hereby;

(xii)   any Liability of Sellers based upon Sellers' acts or omissions occurring after the Effective Time; and

(xiii)  any Liability of Sellers not specifically described above but that may otherwise be set forth in Schedule 2.4(b).

## 2.5 Tax Allocation of Purchase Price

Purchaser and Sellers agree that the Purchase Price shall be allocated among the Purchased Assets in accordance with an allocation to be prepared by Purchaser and agreed upon by Sellers, which agreement shall not be unreasonably withheld. Such allocation shall be in accordance with Section 1060 of the Code and the applicable Treasury Regulations promulgated thereunder. Purchaser and Sellers shall report Tax Returns (including amended Tax Returns and claims for refund) consistent with such allocation, and shall take no position contrary thereto or inconsistent therewith (including, without limitation, in any audits or examinations by any taxing authority or in any other proceedings). Purchaser and Sellers shall cooperate in the filing of any forms (including Forms 8594) with respect to such allocation. Notwithstanding any other provisions of this Agreement, the foregoing agreement shall survive the Closing Date without limitation, and shall not be an admission of and shall not be evidence of the value of any of the Purchased Assets in Sellers' Chapter 11 Cases or any other related proceeding, and shall be for Tax purposes only.

## 2.6 Closing

The closing of the transactions contemplated by this Agreement (the **Closing**) shall take place at the offices of Allen & Overy LLP in New York, New York commencing at 10:00 a.m. local time on June 12, 2008, or as soon thereafter following the satisfaction or waiver of all conditions to the obligations of the parties hereto to consummate the transactions contemplated hereby (other than conditions with respect to actions the respective parties will take at the Closing itself) or such other date as Purchaser and Sellers may mutually determine (the **Closing Date**). The parties hereto shall use their commercially reasonable efforts to consummate the transactions contemplated hereby within fifteen (15) calendar days after the Bankruptcy Court has entered the Sale Order approving such sale to Purchaser.

## 3. REPRESENTATIONS AND WARRANTIES OF SELLERS

Each Seller hereby jointly and severally represents and warrants to the Purchaser as of the date hereof and as of the Closing Date as follows:

## 3.1 Organization and Good Standing

Each Seller is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and has all requisite corporate power and authority, and all requisite qualifications to do business as a foreign corporation, to conduct its business in the manner in which its business is currently being conducted. All jurisdictions in which Sellers are duly qualified or registered to do business as a foreign corporation are listed on Section 3.1 of the Seller Disclosure Schedule. Each Seller has delivered or made available to the Purchaser, a true and correct copy of its certificate of incorporation and bylaws, each as amended to date (collectively, the **Seller Charter Documents**), and each such instrument is in full force and effect. Each Seller is not in violation of any of the provisions of its respective Seller Charter Documents.

## 3.2 Subsidiaries and Investments

Except for its interests in DT Subsidiary, Diamond Glass does not own, directly or indirectly, any capital stock, membership interest, partnership interest, joint venture interest or other equity interest in any Person. DT Subsidiary does not own, directly or indirectly, any capital stock, membership interest, partnership interest, joint venture interest or other equity interest in any Person.

### 3.3    Power, Authorization and Non-Contravention

(a)    Each Seller has the requisite corporate power, legal capacity and authority to: (i) carry on its business as now conducted; (ii) own, operate and lease its properties in the manner in which its properties are currently owned, used and leased; (iii) perform its obligations under all Seller Contracts constituting Purchased Assets to be purchased under Section 2.1, and (iv) upon entry of the Sale Order enter into and perform its obligations under this Agreement and all agreements to which it is or will be a party that are required to be executed pursuant to or in connection with this Agreement (the **Seller Ancillary Agreements**).   The execution and delivery of this Agreement, the Seller Ancillary Agreements and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate and stockholder action on the part of each Seller.

(b)    No consent, approval, Order or authorization of, or registration, declaration or filing with any Governmental Authority or other Person, is required to be obtained or made by Sellers in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby, except for: (i) the consents set forth in Section 3.3(b) of the Seller Disclosure Schedule, (ii) such consents, approvals, Orders, authorizations, registrations, declarations and filings as may be required under applicable federal, foreign and state securities or "blue sky" laws or related laws and (iii) such other consents, authorizations, filings, approvals and registrations that if not obtained or made would not be material to Sellers, the Purchaser or prevent, alter or materially delay the consummation of the transactions contemplated hereby.

(c)    Upon entry of the Sale Order, this Agreement and the Seller Ancillary Agreements are, or when executed and delivered by Sellers and the other parties thereto will be, valid and binding obligations of Sellers (to the extent a party thereto) enforceable against Sellers in accordance with their respective terms, except as to the effect, if any, of (i) applicable bankruptcy, insolvency, moratorium, reorganization, or other similar laws affecting the rights of creditors generally and (ii) rules of law governing specific performance, injunctive relief and other equitable remedies; *provided*, *however*, that the Seller Ancillary Agreements will not be effective until the earlier of the Effective Time or the date provided for therein.

### 3.4    No Violation of Charter Documents and Contracts; Compliance with Legal Authorizations; Governmental Authorizations

(a)    Neither the execution and delivery of this Agreement or any Seller Ancillary Agreement, nor the consummation of the transactions provided for herein or therein will conflict with, or (with or without notice or lapse of time, or both) result in a termination, Breach, impairment or violation of any provision of the Seller Charter Documents, as currently in effect, except as set forth in Section 3.4 of the Seller Disclosure Schedule, or any material Designated Contract.

(b) Except as set forth in Section 3.4(b) of the Seller Disclosure Schedule: (i) each Seller is, and, to Sellers' knowledge, at all times since January 1, 2005 has been, in material compliance with each Legal Requirement that is or was applicable to it or to the conduct of operation of its business or the ownership or use of any of the Purchased Assets; (ii) no event has occurred or circumstance currently exists that (with or without notice or lapse of time) constitutes or will result in a violation by any Seller of, or a failure on the part of any Seller to comply with, any applicable material Legal Requirement; and (iii) each Seller has not received, at any time since January 1, 2005, any written notice or, to Sellers' knowledge, other communication from any Governmental Authority or any other Person regarding any actual, alleged, possible, or potential violation of, or failure to comply by any Seller with, any applicable material Legal Requirement.

(c) Section 3.4(c) of the Seller Disclosure Schedule contains a complete and accurate list of each material Governmental Authorization that are collectively necessary to permit each Seller to lawfully conduct and operate its business in the manner it currently conducts and operates its business and to permit each Seller to own and use the Purchased Assets in the manner in which it currently owns and uses such Purchased Assets. To Sellers' knowledge, each Governmental Authorization listed or required to be listed in Section 3.4(c) of the Seller Disclosure Schedule is valid and in full force and effect. Except as set forth in Section 3.4(c) of the Seller Disclosure Schedule: (i) each Seller is, and at all times since January 1, 2005 has been, in full compliance with all of the material terms and requirements of each Governmental Authorization identified or required to be identified in Section 3.4(c) of the Seller Disclosure Schedule; and (ii) no violation has been alleged by any Governmental Authority, no proceeding is pending or, to the knowledge of Sellers, threatened to revoke or materially limit any such Governmental Authorization, and, to the knowledge of Sellers, there is no basis for any such allegation or proceeding.

## 3.5 Documents and Disclosures

Except as set forth on Section 3.5 of the Seller Disclosure Schedule, the books of account, stock records, minute books and other records of Sellers: (i) are in all material respects true and complete, (ii) have been maintained in accordance with reasonable business practices and (iii) accurately and fairly reflect in all material respects the transactions and dispositions of the assets of Sellers.

## 3.6 Seller Financial Statements; Internal Control Over Financial Reporting

(a) Included in Section 3.6 of the Seller Disclosure Schedule are the audited consolidated financial statements of Sellers (including, in each case, any related notes thereto) for the fiscal year ended December 31, 2006 and the unaudited consolidated financial statements of Sellers (including, in each case, any related notes thereto) for the fiscal year ended December 31, 2007 (the **Seller Financial Statements**) and each: (i) was prepared in accordance with GAAP (except as may be indicated in the notes thereto); (ii) fairly present in all material respects the consolidated financial position of Sellers as at the respective dates thereof and the consolidated results of Sellers' operations and cash flows for the periods indicated, except that the unaudited interim financial statements do not contain any footnotes and were or are subject to normal and recurring year-end adjustments and (iii) except as set forth on Section 3.6 of the Seller Disclosure Schedule, contain no adverse opinion or disclaimer of opinion and were not qualified or modified as to uncertainty, audit scope or accounting principal. Except as set forth on Section 3.6 of the Seller Disclosure Schedule, since December 31, 2007 (the **Base Balance Sheet Date**), Sellers do not have any Liabilities required under GAAP to be set forth on a balance sheet (absolute, accrued, contingent or otherwise) except for Liabilities incurred since

the Base Balance Sheet Date in the ordinary course of business consistent with past practices that are not, individually or in the aggregate, material to the business, results of operations or financial condition of Sellers taken as a whole and Liabilities incurred in connection with this Agreement. There has been no change in Sellers' accounting policies during the periods covered by the Seller Financial Statements, except as described in the notes to the Seller Financial Statements. Sellers do not have any material debt, Liability or obligation of any nature, whether accrued, absolute, contingent or otherwise, and whether due or to become due, that is not reflected, reserved against or disclosed in the Seller Financial Statements or under Section 3.6 of the Seller Disclosure Schedule.

(b)     Sellers have implemented a process, designed by, or under the supervision of, Sellers' principal executive and principal financial officers, and effected by Sellers' board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of the preparation of financial statements in accordance with GAAP and includes those policies and procedures that: (i) pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of Sellers; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP, and that receipts and expenditures of Sellers are being made only in accordance with authorizations of management and directors of Sellers; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of Sellers' assets.

## 3.7    Accounts Receivable

The Accounts Receivable shown in the December 31, 2007 balance sheet contained in the Seller Financial Statements (the **Base Balance Sheet**) and that constitute Purchased Assets to be purchased under Section 2.1 arose in the ordinary course of business consistent with past practice. Allowances for doubtful accounts and warranty returns are adequate and have been prepared in accordance with GAAP and in accordance with the past practices of Sellers. The Accounts Receivable of Sellers constituting Purchased Assets to be purchased under Section 2.1 arising after the Base Balance Sheet Date and prior to the Closing Date arose or will arise in the ordinary course of business consistent with past practice. To the knowledge of Sellers, the Accounts Receivable are not subject to any material claim of offset, recoupment, set off or counter-claim and Sellers have no knowledge of any specific facts or circumstances (whether asserted or unasserted) that could give rise to any such claim in any such case, except to the extent otherwise reflected in the allowances for doubtful accounts as provided for in the Base Balance Sheet or, with respect to Accounts Receivable arising after the Base Balance Sheet Date and prior to the Closing Date, as determined in the ordinary course of business consistent with the past practices of Sellers. Except as set forth in Section 3.7 of the Seller Disclosure Schedule, no material amount of Accounts Receivable are contingent upon the performance by Sellers of any obligation or Contract other than normal warranty repair and replacement and other than products' progress bills in the ordinary course of business consistent with past practice. No Person has any Encumbrance on any of such Accounts Receivable and no agreement for deduction or discount has been made with respect to any of such Accounts Receivable. Section 3.7 of the Seller Disclosure Schedule sets forth an aging of Accounts Receivable of Sellers in the aggregate and by customer, and indicates the amounts of allowances for doubtful accounts and warranty returns, and Section 3.7 of the Seller Disclosure Schedule sets forth such amounts of Accounts Receivable that are subject to asserted warranty claims known to Sellers by information regarding asserted warranty claims known to Sellers made within the last year, including the type and amounts of such claims. Except as set forth on Section 3.7 of the Seller Disclosure Schedule, Sellers do not have any Accounts Receivable from any person, firm or corporation that is affiliated with Sellers or from any director, officer or employee or Affiliate of Sellers.

**3.8    Litigation**

Except as set forth in Section 3.8 of the Seller Disclosure Schedule, there is not any Proceeding pending against Sellers, nor, to Sellers' knowledge, is any Proceeding threatened against Sellers before any Governmental Authority or arbitrator that, if determined adversely to Sellers, would reasonably be expected to have a Material Adverse Effect on Sellers, the Business or the Purchased Assets. There is not any material unsatisfied adverse Order of a Governmental Authority or arbitrator outstanding against Sellers. There is not any Proceeding pending as to which any Seller has received notice of assertion against any Seller, that in any manner could prevent, enjoin, alter or materially delay any of the transactions contemplated by this Agreement.

**3.9    Taxes**

(a)    Each Seller has timely filed all federal, state, local and foreign returns, reports, estimates, information statements or other documents or information (**Returns**) required to be supplied to any Tax authority relating to Taxes required to be filed by or on behalf of such Seller. Such Tax Returns are true, correct and complete in all material respects. Each Seller has paid all Taxes required to be paid, has made all necessary estimated Tax payments, and has no Liability for Taxes in excess of the amount so paid, except to the extent adequate reserves have been established in the Seller Financial Statements or, with respect to Taxes that are not yet due on or prior to the date of this Agreement and that have become due thereafter, adequate reserves have been established by such Seller prior to the Closing Date.

(b)    Each Seller has withheld and paid all material Taxes required by applicable Legal Requirement to be withheld and paid in connection with any amounts paid or owing to any employee, independent producer or contractor, creditor, stockholder, or other Third Party.

(c)    No claim has ever been made by a Governmental Authority in a jurisdiction where any Seller does not file Tax Returns that such Seller is or may be subject to Taxation by that jurisdiction.

(d)    Each Seller is not a party to, and does not have any obligation under, any Tax-sharing, Tax indemnity or Tax allocation agreement or arrangement.

For the purposes of this Agreement, **Tax** or **Taxes** refers to (i) any and all federal, state, local and foreign Taxes, assessments and other governmental charges, duties, impositions and Liabilities relating to Taxes, including Taxes based upon or measured by gross receipts, income, profits, sales, use and occupation, and value added, ad valorem, transfer, franchise, withholding, payroll, recapture, employment, unclaimed property, escheat, excise and property Taxes, together with all interest, penalties and additions imposed with respect to such amounts, (ii) any Liability for payment of any amounts of the type described in clause (i) as a result of being a member of an affiliated, consolidated, combined or unitary group, and (iii) any Liability for amounts of the type described in clauses (i) and (ii) as a result of any express or implied obligation to indemnify another Person or as a result of any obligations under any agreements or arrangements with any other person with respect to such amounts and including any Liability for Taxes of a predecessor entity.

**3.10    Sufficiency of Purchased Assets; Title to Properties**

(a)    The Purchased Assets constitute all of the assets, tangible and intangible, of any nature whatsoever, necessary to operate the Business in the manner currently operated by Sellers and includes substantially all of the operating assets of Sellers, subject to any Excluded Assets or Retained Liabilities.

(b)     Each Seller has good and marketable title to all of its respective Purchased Assets as shown on the Base Balance Sheet, or with respect to leased Purchased Assets, valid leasehold interests in, or with respect to licensed Purchased Assets, valid licenses to use, free and clear of all Encumbrances (other than Permitted Encumbrances). The machinery and equipment included in the Purchased Assets are in all material respects in good condition and repair, normal wear and tear excepted, and all Real Property Leases or Tangible Personal Property to which each Seller is a party are fully effective and afford such Sellers peaceful and undisturbed possession of the subject matter of the Lease. To Sellers' knowledge, each Seller is not in violation of any zoning, building, or safety ordinance, regulation or requirement or other Legal Requirement applicable to the operation of owned or leased properties, and each Seller has not received any notice of such violation with which it has not complied or had waived.

(c)     Sellers do not currently own any Real Property. Section 3.10 (c) of the Seller Disclosure Schedule sets forth the addresses and uses of all Real Property that each Seller, its predecessors or Affiliates own, lease or sublease or have ever owned, leased or subleased since January 1, 2004. All Real Property Leases or Leases of Tangible Personal Property constituting Purchased Assets to which each Seller is a party are legal, valid and binding, are in full force and effect and afford such Seller peaceful and undisturbed possession of the subject matter of the Lease. As a result of the transactions contemplated by this Agreement, Purchaser will obtain a valid ownership or leasehold interest in all Tangible Personal Property that each Seller currently owns or leases and all Real Property that each Seller currently leases, as of the date of this Agreement, (subject to any Real Property retained by Sellers as Excluded Assets), in each case free and clear of all title defects and Encumbrances of any kind, except Permitted Encumbrances. Sellers will obtain any consents necessary to transfer any Real Property Lease to Purchaser pursuant to this Agreement, so such transfer will not result in a breach or default under any Real Property Lease.

## 3.11   Absence of Certain Changes or Events

Excluding the effect of filing and administration of the Chapter 11 Case, since the Base Balance Sheet Date, Sellers have carried on their business in the ordinary course substantially in accordance with the procedures and practices in effect on the Base Balance Sheet Date.

(a)     To Sellers' knowledge, except as set forth under Section 3.11 of the Seller Disclosure Schedule, since the Base Balance Sheet Date there has not been with respect to Sellers:

(i)     any change, event, circumstance or effect that, by itself or in conjunction with all other such changes, whether or not arising in the ordinary course of business, has had or would reasonably be expected to have a Material Adverse Effect on Sellers or on Sellers' ability to conduct the Business as currently conducted, or that is reasonably likely to impede the performance by any Seller of its obligations under this Agreement or any of the Seller Ancillary Agreements;

(ii)     any Encumbrance placed on any of the properties of Sellers except Permitted Encumbrances;

(iii)     any Liability incurred by Sellers other than trade accounts payable and other Liabilities arising in the ordinary course of business;

(iv)    any purchase, license, sale or other disposition, or any agreement or other arrangement for the purchase, license, sale or other disposition, of any of the Purchased Assets other than in the ordinary course of business and consistent with past practice;

(v)    any material damage, destruction or loss of any material property or asset, whether or not covered by insurance;

(vi)    any material labor dispute or material claim of unfair labor practices;

(vii)    any increase in the compensation payable or to become payable to any of Sellers' officers, employees or agents, or any bonus payment or arrangement made to or with any of such officers, employees, consultants or agents; or any increase in the compensation payable or to become payable to any of Sellers' other officers, employees, consultants or agents (other than normal annual raises for non-officers in the ordinary course of business consistent with past practice) or any bonus payment or arrangement made to or with any of such officers, employees or agents other than normal bonuses or compensation increases granted prior to the date of this Agreement as disclosed under Section 3.11 of the Seller Disclosure Schedule;

(viii)    any termination or resignation of any executive officer of Sellers; or

(ix)    any loss of one or more material customers of Sellers, that individually or in the aggregate, account for more than five percent (5%) of the consolidated revenues of Sellers as of the Base Balance Sheet Date.

(b)    Except as set forth under Section 3.11 of the Seller Disclosure Schedule, since the Base Balance Sheet Date Sellers have not:

(i)    amended their certificates of incorporation, bylaws or any other organizational document;

(ii)    made any material payment or discharged any material Encumbrance or Liability of Sellers;

(iii)    incurred any material obligation or Liability to any of their employees, officers, directors, stockholders or Affiliates, or any loans or advances made to any of their employees, officers, directors, stockholders or Affiliates, except normal compensation and reasonable travel related expense allowances payable to employees, officers or directors;

(iv)    declared, set aside or paid any dividend on, or made any other distribution in respect of, their capital stock, or made any changes in any rights, preferences, privileges or restrictions of any of their outstanding capital stock;

(v)    effected or been a party to any transaction relating to a merger, consolidation, sale of all or substantially all of their assets, or similar transaction;

(vi)    executed, amended, relinquished, terminated or failed to renew any material Contract constituting an Asset, lease, transaction or legally binding commitment other than in the ordinary course of their business (nor has there been any written or oral indication or

assertion by the other party thereto of its desire to so amend, relinquish, terminate or not renew any such Contract, lease transaction or legally binding commitment);

(vii)     deferred the payment of any accounts payable outside the ordinary course of business or provided any discount, accommodation or other concession outside the ordinary course of business in order to accelerate or induce the collection of any receivable;

(viii)    incurred indebtedness for borrowed money, entered into any capital lease or guaranteed any such indebtedness; or

(ix)      entered into any other material transaction or taken any other material action outside the ordinary course of their business (other than as disclosed in Section 3.11 of the Seller Disclosure Schedule).

**3.12     Intellectual Property**

(a)      Definition.  As used herein, the term **Intellectual Property Rights** shall mean all worldwide industrial and intellectual property rights, including, (i) patents, patent applications and patent rights (collectively, **Patents**); (ii) trademarks (registered and/or at common law), trademark applications, trade names, logos, trade dress, brand names, service marks, service mark applications, domain names and other indicia of source and all goodwill associated therewith (collectively **Trademarks**); (iii) works of authorship, copyrights, copyright registrations and applications for registration, and moral rights (collectively, **Copyrights**); (iv) know-how, trade secrets, customer lists, proprietary information, proprietary processes and formulae, databases and data collections (collectively, **Trade Secrets**); (v) all source and object code, software, algorithms, architecture, structure, display screens, layouts, inventions, development tools (collectively, **Software**) and all documentation and media constituting, describing or relating to the above, including, manuals, memoranda and records;

(b)      Ownership of Intellectual Property.  Except as set forth on Section 3.12(b) of the Seller Disclosure Schedule, each Seller owns all right, title and interest in, or has license to use (sufficient for the conduct of its business as currently conducted), all Intellectual Property Rights used in or reasonably necessary to the conduct of its business as currently conducted including the business of the development, design, maintenance, sale, licensing, installation and use of Sellers' products and the sale of commercial services using such Intellectual Property Rights (with such Intellectual Property Rights being hereinafter collectively referred to as the **Seller IP Rights**).  To Sellers' Knowledge, except as set forth in Section 3.12(b) of the Seller Disclosure Schedule, Sellers have the exclusive, unrestricted, worldwide right to design, develop, use, reproduce, manufacture, sell, license and distribute all of its products and services (such products and services being set forth under Section 3.12(b) of the Seller Disclosure Schedule and hereinafter collectively referred to as the **Seller Products and/or Services**).  Set forth under Section 3.12(b) of the Seller Disclosure Schedule is a true and complete list of all Copyrights, Trademarks, Patents, Trade Secrets and Software held or used by Sellers.  Each Seller is not aware of any loss, abandonment, cancellation, termination or expiration of any such Seller IP Rights except as set forth on Section 3.12(b) of the Seller Disclosure Schedule.  To Sellers' knowledge, the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby will not constitute a material Breach of any instrument or agreement governing any Seller IP Right, will not cause forfeiture or termination or give rise to a right of forfeiture or termination of any Seller IP Right or materially impair the right of Sellers to use, sell or license any Seller IP Right or portion thereof.

(c)    <u>No Violation of Rights of Others</u>. To Sellers' knowledge, the business of Sellers and the design, development, use, manufacture, sale, license or provision of any Seller Product and Service does not, and the use, manufacture, sale, license or provision of any Seller Product or Service after the Effective Time will not cause Sellers to infringe or violate any of the Intellectual Property Rights of any other Person. Sellers have not received any written or oral claim or notice of infringement or potential infringement of the Intellectual Property Rights of any other Person. To Sellers' knowledge, Sellers are not using any confidential information or trade secrets of any Third Party, including, but not limited to, any past or present employees or then respective past employers. To Sellers' knowledge, there are no royalties, honoraria, fees or other payments payable by Sellers to any Person by reason of the ownership, use, license, sale, or disposition of the Seller IP Rights (other than as set forth under Section 3.12(b) of the Seller Disclosure Schedule).

(d)    <u>Protection of Rights</u>. Sellers have taken all commercially reasonable steps designed to safeguard and maintain the secrecy and confidentiality of, and its proprietary rights in, all Seller IP Rights. To the knowledge of Sellers, there is not any material unauthorized use, infringement or misappropriation of any Seller IP Rights by any Third Party, including, to the knowledge of Sellers, any employee of Sellers. Sellers have made available to the Purchaser copies of all agreements that Sellers have with their officers, employees and consultants regarding the protection of proprietary information and the assignment to Sellers of all Intellectual Property Rights arising from the services performed for Sellers by such Persons.

**3.13    Conformity of Products and Services**

Except as set forth in Section 3.13 of the Seller Disclosure Schedule, all Seller Products and/or Services delivered or provided by Sellers to customers on or prior to the Closing Date conform in all material respects (to the extent required in Contracts with such customers) to applicable contractual commitments, express and implied warranties, product specifications and product documentation and to any representations provided to customers, and Sellers do not have any material Liability (and, to Sellers' knowledge, there is no legitimate basis for any present or future Proceeding against Sellers giving rise to any material Liability relating to the foregoing Contracts) for replacement or repair thereof or other damages in connection therewith in excess of any reserves therefor reflected on the Base Balance Sheet, or, with respect to any such material Liability arising after the Base Balance Sheet Date and prior to the Closing Date, such reserves as determined in accordance with GAAP and in accordance with the past practices of Sellers.

**3.14    Product and Service Warranties**

Set forth on Section 3.14 of the Seller Disclosure Schedule are the standard written forms of product and service warranties and guarantees utilized by Sellers as of the date of this Agreement with respect to the Seller Products and/or Services. To Sellers' knowledge, except as set forth on Section 3.14 of the Seller Disclosure Schedule, during a period of three (3) years prior to the Closing Date, Sellers have not made any other written material warranties (that remain in effect) with regard to Seller Products and/or Services.

**3.15    Products Liability or Recall**

There are not, and have not been in the past, any claims, Proceedings or orders against Sellers, any predecessor, any Affiliate of Sellers or any former subsidiary relating to any product manufactured, distributed or sold by Sellers, any predecessor, any Affiliate of Sellers or any former subsidiary and

alleged to have been defective or improperly designed or manufactured, nor have any such claims, Proceedings or orders been threatened against Sellers, any predecessor, any Affiliate of Sellers or any former subsidiary. Sellers, any predecessor, any Affiliate of Sellers and any former subsidiary have not been notified in writing of any claims for any product returns or recalls relating to any products they manufactured or distributed. Sellers, any predecessor, and any Affiliate of Sellers are not currently planning to, and are not legally obliged to, make a recall of any product any of them manufactured or distributed. No facts, circumstances, or conditions exist that would reasonably be expected to result in (i) Sellers, any predecessor, and any Affiliate of Sellers becoming required to make any such recall or (ii) Sellers, any predecessor, and any Affiliate of Sellers making any such recall if they acted in a manner consistent with past practice.

**3.16    List of Certain Employees, Suppliers and Customers**

(a)     Section 3.16(a) of the Seller Disclosure Schedule sets forth a detailed description of all compensation, including salary, bonus and deferred compensation paid or payable, for each officer, employee, consultant and independent contractor of Sellers who individually received compensation in excess of $100,000 for the fiscal year ended December 31, 2007 or is anticipated to receive compensation in excess of $100,000 for the fiscal year ending December 31, 2008.

(b)     Section 3.16(b) of the Seller Disclosure Schedule sets forth a list of all suppliers, licensors and vendors of Sellers to whom, since January 1, 2007, Sellers made payments aggregating $100,000 or more, showing, with respect to each, the name, address and dollar value involved. As of the date hereof, no such supplier, licensor or vendor has canceled or otherwise terminated or materially reduced its business with Sellers or materially and adversely modified its relationship with Sellers nor, to the knowledge of Sellers, does any supplier, licensor or vendor, have any plan or intention to do so.

(c)     Section 3.16(c) of the Seller Disclosure Schedule sets forth the name of each customer or distributor of Sellers who accounted for more than one percent (1%) of the revenues of Sellers for the fiscal year(s) ending December 31, 2006 and December 31, 2007 (the **Customers**) showing with respect to each, the name, address and dollar value involved. Except as set forth in Section 3.16(c) of the Seller Disclosure Schedule, between December 31, 2006 and the date of this Agreement, no Customer of Sellers has canceled or otherwise terminated its relationship with Sellers, or not renewed or accepted any maintenance agreements, or has decreased materially its purchases of Seller Products and/or Services. As of the date hereof, no Customer has, to the knowledge of the Sellers, any plan or intention to terminate, to cancel or otherwise materially and adversely modify its relationship with Sellers or to decrease materially or limit its purchase or distribution of Seller Products and/or Services.

**3.17    Compliance with Laws**

Each Seller has complied, or prior to the Closing Date will have complied, and is or will be at the Closing Date in compliance, in all material respects, with all Legal Requirements, and all Orders applicable to Sellers, or to the Purchased Assets, properties and business of Sellers.

Sellers have received all material permits, approvals and Governmental Authorizations from, and have made all material filings with, Third Parties, including Governmental Authorities, that are necessary to the conduct of its business as currently conducted.

**3.18    Agreements and Commitments**

Except as set forth under Section 3.18 of the Seller Disclosure Schedule and delivered or made available by Sellers to the Purchaser on or prior to the Closing Date, as of the date hereof, each Seller is not a party or subject to any agreement, obligation or commitment that is material to Sellers, their financial condition or business or that is described below, including but not limited to the following:

(a)    any Contract providing for payments by or to Sellers in an amount with respect to any single transaction, or series of related transactions, of $25,000 or more in the ordinary course of business;

(b)    any Contract to which any Seller is a party (i) with respect to Seller IP Rights licensed or transferred to any Third Party (other than standard agreements with customers arising in the ordinary course of business consistent with past practice, the forms of which have been delivered to the Purchaser or its counsel); and (ii) pursuant to which a Third Party has licensed or transferred any Intellectual Property Rights to any Seller reasonably necessary for the conduct of its business as of the date hereof (except for commercially available, non-customized software sold at retail);

(c)    any agreement by any Seller to encumber, transfer or sell any material rights in or with respect to any Seller IP Rights except non-exclusive software licenses;

(d)    any Contract currently in force for hosting, data center, transaction processing or other services related to Sellers' website;

(e)    any agreement for the sale or lease of Tangible Personal Property involving more than $25,000 per year;

(f)    any dealer, distributor, sales representative, original equipment manufacturer, value added remarketer or other agreement for the distribution of Seller Products and/or Services (other than standard agreements arising in the ordinary course of business consistent with past practice, the forms of which have been delivered to the Purchaser or its counsel);

(g)    any franchise agreement;

(h)    any Contract granting most favored nation pricing and/or terms to any customer, licensee, purchaser, reseller, promoter or remarketer of any Seller Products and/or Services;

(i)    any joint venture Contract or arrangement or any other agreement that involves a sharing of profits with other Persons or the payment of royalties to any other Person;

(j)    any instrument evidencing indebtedness for borrowed money by way of direct loan, sale of debt securities, purchase money obligation, conditional sale, guarantee or otherwise, except for trade indebtedness or any advance to any employee of Sellers incurred or made in the ordinary course of business, and except as disclosed in the Seller Financial Statements;

(k)    any Contract containing covenants purporting to limit Sellers' freedom to compete in any line of business in any geographic area or to sell products or services to a specific entity;

(l)     any Contract for the employment of any officer, employee or consultant of Sellers or any other type of Contract or understanding with any officer, employee or consultant of Sellers that is not immediately terminable by Sellers without cost or liability;

(m)     any Contract for consulting or similar services with a term of more than sixty (60) days that is not terminable without penalty with notice of sixty (60) days or less; or

(n)     any other material Contract entered into outside the ordinary course of business.

To Sellers' knowledge, all agreements, obligations and commitments listed in Section 3.18 of the Seller Disclosure Schedule, are valid, binding and in full force and effect, and except as expressly noted, a true and complete copy of each has been delivered or made available to the Purchaser. Except as noted on Section 3.18 of the Seller Disclosure Schedule, Sellers are not and, to the knowledge of Sellers, there is not any other party that is in material Breach of or default under any material term of any such agreement, obligation or commitment.

**3.19    Cure Amount**

Schedule 3.19 sets forth the amount that, to Sellers' knowledge, is required to be paid to cure any outstanding defaults under each Designated Contract.

**3.20    Employee Benefits Plans**

(a)     Schedule 3.20(a) sets forth a correct and complete list of: (i) all "employee benefit plans" (as defined in Section 3(3) of ERISA), (ii) all employment, consulting, non-competition, employee non-solicitation, employee loan or other compensation agreements, and all collective bargaining agreements, and (iii) all bonus or other incentive compensation, equity or equity-based compensation, stock purchase, deferred compensation, change in control, severance, leave of absence, vacation, salary continuation, medical, life insurance or other death benefit, educational assistance, training, service award, section 125 cafeteria, dependant care, pension, welfare benefit or other material employee or fringe benefit plans, policies, agreements or arrangements, in each case as to which any Seller has any obligation or liability, contingent or otherwise, thereunder for current or former employees, directors or individual consultants of any Seller (collectively, the **Seller Employee Plans**). None of the Seller Employee Plans is subject to Title IV of ERISA or Section 412 of the Code nor does any Seller or any Subsidiary have any obligation or liability, contingent or otherwise, with respect to any such plan.

(b)     The Seller Employee Plans have been maintained in all material respects in accordance with their terms and with all applicable provisions of ERISA, the Code and other Legal Requirements. Each Seller Employee Plan that is intended to be qualified under section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service that it is so qualified, and each related trust that is intended to be exempt from federal income tax pursuant to section 501(a) of the Code has received a determination letter from the Internal Revenue Service that it is so exempt, and no fact or event has occurred since the date of such determination letter that would reasonably be expected to adversely affect such qualification or exemption, as the case may be.

(c)     Except as set forth on Section 3.20(c) of the Seller Disclosure Schedule, all contributions (including all employer contributions and employee contributions) required to have been made

under any of the Seller Employee Plans (including workers compensation) or by Law have been timely made.

(d) There are no pending actions, claims or lawsuits arising from or relating to the Seller Employee Plans, (other than routine benefit claims), nor do Sellers have any knowledge of facts that could form the basis for any such claim or lawsuit.

(e) None of the Seller Employee Plans provides for post-employment life insurance or health benefits coverage, except as may be required under Part 6 of Subtitle B of Title I of ERISA at the expense of the participant or the participant's beneficiary, or coverage through the last day of the month following the date of termination of employment.

(f) Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (i) result in any payment becoming due to any employee of Sellers, (ii) increase any benefits otherwise payable under any Seller Employee Plan or (iii) result in the acceleration of the time of payment or vesting of any such benefits under any Seller Employee Plan. None of the compensation payable under any Seller Employee Plan will constitute an "excess parachute payment" under Section 280G of the Code by reason of the consummation of the transactions contemplated by this Agreement.

(g) To the extent any Seller has engaged any individual to perform services (other than through a contract with an organization other than such individual) and did not treat such individual as an employee of such Seller, such treatment was proper and complied with all applicable Legal Requirements.

(h) Sellers are not a party to any labor or collective bargaining agreement and there are no labor or collective bargaining agreements that pertain to the employees of Sellers. No labor organization or group of employees of Sellers has made a pending demand for recognition, and there are no representation proceedings or petitions seeking a representation currently pending or, to the knowledge of Sellers, threatened to be brought or filed with the National Labor Relations Board or other labor relations tribunal. There is no organizing activity involving the Sellers pending, or to the knowledge of Sellers, threatened by any labor organization or group of employees of the Sellers. Except as set forth on Section 3.20(h) of the Seller Disclosure Schedule, there are no strikes, work stoppages, slowdowns, lockouts or similar labor disputes, unfair labor practice charges, arbitrations, material grievances, unfair employment practice charges or complaints, or other claims or complaints against Sellers, pending or, to the knowledge of Sellers, threatened by or on behalf of any employee or group of employees of Sellers.

**3.21 Relationships with Affiliates**

Except as disclosed in Section 3.21 of the Seller Disclosure Schedule, no Person (except Sellers) has, or since January 1, 2005 has had, any interest in any property (whether real, personal, or mixed and whether tangible or intangible), used in or pertaining to Sellers' business. None of Sellers nor any Affiliate of any of them owns, or since January 1, 2005 has owned, of record or as a beneficial owner, an equity interest or any other financial or profit interest in any Person that has (a) had business dealings or a material financial interest in any transaction with Sellers other than business dealings or transactions disclosed in Section 3.21 of the Seller Disclosure Schedule, each of which has been conducted in the ordinary course of business with Sellers at substantially prevailing market prices and on substantially prevailing market terms, or (b) engaged in competition with Sellers with respect to any line of the Seller Products and/or Services (a **Competing Business**) in any market currently served by Sellers, except for

ownership of less than one percent (1%) of the outstanding capital stock of any Competing Business with securities listed on any national or regional securities exchange or that have been registered under Section 12(g) of the Exchange Act. Except as set forth in Section 3.21 of the Seller Disclosure Schedule, none of Sellers nor any Affiliate of any of them is a party to any Contract with, or has any claim or right against, Sellers.

## 3.22 Environmental Matters

(a)     Except as set forth on Section 3.22 of the Seller Disclosure Schedule:

    (i)     each Seller is, and has been, in compliance with all applicable Environmental Laws in all material respects;

    (ii)     each Seller has obtained and currently maintains all Environmental Permits applicable to its operations and is, and has been, in compliance with all Environmental Permits in all material respects;

    (iii)     there is no material Environmental Claim that is pending or, to the knowledge of Sellers, threatened against or affecting Sellers, or any Affiliate of Sellers or any Real Property currently or, to the knowledge of Sellers, formerly owned, operated or leased by Sellers, any predecessor, any Affiliate of Sellers or any former subsidiary, and no facts, circumstances or conditions exist that would reasonably be expected to form the basis of any such material Environmental Claim;

    (iv)     Sellers and any Affiliate of Sellers have not received any notice of or entered into or assumed by Contract or operation of any Legal Requirement or otherwise, any material obligation, liability, order, decree, settlement, Proceeding, judgment or injunction relating to or arising under Environmental Laws;

    (v)     neither the execution and delivery of this Agreement by Sellers, nor the consummation by Sellers of the transactions contemplated herein, nor compliance by Sellers with any of the provisions herein, will result in the suspension, termination or revocation of, or a right of suspension, termination or cancellation under, any Environmental Permit for the Business; and

    (vi)     there has been no material Release or threatened Release of any Hazardous Substance in, on, at, under or from any properties currently or previously owned, leased or operated by Sellers, any predecessor, any Affiliate of Sellers or any former subsidiary or, to the knowledge of Sellers, at any third-party location to which Sellers, any predecessor, any Affiliate of Sellers or any former subsidiary transported or arranged for the disposal or treatment of any Hazardous Substances.

(b)     Sellers have made available correct and complete copies of all environmentally related audits, studies, reports, analyses and results of investigations that have been performed with respect to currently or previously owned, leased or operated properties of Sellers, any predecessor, any Affiliate of Sellers or any former subsidiary.

(c)     To the knowledge of Sellers, there is not now, nor has there been in the past, on, in or under any Real Property owned, leased or operated by Sellers, any predecessor, any Affiliate of Sellers or any former subsidiary, (i) any underground storage tanks, above-ground storage tanks, dikes,

ponds, lagoons or impoundments, (ii) any asbestos or asbestos-containing materials, (iii) any polychlorinated biphenyls or (iv) any radioactive substances.

(d)     Sellers, any predecessor, any Affiliate of Sellers and any former subsidiary have not manufactured, distributed or otherwise incorporated into any product that they manufactured or distributed, or ever acquired any company or business that manufactured, distributed or otherwise incorporated into any product that they manufactured or distributed, any asbestos or asbestos-containing materials.

## 3.23    Insurance

Each Seller maintains fire and casualty, workers compensation, general liability, business interruption and product liability insurance (which current policies are listed under Section 3.23 of the Seller Disclosure Schedule) that it believes to be reasonably prudent for similarly sized and similarly situated businesses. Section 3.23 of the Seller Disclosure Schedule sets forth all material claims made under insurance policies since January 1, 2005 and the premiums that apply with respect to such insurance policies as of the date of this Agreement.

## 3.24    Board of Directors and Officers

Section 3.24 of the Seller Disclosure Schedule accurately sets forth, as of the date of this Agreement: (a) the name and title of each of Sellers' officers; and (b) the name, principal occupation and address of each member of Sellers' board of directors.

## 3.25    Brokers

Except for the fees payable by Sellers to NatCity Investments, Inc., no broker, investment banker or other Person is entitled to any broker's, finder's or other similar fee or commission in connection with the transactions contemplated by this Agreement.

## 3.26    Accuracy of Disclosure

To Sellers' knowledge, this Agreement, its Schedules, and any of the certificates or documents to be delivered by Sellers to Purchaser under this Agreement, taken together, do not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained herein and therein, in light of the circumstances under which such statements were made, not misleading.

## 3.27    No Other Representations or Warranties

Except for the representations and warranties contained in this Article 3, neither Sellers nor any other Person makes any other representation or warranty, express or implied, on behalf of Sellers.

## 4.    REPRESENTATIONS AND WARRANTIES OF PURCHASER

The Purchaser, where applicable, hereby represents and warrants to Sellers on the date hereof and as of the Closing Date as follows:

**4.1    Organization**

The Purchaser is duly organized and validly existing under the laws of the jurisdiction in which it is organized and has all necessary limited liability company power and authority to conduct its business in the manner in which its business is currently being conducted.

**4.2    Power, Authorization and Non-Contravention**

    (a)    The Purchaser has the limited liability company power, legal capacity and authority to (i) carry on its business as now conducted; (ii) own, operate and lease its properties in the manner in which its properties are currently owned, used and leased; (iii) perform its obligations under Contracts to which it is a party or bound, and, as designated, authorized and directed by the Agent, enter into and perform its obligations under this Agreement and all agreements to which the Purchaser is or will be a party that are required to be executed pursuant to this Agreement (the **Purchaser Ancillary Agreements**); except in the case of clauses (i), (ii) and (iii) of this Section 4.2 where the failure to have such power, capacity or authority would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the Purchaser. The execution, delivery and performance of this Agreement and the Purchaser Ancillary Agreements have been duly and validly approved and authorized by the Purchaser's managers, as applicable. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary limited liability company action on the part of the Purchaser.

    (b)    No consent, approval, Order or authorization of, or registration, declaration or filing with any Governmental Authority or other Person is required to be obtained or made by the Purchaser in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby, except for (i) such consents, approvals, Orders, authorizations, registrations, declarations and filings as may be required under applicable federal, foreign and state securities or "blue sky" laws or related laws and (ii) such other consents, authorizations, filings, approvals and registrations that if not obtained or made would not be material to the Purchaser or prevent, alter or materially delay the consummation of the transactions contemplated hereby.

    (c)    Upon entry of the Sale Order, this Agreement and the Purchaser Ancillary Agreements are, or when executed by the Purchaser (as applicable) and the other parties thereto will be, valid and binding obligations of the Purchaser, to the extent a party thereto, enforceable against the Purchaser, to the extent a party thereto in accordance with their respective terms, except as to the effect, if any, of (i) applicable bankruptcy and insolvency, moratorium, reorganization or other similar laws affecting the rights of creditors generally and (ii) rules of law governing specific performance, injunctive relief and other equitable remedies.

**4.3    No Violation of Charter Documents, Contracts or Laws**

Neither the execution and delivery of this Agreement or any Purchaser Ancillary Agreement, nor the consummation of the transactions provided for herein or therein, will conflict with, or (with or without notice or lapse of time, or both) result in a termination, Breach, impairment or violation of: (a) any provision of the Purchaser's Charter Documents, as currently in effect; (b) any material Contract to which the Purchaser is a party or bound; or (c) any federal, state, local or foreign judgment, writ, decree, Order, statute, rule or regulation applicable to the Purchaser or any of its respective assets or properties.

### 4.4 No Other Representations or Warranties

Except for the representations and warranties contained in this Article 4, neither Purchaser nor any other Person makes any other representation or warranty, express or implied, on behalf of Purchaser.

### 5. COVENANTS OF SELLERS

### 5.1 Advice of Changes

During the period from the date of this Agreement until the earlier to occur of (a) the Effective Time or (b) the termination of this Agreement in accordance with the provisions of Article 11 hereof, Sellers will promptly advise the Purchaser in writing of: (i) the discovery by Sellers of any event, condition, fact or circumstance occurring on or prior to the date of this Agreement that would render any representation or warranty by Sellers contained in this Agreement untrue or inaccurate in any material respect; (ii) any event, condition, fact or circumstance occurring subsequent to the date of this Agreement that would render any representation or warranty by Sellers contained in this Agreement, if made on or as of the date of such event or the Closing Date (provided that representations and warranties that are confined to a specific date shall speak as of that date), untrue or inaccurate in any material respect; (iii) any Breach of any covenant or obligation of Sellers pursuant to this Agreement or any Ancillary Agreement; (iv) any event, condition, fact or circumstance that may make the timely satisfaction of any of the conditions set forth in Article 10 impossible or unlikely; and (v) any Material Adverse Effect on Sellers.

### 5.2 Conduct of Business

During the period from the date of this Agreement until the earlier to occur of (a) the Effective Time or (b) the termination of this Agreement in accordance with the provisions of Article 11 hereof, Sellers shall, except as contemplated by this Agreement or to the extent that the Purchaser shall otherwise consent in writing (which consent shall not be unreasonably withheld or delayed), carry on the Business in the usual, regular and ordinary course, in substantially the same manner as heretofore conducted and in compliance in all material respects with all applicable Legal Requirements and, subject to orders of the Bankruptcy Court and otherwise to the requirements of the Bankruptcy Code, pay its debts and Taxes when due, pay or perform other material obligations when due, and use all commercially reasonable efforts consistent with past practices and policies to (i) preserve intact its present business organization, (ii) make available the services of its present officers, (iii) preserve its relationships with customers, suppliers, licensors, licensees, and others with which it has business dealings, (iv) maintain the Purchased Assets in good working condition and repair according to the standards it has maintained as of the date of this Agreement, subject only to ordinary wear and tear (including maintaining the intangible assets by making all filings and paying all renewal fees), and (v) keep in full force all insurance policies identified under Section 3.23 of the Seller Disclosure Schedule and obtain, renew or extend any insurance required for the Business and the Purchased Assets. In addition, during that period, Sellers will promptly notify the Purchaser of any material event involving the operation of the Business or the Purchased Assets consistent with the agreements contained herein.

In addition, during the period from the date of this Agreement until the earlier to occur of (a) the Effective Time or (b) the termination of this Agreement in accordance with the provisions of Article 11 hereof, except as provided otherwise herein or as required by order of the Bankruptcy Court or as approved or recommended by the Purchaser in writing, Sellers and their Subsidiaries will not, without the prior written consent of the Purchaser, which consent shall not be unreasonably withheld or delayed:

(a)     materially revalue any of its assets or, except as required by GAAP, make any change in accounting methods, principles or practices, or agree to any material audit assessment by any Tax authority or make any Tax election;

(b)     materially change its business practices or policies with respect to the Seller Products and/or Services or its customers;

(c)     except as permitted pursuant to Section 2.3(b)(iii)(A) of this Agreement, institute (a) any increase in any compensation (including awards of equity-based compensation) payable to any current or former director, officer or employee of any Seller or in any profit-sharing, bonus, incentive, deferred compensation, insurance, pension, retirement, medical, hospital, disability, welfare or other benefit made available to employees of any Seller except for increases of cash compensation in the ordinary course of business; (b) any increase in severance or termination pay, except to the extent required under any agreement as of the date of this Agreement; or (c) any amendment or termination of any Seller Employee Plan, except as required by law, or adoption of any new employee benefit plan, any individual employment, severance, change in control or consulting agreement or collective bargaining or other labor agreement.

(d)     take any action, not take any action or intentionally omit to take any action that would have a Material Adverse Effect on Sellers other than as contemplated herein;

(e)     fail to perform or comply with any term or condition, or take any action that would cause a default or event of default, under the DIP Financing; and

(f)     agree to do any of the things described in the preceding Sections 5.2(a) through (e).

## 5.3    Regulatory Approvals

Sellers shall provide evidence in form and substance reasonably satisfactory to Purchaser that Sellers have obtained all Governmental Authorizations (including any in connection with Environmental Laws) legally required in connection with this Agreement and consummation of the transactions contemplated herein, including evidence of Sellers' compliance with any applicable property transfer requirements (such as the New Jersey Industrial Site Recovery Act, the Connecticut Transfer Act or any similar property transfer laws) or any voluntary cleanup agreements.

## 5.4    Necessary Consents

If the Bankruptcy Court does not otherwise approve the assignment to Purchaser in form and substance reasonably satisfactory to Purchaser, Sellers will use all commercially reasonable efforts to obtain such written consents and take such other actions as may be necessary or appropriate for Sellers, in addition to those set forth in Section 5.3, to allow the consummation of the transactions provided for herein and to facilitate and allow the Purchaser to carry on Sellers' Business after the Closing Date, including the obtaining of any consents required to assign the Designated Contracts and/or Assumed Real Property to Purchaser, and such consents shall be in full force and effect.

## 5.5    Securities Laws

Sellers shall use all reasonable efforts to assist the Purchaser to the extent necessary to comply with applicable federal and state securities or "blue sky" laws or related laws of all jurisdictions applicable in connection with the transactions contemplated by this Agreement.

## 5.6    Litigation

Sellers will notify the Purchaser in writing promptly after learning of any Proceeding by or before any Governmental Authority initiated or threatened against Sellers relating to the Business or the Purchased Assets or for the purpose or with the effect of enjoining or preventing the consummation of any of the transactions contemplated by this Agreement, or that, if adversely determined, would be reasonably expected to have a Material Adverse Effect on Sellers, the Business, the Purchased Assets or the Assumed Liabilities. If any Seller becomes subject to a review by the Internal Revenue Service or any other Taxing agency or authority for periods prior to the Closing Date, and such review has the potential to materially affect the Liability of the Purchaser or any of its Affiliates for any Taxes due with respect to a Taxable period ending after the Closing Date, Sellers shall keep the Purchaser informed on a regular basis of the nature of such Proceedings and shall consider in good faith any recommendations made by the Purchaser as to the conduct and settlement of such Proceedings. In no event will Sellers enter into any settlement or other stipulation with respect to any such review without the written consent of the Purchaser, which consent will not be unreasonably withheld.

## 5.7    Employment Matters

(a)     Sellers agree that, from and after the date hereof, Purchaser may offer employment, effective as of the Closing, to any Persons employed by Seller, which employment will become effective as of the Closing Date and only if the Closing occurs. Only if the Closing occurs, any such Person who accepts such an offer of employment with Purchaser shall be a **Transferred Employee** and shall be employed by Purchaser on such terms and conditions as Purchaser and each such Transferred Employee may mutually agree. Upon request of Purchaser, Sellers shall provide Purchaser reasonable access to data (including computer data) regarding the dates of hire, compensation, benefits, and job descriptions of the Transferred Employees.

(b)     At Closing, at Purchaser's sole discretion, the Transferred Employees shall either continue to participate in the Assumed Seller Employee Plans that each Transferred Employee participated in prior to the Closing or Purchaser shall make available or establish such employee benefit plans, programs and policies for the benefit of the Transferred Employees and their eligible dependents as Purchaser shall elect to make available to the Transferred Employees (the **Purchaser Plans**). With respect to participation in any Purchaser Plans, the Purchaser shall credit (i) each Transferred Employee with his or her service with Sellers between the Petition Date and the Closing Date to the same extent such service would have been credited had such service been with Purchaser, up to the priority limits imposed by section 507 of the Bankruptcy Code and (ii) the Transferred Employees with all service recognized by Sellers under the Seller Employee Plans as service with Purchaser for purposes of eligibility to participate and vesting under the Purchaser Plans, but not for the purpose of benefit accruals. Purchaser shall waive any coverage-waiting period, pre-existing condition, and actively-at-work requirements under Purchaser Plans to the extent such conditions or requirements have been satisfied under corresponding Seller Employee Plans as of the Closing Date and shall provide that any eligible expenses incurred under the applicable Seller Employee Plan before the Closing Date by a Transferred Employee (and his or her dependents) during the calendar year of the Closing and timely disclosed to Purchaser by such Transferred Employee in accordance with the terms and conditions of the applicable Purchaser Plan shall be taken into account for purposes of satisfying the applicable deductible, coinsurance, and maximum out-of-pocket provisions, and applicable annual and/or lifetime maximum benefit limitations of such applicable Purchaser Plans.

(c)     Sellers shall promptly notify the Purchaser if any of Sellers' directors or officers becomes aware that any of the key personnel listed under Section 5.7(c) of the Seller Disclosure Schedule intends to leave Sellers' employ.

**5.8     Satisfaction of Closing Conditions**

Sellers will use their commercially reasonable efforts to satisfy or cause to be satisfied all the conditions precedent that are set forth in Article 10 on or before the Closing Date. Subject to the terms and conditions of this Agreement, Sellers will use their commercially reasonable efforts to cause the transactions contemplated by this Agreement to be consummated, and, without limiting the generality of the foregoing, to obtain all consents and authorizations of Third Parties and to make all filings with, and give all notices to, Third Parties that may be necessary or reasonably required on their part in order to effect the transactions contemplated hereby.

**5.9     Change of Name**

On or before the Closing Date, Sellers shall (i) amend the Seller Charter Documents and take all other actions necessary to change each of their names to ones sufficiently dissimilar to Sellers' present names, in Purchaser's judgment, to avoid confusion; and (ii) take all actions requested by Purchaser to enable Purchaser to change its name to Sellers' present name. In addition, from and after the Effective Time, each Seller shall not use the present name of such Seller, or any variation thereof.

**5.10     Access to Information**

During the period from the date of this Agreement until the earlier to occur of (a) the Effective Time or (b) the termination of this Agreement in accordance with the provisions of Article 11 hereof, subject to the terms and conditions hereof relating to the confidentiality and use of confidential and proprietary information, and subject to compliance with applicable Legal Requirements, Sellers will provide the Purchaser and its agents with reasonable access, during regular business hours, to the files, books, records and offices of Sellers, including, without limitation, any and all information relating to Seller Taxes, commitments, Contracts, Leases, licenses, real, personal and intangible property (including any Intellectual Property Rights), and financial condition. Sellers will cause their accountants to cooperate with the Purchaser and its agents in making available all financial information reasonably requested, including, without limitation, the right to examine all working papers pertaining to all financial statements prepared or audited by such accountants.

**5.11     Casualty**

If, between the date of this Agreement and the Closing, any of the Purchased Assets shall be destroyed or damaged in whole or in part by fire, earthquake, flood, other casualty, or any other cause (**Casualty**), then Purchaser shall have the option to: (a) acquire such Purchased Assets on an "as is" basis and take an assignment from Sellers of all insurance proceeds payable to Sellers in respect of the Casualty, or (b) if Casualty would have a Material Adverse Effect, terminate this Agreement and the transactions contemplated hereby.

**5.12     Seller Disclosure Schedules**

Within ten calendar days after the date of this Agreement, Sellers shall provide to Purchaser the Seller Disclosure Schedules, which shall be subject to the sole right of Purchaser to accept or reject, in whole or in part. To the extent Purchaser rejects any part of the Seller Disclosure Schedules, Purchaser shall

notify Sellers of such rejection, and Sellers shall have five Business Days from the date Purchaser sends such notification to Sellers to amend the Seller Disclosure Schedules to the satisfaction of Purchaser (the **Disclosure Schedule Resolution Period**). To the extent Purchaser rejects any part of the Seller Disclosure Schedules following the Disclosure Schedule Resolution Period, Purchaser shall have the right to terminate this Agreement pursuant to Section 11.1(g) of this Agreement.

## 6. COVENANTS OF PURCHASER

### 6.1 Advice of Changes

During the period from the date of this Agreement until the earlier to occur of (a) the Effective Time and (b) the termination of this Agreement in accordance with the provisions of Article 11 hereof, Purchaser will promptly advise Sellers in writing of: (i) the discovery by Purchaser of any event, condition, fact or circumstance occurring on or prior to the date of this Agreement that would render any representation or warranty by Purchaser contained in this Agreement untrue or inaccurate in any material respect; (ii) any event, condition, fact or circumstance occurring subsequent to the date of this Agreement that would render any representation or warranty by Purchaser contained in this Agreement, if made on or as of the date of such event or the Closing Date (provided that the representations and warranties that are confined to a specific date shall speak only as of such date), untrue or inaccurate in any material respect; (iii) any Breach of any covenant or obligation of the Purchaser pursuant to this Agreement or any Ancillary Agreement; (iv) any event, condition, fact or circumstance that may make the timely satisfaction of any of the conditions set forth in Article 9 impossible or unlikely; and (v) any material adverse effect on Purchaser.

### 6.2 Litigation

Purchaser will notify Sellers in writing promptly after learning of any Proceeding threatened or pending for the purpose or with the probable effect of enjoining or preventing the consummation of any of the transactions contemplated by this Agreement, or that would be reasonably expected to have a material adverse effect on Purchaser.

### 6.3 Satisfaction of Conditions Precedent

Upon the terms and subject to the conditions of this Agreement, the Purchaser will use commercially reasonable efforts to satisfy or cause to be satisfied all the conditions precedent that are set forth in Article 9 on or before the Closing Date. Upon the terms and subject to the conditions of this Agreement, the Purchaser will use commercially reasonable efforts to cause the transactions contemplated by this Agreement to be consummated, and, without limiting the generality of the foregoing, to obtain all consents and authorizations of Third Parties and to make all filings with, and give all notices to, Third Parties that may be necessary or reasonably required on its part in order to effect the transactions provided for herein.

## 7. ADDITIONAL COVENANTS

### 7.1 Non-Competition, Non-Solicitation and Non-Disparagement

(a) <u>Non-Competition</u>. For a period of five (5) years after the Closing Date, neither of the Sellers shall, anywhere in the world, directly or indirectly invest in, own, manage, operate, finance, control, advise, or render services to, or guarantee the obligations of, any Person engaged in or planning to become engaged in the Business or any business that competes with the Business;

*provided, however*, that Sellers may purchase or otherwise acquire up to (but not more than) five percent (5%) of any class of the securities of any Person (but may not otherwise participate in the activities of such Person) if such securities are listed on any national or regional securities exchange or have been registered under Section 12(g) of the Exchange Act.

(b)     Non-Solicitation.  For a period of five (5) years after the Closing Date, neither of the Sellers shall, directly or indirectly:

(i)     solicit the business of any Person who is an active customer of Purchaser; or

(ii)     cause, induce or attempt to cause or induce any customer, supplier, licensee, licensor, franchisee, employee, consultant or other business relation of Sellers on the Closing Date or within the year preceding the Closing Date to cease doing business with Purchaser, to deal with any competitor of Purchaser, or in any way interfere with its relationship with Purchaser.

(c)     Non-Disparagement.  After the Closing Date, the parties hereto will not disparage the other parties or any of their respective shareholders, directors, officers, employees or agents.

(d)     Modification of Covenant.  If a Final Order of a Governmental Authority of competent jurisdiction determines that any term or provision contained in Section 7.1(a) through (c) is invalid or unenforceable, then the parties agree that the court or tribunal will have the power to reduce the scope, duration, or geographic area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision.  This Section 7.1 will be enforceable as so modified after the expiration of the time within which the judgment may be appealed.  This Section 7.1 is reasonable and necessary to protect and preserve Purchaser's legitimate business interests and the value of the Purchased Assets and to prevent any unfair advantage being conferred on Sellers.

**7.2     Further Assurances**

Sellers agree that if, at any time before or after the Effective Time, the Purchaser considers or is advised that any further deeds, assignments, assurances or other actions are reasonably necessary or desirable to vest, perfect or confirm Purchaser's assumption of the Assumed Liabilities, Sellers shall execute and deliver all such proper deeds, assignments and assurances and do all other things reasonably necessary to vest, perfect or confirm title to such property or rights in Purchaser and take all such other lawful and reasonably necessary action to carry out the purposes of this Agreement.  In addition, from and after the Closing Date, Sellers agree that they will (i) remit to Purchaser all checks or payments received by them to which Purchaser is entitled in connection with Purchaser's purchase of the Purchased Assets or assumption of the Assumed Liabilities and (ii) collect any and all insurance proceeds arising from or relating to the Purchased Assets or the Assumed Liabilities prior to the Effective Time and remit such sums directly to Purchaser.  Purchaser agrees that if, at any time before or after the Effective Time, Sellers consider or are advised that any further instruments of assumption or assurances are reasonably necessary or desirable to confirm Purchaser's assumption of the Assumed Liabilities, Purchaser shall execute and deliver all such proper instruments and assurances and do all other things reasonably necessary to confirm Purchaser's assumption of the Assumed Liabilities, and take all such other lawful and reasonably necessary action to carry out the purposes of this Agreement.

**7.3    Filings**

The parties agree that, based upon the current facts known to them, no Antitrust Filings (as hereinafter defined) nor Other Filings (as hereinafter defined) are required. Notwithstanding the foregoing, in the event that Antitrust Filings (as hereinafter defined) or Other Filings (as hereinafter defined) are required, as promptly as practicable after the date of this Agreement, each of Sellers and the Purchaser will prepare and file (i) with the United States Federal Trade Commission and the Antitrust Division of the United States Department of Justice Notification and Report Forms relating to the transactions contemplated herein if required by the HSR Act, as well as comparable notification forms required by the merger notification or control laws and regulations of any other applicable jurisdiction (the **Antitrust Filings**) and (ii) any other filings required to be filed by them under the Exchange Act, the Securities Act or any other Federal, state or foreign laws relating to the transactions contemplated by this Agreement (the **Other Filings**). Sellers and the Purchaser each shall promptly supply the other with any information that may be required in order to effectuate any filings pursuant to this Section 7.3. Neither the Purchaser nor any of its Affiliates shall be under any obligation to make proposals, execute or carry out agreements or submit to orders providing for the sale or other disposition or holding separate (through the establishment of a trust or otherwise) of any assets or categories of assets of the Purchaser or any of its Affiliates, or imposing or seeking to impose any limitation on the ability of the Purchaser or any of its Affiliates or subsidiaries to conduct their business or own such assets or to acquire, hold or exercise full rights of ownership of the Purchased Assets to be acquired.

**7.4    Confidentiality**

(a)    Each party agrees that it will treat in confidence all documents, materials and other information that it shall have obtained regarding the other party during the course of the negotiations leading to the consummation of the transactions contemplated hereby (whether obtained before or after the date of this Agreement), the investigation provided for herein and the preparation of this Agreement and other related documents, and, in the event the transactions contemplated hereby shall not be consummated, each party will return to the other party all copies of nonpublic documents and materials that have been furnished in connection therewith. Such documents, materials and other information shall not be communicated to any third Person (other than, in the case of Purchaser, to its counsel, accountants, financial advisors or lenders, and in the case of Seller, to its counsel, accountants or financial advisors). No other party shall use any confidential information in any manner whatsoever except solely for the purpose of evaluating the proposed purchase and sale of the Purchased Assets; *provided, however*, that after the Closing Purchaser may use or disclose any confidential information included in the Purchased Assets or otherwise reasonably related to the Purchased Assets or the business conducted therewith. The obligation of each party to treat such documents, materials and other information in confidence shall not apply to any information that (i) is or becomes available to such party from a source other than such party, (ii) is or becomes available to the public other than as a result of disclosure by such party or its agents, (iii) is required to be disclosed under applicable law or judicial process, but only to the extent it must be disclosed or (iv) such party reasonably deems necessary to disclose to obtain any of the consents or approvals contemplated hereby.

(b)    To the extent each Seller is permitted to disclose the existence or terms of confidentiality agreements entered into by or on behalf of such Seller with any Person in connection with the transactions contemplated hereby, each Seller hereby assigns to Purchaser, effective at the Closing, its rights under all such confidentiality agreements to the extent that such rights relate to such Seller. Copies of such confidentiality agreements shall be provided to Purchaser on the Closing Date.

## 7.5 Cure Payments

Subject to the terms and conditions of this Agreement, upon the sale, transfer, assignment and conveyance of the Purchased Assets to Purchaser at Closing, Purchaser shall assume and agree to pay, perform and discharge when due, all Assumed Liabilities that constitute cure payments for all Designated Contracts as determined by a Cure Finding (as defined below) for such contracts. The Sale Order shall provide that the assumption and assignment to Purchaser of the Designated Contracts set forth on Section 3.19 of the Seller Disclosure Schedule, each as in effect on the date hereof, is approved, subject only to payment by Purchaser of all cures as determined by a Cure Finding, provided that such cures do not exceed, in the aggregate, the sum of the amounts set forth on Section 3.19 of the Seller Disclosure Schedule for each of the contracts.

Purchaser shall cooperate with Sellers in providing to the Bankruptcy Court any evidence necessary to prove adequate assurance of future performance necessary to effect the assumption and assignment of the Designated Contracts.

The term **Cure Finding** as used herein shall mean a finding by the Bankruptcy Court determining the amount required to be paid to cure any outstanding defaults under a Designated Contract so that Sellers may assume and assign such Designated Contract to Purchaser pursuant to section 365 of the Bankruptcy Code. The Sale Order shall include the Cure Findings for each Designated Contract thereon. Upon objection by the non-debtor party to any such contract, Purchaser or, upon prior written request of Purchaser, Sellers shall either settle the objection of such party (subject to approval of the Purchaser of any such settlement that sets a higher Cure Finding than the amount set forth on Section 3.19 of the Seller Disclosure Schedule for such Designated Contract) or shall litigate such objection under such procedures as the Bankruptcy Court shall approve and proscribe.

Purchaser shall be responsible for tendering any cure amounts for each Designated Contract as determined by a Cure Finding for such Designated Contract, but in no event shall Purchaser be liable for or obligated to tender an amount in excess of the amount set forth on Section 3.19 of the Seller Disclosure Schedule for each of the Designated Contracts, and if the Closing occurs Purchaser shall pay such cure amounts as of the Closing Date. The Sale Order shall provide that Purchaser may take any action and file any motions or other papers with respect to a Cure Finding required to be taken by Sellers pursuant to this Section 7.5 in place and in the name of Sellers or that Purchaser shall pay the reasonable costs and expenses of Sellers incurred in taking any such action or filing any such motion or other papers, including but not limited to reasonable attorney's fees of Sellers involved in any such settlement or litigation. Sellers shall obtain the consent of any non-debtor party to any Designated Contract that Sellers may not assume and assign to Purchaser pursuant to section 365(c)(1) of the Bankruptcy Code absent the consent of the non-debtor party thereto.

The aggregate amount determined as the sum of (a) the Cure Findings, plus (b) any related costs incurred by Purchaser in connection with any settlement or litigation in connection with obtaining any Cure Finding under this Agreement, shall not exceed the aggregate sum of the amounts set forth on Section 3.19 of the Seller Disclosure Schedule for each Designated Contract.

## 8. BANKRUPTCY PROCEDURES, ETC.

## 8.1 Motion and Notice Regarding Approval of Bid Procedures

On or before April 1, 2008, Sellers shall file a motion (the **Bid Procedures Motion**) and give sufficient notice in accordance with the requirements of the Bankruptcy Code and Bankruptcy Rules and any

orders of the Bankruptcy Court, seeking on an emergency basis the entry of an order of the Bankruptcy Court (the **Bid Procedures Order**) approving the bidding and auction procedures set forth on Exhibit I annexed hereto (the **Bid Procedures**). Upon the approval of the Bid Procedures Order by the Bankruptcy Court, Sellers shall promptly implement such procedures in accordance therewith, including by distributing a copy of the Bid Procedures Order (in the form of notice approved by the Bankruptcy Court) to all Persons who have expressed an interest in acquiring the Purchased Assets.

The Bid Procedures Order as entered by the Bankruptcy Court shall be in form and substance mutually satisfactory to Purchaser and Sellers.

8.2 **Sale Order**

On or before April 1, 2008, Sellers shall file a motion (the **Sale Motion**) and give sufficient notice in accordance with the requirements of the Bankruptcy Code and Bankruptcy Rules and any orders of the Bankruptcy Court, seeking on an emergency basis the entry of an order of the Bankruptcy Court approving, pursuant to Bankruptcy Code sections 105(a), 363, and 365, (1) a sale of the Purchased Assets to the Purchaser in accordance with this Agreement and subject to the Bid Procedures Order, and (2) to the extent required under the Bankruptcy Code or other applicable law, approval of Sellers' assumption and assignment of certain of the Purchased Assets in accordance with the terms and conditions of this Agreement. Sellers shall seek prompt entry of an order of the Bankruptcy Court granting the Sale Motion (the **Sale Order**) after sufficient notice has been given, which order as entered shall be in form and substance satisfactory to Purchaser.

8.3 **No Talk/No Shop Provision**

From the date of the entry of the Sale Order (and provided Buyer has been designated as the successful bidder at any Auction) through the Closing Date, Sellers shall cease any and all activities, discussions or negotiations with any parties with respect to the sale of Sellers' Purchased Assets or business and neither Sellers nor its employees, consultants, agents or representatives shall solicit, accept or in any way seek to further any offer to purchase any Purchased Assets of Sellers, or any other entity to be formed through the restructuring of Sellers or take any other action inconsistent with the transactions contained in this Agreement or the Sale Order.

8.4 **Expense Reimbursement**

In the event of a termination of this Agreement pursuant to Sections 11.1(d)(B) and (C) only, Sellers will reimburse the Purchaser for all actual out-of-pocket costs and expenses (including professional fees) reasonably incurred by the Purchaser and its affiliates in connection with the transactions contemplated by this Agreement, up to a maximum of 2.0% of the Purchase Price (excluding the Assumed Liabilites) (the **Expense Reimbursement**).

8.5 **[RESERVED]**

8.6 **Defense of Orders**

Sellers, at their sole cost and expense, shall defend the Bid Procedures Order and the Sale Order in the event that Purchaser elects, in its sole discretion, to close the purchase of the Purchased Assets notwithstanding the pendency of any motion for reconsideration or appeal of such Orders and shall promptly reimburse Purchaser for its reasonable attorneys' fees and costs in entering an appearance and in participating in such reconsideration or appeal.

9. **CONDITIONS TO OBLIGATIONS OF SELLERS**

Sellers' obligations hereunder are subject to the fulfillment or satisfaction, on and as of the Closing, of each of the following conditions (any one or more of which may be waived by Sellers, but only in writing signed on behalf of Sellers by an authorized officer of Diamond Glass):

9.1 **Accuracy of Representations and Warranties**

Each of the representations and warranties of the Purchaser set forth in Article 4 of this Agreement shall be true and correct in all material respects (or in all respects, to the extent any such representation and warranty is already qualified by materiality) on and as of the date hereof and on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date, except that to the extent such representations and warranties address matters only as of a particular date, such representations and warranties shall, to such extent, be true and correct on and as of such particular date as if made on and as of such particular date. Sellers shall have received a certificate to such effect from Purchaser signed by the sole member of Purchaser.

9.2 **Covenants**

Purchaser shall have performed and complied in all material respects with all of its covenants contained in Article 6 on or before the Closing Date.

9.3 **Compliance with Law**

There shall be no Order by any Governmental Authority or any other fact or circumstance, that would prohibit or render illegal the transactions contemplated by this Agreement.

9.4 **Government Consents**

There shall have been obtained at or prior to the Closing Date such permits or authorizations, and there shall have been taken such other actions, as may be required to consummate the sale of Purchased Assets by any Governmental Authority having jurisdiction over the parties hereto and the actions herein proposed to be taken, including but not limited to satisfaction of all requirements under applicable federal and state securities or "blue sky" laws.

9.5 **Absence of Litigation**

No litigation or proceeding shall be pending that could reasonably be expected to have the effect of enjoining or preventing the consummation, or altering the terms, of any of the transactions provided for in this Agreement. No litigation or proceeding shall be pending that could reasonably be expected to have a material adverse effect on Purchaser that has not been previously disclosed to Sellers herein.

9.6 **Sale Order**

The Bankruptcy Court shall have entered the Sale Order.

9.7 **Other Deliveries**

Purchaser shall have delivered to Sellers the Assignment and Assumption Agreement and any Assignment and Assumption of Lease, each duly executed by Purchaser

## 10. CONDITIONS TO OBLIGATIONS OF PURCHASER

The obligations of Purchaser hereunder are subject to the fulfillment or satisfaction on, and as of the Closing, of each of the following conditions (any one or more of which may be waived by Purchaser, but only in a writing signed on behalf of Purchaser by its sole member):

### 10.1 Accuracy of Representations and Warranties

Each of the representations and warranties of Sellers set forth in Article 3 of this Agreement shall be true and correct in all material respects (or in all respects, to the extent any such representation and warranty is already qualified by materiality) on and as of date hereof and on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date, except that, to the extent such representations and warranties address matters only as of a particular date, such representations and warranties shall, to such extent, be true and correct on and as of such particular date as if made on and as of such particular date. Purchaser shall have received a certificate to such effect executed on behalf of Sellers by the President, Chief Executive Officer or Chief Financial Officer of Diamond Glass.

### 10.2 Covenants

Sellers shall have performed and complied in all material respects with all of their covenants contained in Article 5 on or before the Closing Date, and the Purchaser shall have received a certificate to such effect executed on behalf of Sellers by the President, Chief Executive Officer or Chief Financial Officer of Diamond Glass.

### 10.3 Absence of Material Adverse Effect

No Material Adverse Effect with respect to Sellers shall have occurred since the date of this Agreement and be continuing.

### 10.4 Compliance with Law

There shall be no Order by any Governmental Authority, or any other fact or circumstance, that would prohibit or render illegal the transactions contemplated by this Agreement.

### 10.5 Government Consents; No Injunction

There shall have been obtained at or prior to the Closing Date such permits or authorizations, and there shall have been taken such other actions, as may be required to consummate the sale of Purchased Assets by any Governmental Authority having jurisdiction over the parties and the actions herein proposed to be taken, including but not limited to satisfaction of all requirements under applicable federal and state securities or "blue sky" laws.

### 10.6 Third-Party Consents; Assignments; Other Documents

Subject to the provisions of Sections 363 and 365 of the Bankruptcy Code, if the Bankruptcy Court does not otherwise approve the assignment to Purchaser in form and substance reasonably satisfactory to Purchaser, Sellers shall have obtained, and the Purchaser shall have received from Sellers: (a) duly executed copies of all material Third-Party consents, approvals, assignments, waivers, authorizations, permits or other certificates set forth on Section 3.3(b) of the Seller Disclosure Schedule; and, to the

extent necessary, (b) any other written consents, assignments, waivers, authorizations or other certificates where, in the case of this clause (b), the failure to have received the same would have a Material Adverse Effect on the Purchased Assets or the business to be conducted with the Purchased Assets by Purchaser, including any consents required to assign any of the Designated Contracts or Assumed Real Property, and such consents shall be in full force and effect.

In accordance with Section 7.5 hereof, the Sale Order shall provide that the assumption and assignment to Purchaser of the Designated Contracts set forth on Section 3.19 of the Seller Disclosure Schedule, each as in effect on the date hereof, is approved, subject only to payment by Purchaser of all cures as determined by a Cure Finding, provided that such cures do not exceed, in the aggregate, the sum of the amounts set forth on Section 3.19 of the Seller Disclosure Schedule for each of the contracts.

### 10.7    Absence of litigation

No litigation or proceeding shall be pending that could reasonably be expected to have the effect of enjoining or preventing the consummation, or altering the terms, of any of the transactions provided for in this Agreement. No litigation or proceeding shall be pending that could reasonably be expected to have a Material Adverse Effect on Sellers, the Purchased Assets, the Assumed Liabilities or the business to be conducted with the Purchased Assets by Purchaser.

### 10.8    Sale Order; Allowance of Buyer Claim

The Bankruptcy Court shall have entered, in form and substance satisfactory to the Purchaser, the Bid Procedures Order and Sale Order, each of which shall be a Final Order. Notwithstanding the foregoing, nothing in this Agreement shall preclude Sellers from consummating the transactions contemplated herein if Purchaser, in its sole discretion, waives the requirement that the Sale Order shall have become a Final Order. No notice of such waiver of this condition or any other condition to the Closing need be given except to Sellers, it being the intention of the parties hereto that Purchaser shall be entitled to, and is not waiving, the protection of section 363(m) of the Bankruptcy Code, the mootness doctrine and any similar statute or body of law if the Closing occurs in the absence of the Sale Order becoming a Final Order.

The Bankruptcy Court shall have entered an order, binding on all parties-in-interest in the Bankruptcy Case (which order may be the Bid Procedures Order or the Sale Order), unconditionally allowing a claim by Purchaser (as authorized and directed by Guggenheim, on behalf of and for the benefit of the Lenders (including their successors and assigns) under the Credit Agreement and the DIP Financing as the case may be) in the Bankruptcy Case in an aggregate amount equal to all DIP Obligations and Prepetition Obligations, and, authorizing and approving Purchaser's credit bidding (on behalf of the Lenders, their successors and assigns, or as directed by the Agent) such amounts to satisfy in part the Purchase Price as contemplated herein and pursuant to section 363(k) of the Bankruptcy Code.

### 10.9    Other Deliveries

Sellers shall have delivered to Purchaser the following:

(a)    a customary bill of sale for all of the Purchased Assets that are Tangible Personal Property (the **Bill of Sale**), duly executed by Sellers;

(b)      a customary assignment of all of the Purchased Assets that are intangible personal property, which assignment shall also contain Purchaser's undertaking and assumption of the Assumed Liabilities (the **Assignment and Assumption Agreement**), executed by Sellers;

(c)      for each interest in Real Property identified on Section 3.10(c) of the Seller Disclosure Schedule that is not one of the Excluded Real Property Interests, a customary Assignment and Assumption of Lease or such other appropriate document or instrument of transfer, as the case may require, and in the case of the Excluded Real Property Interests, a lease or sublease, as the case may require, to Purchaser for $1 for six months, each in form and substance satisfactory to Purchaser and its counsel and executed by Sellers;

(d)      customary assignments of all Seller IP Rights and customary separate assignments of all registered trademarks, servicemarks, patents and copyrights, and all applications therefore executed by Sellers;

(e)      an entered copy of the Sale Order; and

(f)      such other deeds, bills of sale, assignments, certificates of title, documents and other instruments of transfer and conveyance as may reasonably be requested by Purchaser, each in form and substance satisfactory to Purchaser and its legal counsel and executed by Sellers.

## 10.10    Financial Statements

Sellers shall have delivered a copy of the audited consolidated financial statements of Sellers for the period ended December 31, 2007 reviewed by Kronick Kalada Berdy & Co., or another national or regional accounting firm registered with the Public Company Accounting Oversight Board (the **Reviewer**), which shall contain no adverse opinion or disclaimer of opinion or modification as to uncertainty, accounting principal, or audit scope. Purchaser shall have the sole right to approve and accept the Reviewer and the terms of such firm's engagement, such approval and acceptance not to be unreasonably withheld. Sellers also shall have delivered the unaudited consolidated financial statements of Sellers (including any related notes thereto) for the three month period ended March 31, 2008 and monthly and quarterly management accounts of Sellers, each certified by the chief financial officer of Diamond Glass as being prepared in accordance with GAAP applied on a consistent basis through the periods involved.

## 10.11    Key Employees

Purchaser shall have entered into employment agreements with certain employees of Sellers that are designated by Purchaser in advance of Closing upon terms and conditions mutually agreeable to Purchaser and any such designated employee. The parties agree that such list of designated individuals shall not exceed fifteen.

## 11.     TERMINATION

## 11.1    Termination of Agreement

Certain of the parties hereto may terminate this Agreement as provided below:

(a)      Purchaser and Sellers may terminate this Agreement by mutual written consent at any time prior to the Closing;

(b) Purchaser may terminate this Agreement by giving written notice to Sellers at any time prior to the Closing if (A) Sellers have within the then previous ten (10) business days given Purchaser any notice pursuant to Section 5.1 above and (B) the development that is the subject of the notice has caused the representations and warranties in Article 3 above not to be true and correct in all material respects (except to the extent that any such representation or warranty is qualified by terms such as "material" and "Material Adverse Effect," in which case if such development that is the subject of the notice has caused the representation or warranty in Article 3 above not to be true and correct in all respects) and such result has not been cured within fifteen (15) days of the date of such notice;

(c) Purchaser may terminate this Agreement by giving written notice to Sellers at any time prior to the Closing (A) in the event Sellers have Breached any material representation, warranty, or covenant contained in this Agreement in any material respect, Purchaser has notified Sellers of the Breach, and the Breach has continued without cure for a period of fifteen (15) days after the notice of Breach or (B) if the Closing shall not have occurred on or before June 30, 2008, by reason of the failure of any condition precedent under Article 10 hereof (unless the failure results primarily from Purchaser itself Breaching any representation, warranty, or covenant contained in this Agreement);

(d) Purchaser may terminate this Agreement by giving written notice to the Sellers at any time prior to Closing (A) if the Bid Procedures Order shall not have been entered by the Bankruptcy Court within twenty (20) days following the Petition Date, (B) (i) if Sellers have accepted or selected, and the Bankruptcy Court shall have approved, the bids or bids (including a credit bid) of any Person or Persons other than Purchaser or any of its Affiliates to purchase all or any portion of the businesses and Purchased Assets of Sellers and (ii) such transaction or transactions contemplated by any such bid or bids shall have been consummated, or (C) if Sellers withdraw their support for the transactions contemplated by this Agreement and seek to have a stand alone plan of reorganization approved by the Bankruptcy Court;

(e) Sellers may terminate this Agreement by giving written notice to Purchaser at any time prior to the Closing (A) if Purchaser has Breached any material representation, warranty, or covenant contained in this Agreement in any material respect, Sellers have notified Purchaser of the Breach, and the breach has continued without cure for a period of fifteen (15) days after the notice of Breach or (B) if the Closing shall not have occurred on or before June 30, 2008, by reason of the failure of any condition precedent under Article 9 hereof (unless the failure results primarily from Sellers Breaching any representation, warranty, or covenant contained in this Agreement);

(f) (A) Purchaser may also terminate this Agreement by giving written notice to Sellers at any time prior to the Closing but within two (2) business days following April 1, 2008 if the Petition Date is not on or before April 1, 2008; (B) to the extent that Purchaser does not terminate this Agreement within such two (2) day period pursuant to Section 11.1(f)(A) above, Purchaser may terminate this Agreement by giving written notice to Sellers at any time prior to the Closing but within two (2) business days following April 21, 2008 if the date of entry of the Bid Procedure Order is not on or before April 21, 2008; (C) to the extent that Purchaser does not terminate this Agreement within such two (2) day period pursuant to Section 11.1(f)(B) above, Purchaser may terminate this Agreement by giving written notice to Sellers at any time prior to the Closing but within two (2) business days following June 6, 2008 if the date of entry of the Sales Order is not on or before June 6, 2008; and (D) to the extent that Purchaser does not terminate this Agreement within such two (2) day period pursuant to Section 11.1(f)(C) above, Purchaser may

terminate this Agreement by giving written notice to Sellers at any time prior to the Closing but within two (2) business days following June 30, 2008 if the Closing Date is not on or before June 30, 2008;

(g)     Purchaser may terminate this Agreement by giving written notice to Sellers to the extent Purchaser rejects any part of the Seller Disclosure Schedules following the Disclosure Schedule Resolution Period in accordance with Section 5.12 of this Agreement.

## 11.2     Payment of Expense Reimbursement

If this Agreement is terminated by Purchaser pursuant to either Section 11.1(d)(B) or (C) hereof, then Sellers shall pay to Purchaser the Expense Reimbursement upon the consummation of the transaction by Sellers and such other Person, in the event of a termination pursuant to Section 11.1(d)(B), and upon the date the Sellers withdraw their support for the transactions contemplated by this Agreement, if such termination is pursuant to Section 11.1(d)(C)

## 11.3     Effect of Termination

Except as provided for in Section 11.2, in the event that this Agreement is terminated by either Party pursuant to Section 11.1 then said termination shall be the sole remedy of the parties hereto with respect to Breaches of any covenant, representation, or warranty contained in this Agreement and none of the parties hereto nor any of their respective directors, officers, members, or Affiliates, as the case may be, shall have any liability or further obligation to the other party or any of their respective directors, officers, members, or Affiliates, as the case may be, pursuant to this Agreement; *provided, however,* that if this Agreement is terminated because of a breach of this Agreement by the nonterminating party or because one or more of the conditions to the terminating party's obligations under this Agreement is not satisfied as a result of the nonterminating party's failure to comply with its obligations under this Agreement, the terminating party's right to pursue all remedies at law or in equity will survive such termination unimpaired. Upon any termination of this Agreement pursuant to Section 11.1, all Confidential Information of either party shall be returned to the other party.

## 12.     MISCELLANEOUS

## 12.1     Entire Agreement

This Agreement, the Ancillary Agreements and the Schedules hereto constitute the entire understanding and agreement of the parties hereto with respect to the subject matter hereof and supersede all prior and contemporaneous agreements or understandings, inducements or conditions, express or implied, written or oral, between the parties with respect to the subject matter hereof. The express terms hereof control and supersede any course of performance or usage of trade inconsistent with any of the terms hereof.

## 12.2     Assignment; Binding Upon Successors and Assigns

The rights and obligations of any party under this Agreement shall not be assignable by such party hereto without the prior written consent of the others, except that any rights and obligations of Purchaser hereunder may be assigned in whole or in part from time to time to an Affiliate of Purchaser without the consent of any other party. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. The successors and permitted assigns hereunder shall include, in the case of Purchaser, any permitted assignee as well as the successors in interest to such permitted assignee (whether by merger, liquidation or otherwise).

**12.3    No Third Party Beneficiaries**

No provisions of this Agreement are intended, nor will be interpreted, to provide or create any third party beneficiary rights or any other rights of any kind in any client, customer, affiliate, stockholder, partner, employee of any party hereto or any other Person unless specifically provided otherwise herein (including Guggenheim's right, as agent on behalf of the Lenders, to credit bid or direct the credit bidding of the Lenders' claims on account of the DIP Obligations and Prepetition Obligations as contemplated herein through Purchaser, for which purpose the Lenders and the Agent shall be deemed to be third party beneficiaries of this Agreement), and, except as so provided, all provisions hereof will be personal solely between the parties to this Agreement.

**12.4    No Joint Venture**

Nothing contained in this Agreement will be deemed or construed as creating a joint venture or partnership between the parties hereto. No party is by virtue of this Agreement authorized as an agent, employee or legal representative of any other party. No party will have the power to control the activities and operations of any other, and the parties' status is, and at all times, will continue to be, that of independent contractors with respect to each other. No party will have any power or authority to bind or commit any other. No party will hold itself out as having any authority or relationship in contravention of this Section 12.4.

**12.5    Severability**

If any provision of this Agreement, or the application thereof, is for any reason held to any extent to be invalid or unenforceable, the remainder of this Agreement and application of such provision to other persons or circumstances will be interpreted so as reasonably to affect the intent of the parties hereto. The parties further agree to replace such unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the economic, business and other purposes of the void or unenforceable provision.

**12.6    Section Headings**

A reference to an Article, Section or Schedule will mean an Article or Section in, or a Schedule to, this Agreement, unless otherwise explicitly set forth. The titles and headings in this Agreement are for reference purposes only and will not in any manner limit the construction of this Agreement. For the purposes of such construction, this Agreement will be considered as a whole.

**12.7    Amendment, Extension and Waivers**

At any time prior to the Effective Time, Purchaser and Sellers may, to the extent legally allowed: (a) extend the time for performance of any of the obligations of the other party; (b) waive any inaccuracies in the representations and warranties made to such party contained herein or in any document delivered pursuant hereto; and (c) waive compliance with any of the agreements, covenants or conditions for the benefit of such party contained herein. Any term or provision of this Agreement may be amended. Any agreement to any amendment, extension or waiver will be valid only if set forth in writing and signed by the party to be bound. The waiver by a party of any Breach hereof or default in the performance hereof will not be deemed to constitute a waiver of any other default or any succeeding Breach or default. The failure of any party to enforce any of the provisions hereof will not be construed to be a waiver of the right of such party thereafter to enforce such provisions. This Agreement may be amended by the parties hereto at any time.

**12.8    Public Announcement**

Except to the extent required to comply with Article 8 hereof, no party hereto shall issue any press release or otherwise make any statements to any Third Party with respect to this Agreement or the transactions contemplated hereby other than with the prior written consent of the other parties, which consent shall not be unreasonably withheld or delayed. Prior to the issuance of any announcement of this Agreement and the transactions contemplated hereby by any party, such party will consult with the other parties regarding the content of such announcement and obtain such other parties' reasonable approval of such press release.    Notwithstanding the foregoing, any party may issue such announcements, and make such other disclosures regarding this Agreement or the transactions contemplated hereby, as it determines are required under applicable Legal Requirements or any listing or trading agreement concerning its publicly traded securities.

**12.9    Governing Law**

The validity of this Agreement the construction of its terms, and the interpretation and enforcement of the rights and duties of the parties to this Agreement will be exclusively governed by and construed in accordance with the internal laws of the State of New York as applied to agreements entered into solely between residents of and to be performed entirely in the State of New York, without reference to that body of law relating to conflicts of law or choice of law.

**12.10   Jurisdiction; Venue; Waiver of Jury Trial**

(a)     Each of the parties to this Agreement hereby agrees that the Bankruptcy Court shall have exclusive jurisdiction to hear and determine any claims or disputes between the parties hereto pertaining directly or indirectly to this Agreement, and all documents, instruments and agreements executed pursuant hereto or thereto, or to any matter arising herefrom (unless otherwise expressly provided for herein or therein).   To the extent permitted by law, each party hereby expressly submits and consents in advance to such jurisdiction in any action or proceeding commenced by any of the other parties hereto in any of such courts, and agrees that service of such summons and complaint or other process or papers may be made by registered or certified mail addressed to such party at the address to which notices are to be sent pursuant to this Agreement.   Each of the parties waives any claim that the Bankruptcy Court is an inconvenient forum or an improper forum based on lack of venue. The choice of forum set forth in this Section 12.10 shall not be deemed to preclude the enforcement of any judgment obtained in such forum or the taking of any action to enforce the same in any other appropriate jurisdiction.

(b)     Each party hereto hereby waives, to the fullest extent permitted by applicable Legal Requirement, any right it may have to a trial by jury in respect of any litigation directly or indirectly arising out of, under or in connection with this Agreement.  Each party hereto (a) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that any other party would not, in the event of litigation, seek to enforce the foregoing waiver and (b) acknowledges that it and the other parties hereto have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section.

### 12.11 Notices

Any notice or other communication required or permitted to be given under this Agreement will be in writing, will be delivered personally or by mail or express delivery, postage prepaid, and will be deemed given upon actual delivery or, if mailed by registered or certified mail, on the third business day following deposit in the mails, addressed as follows:

If to Purchaser:

> Diamond Glass Acquisition, LLC
> c/o Guggenheim Corporate Funding, LLC
> 135 East 57th Street, 7th Floor
> New York, New York 10022
> Attention: Legal Department
> Phone: (212) 651-9450

with a copy to:

> Allen & Overy LLP
> 1221 Avenue of the Americas
> New York, NY 10020
> Attention: Ken Coleman, Esq.
>               Dan Guyder, Esq.
> Phone: (212) 610-6434

If to any Seller:

> c/o Diamond Glass, Inc.
> 220 Division Street
> Kingston, PA 18704
> Attention: William Cogswell
> Phone: (570) 287-9915 ext. 3180

with a copy to:

> Foley & Larder LLP
> 90 Park Avenue
> New York, NY 10016
> Attention: Michael Richman, Esq.
> Phone: (212) 338-3409

or to such other address as the party in question may have furnished to the other parties by written notice given in accordance with this Section 12.11.

### 12.12 Time is of the Essence

The parties hereto acknowledge and agree that time is of the essence in connection with the execution, delivery and performance of this Agreement.

### 12.13 Counterparts

This Agreement may be executed in counterparts, each of which will be an original as regards any party whose name appears thereon and all of which together will constitute one and the same instrument. This Agreement will become binding when one or more counterparts hereof, individually or taken together, bear the signatures of all parties reflected hereon as signatories.

### 12.14 Nonsurvival of Representations and Warranties

None of the representations and warranties in this Agreement or in any instrument delivered pursuant to this Agreement shall survive the Closing. This Section 12.14 shall not limit any covenant or agreement of the parties contained in this Agreement or in any instrument delivered pursuant to this Agreement that by its terms applies or contemplates performance in whole or in part after the Effective Time. Purchaser will accept the Purchased Assets at the Closing Date "AS IS" and "WHERE IS", subject to Closing and the provisions of this Agreement and the Sale Order.

### 12.15 Disclosure Schedule

The parties hereto acknowledge and agree that any disclosure contained in a specific numbered section of the Seller Disclosure Schedule shall be deemed to have been disclosed for purposes of other numbered sections only to the extent such disclosure is specifically cross referenced on the relevant section of the Seller Disclosure Schedule.

### 12.16 Release

Effective upon the Closing Date, each of Sellers, for itself and for its heirs, assigns, agents, principals, officers, directors, subsidiaries, Affiliates, shareholders employees, insurers, successors and assigns, hereby acknowledges that it has no claim, counterclaim, setoff, recoupment, action, or cause of action of any kind or nature whatsoever (including actions for avoidance, subordination, or recharacterization of any pre-Petition Date claims, Encumbrances and interests) against Purchaser or its Affiliates for themselves and for their heirs, assigns, agents, principals, officers, directors, subsidiaries, shareholders, members, managers, employees, Affiliates, attorneys or financial advisors, that directly or indirectly arise out of, are based on, or in any manner are connected with (i) the DIP Financing, the Credit Agreement and any other agreements to which any of the Sellers and the Purchaser (or any of its Affiliates) are (or were) parties and all transactions referred to in such agreements, or (ii) the acquisition by Purchaser, and the assignment by Guggenheim or its other Affiliates, of claims and liens in and against Sellers and their respective assets and properties (jointly, the **Released Claims**). Should any Released Claims nonetheless exist, each Seller, on behalf of itself and its estate, hereby (i) releases and discharges Purchaser from any liability whatsoever on such Released Claims and (ii) releases, waives, and discharges all such Released Claims against Purchaser, Guggenheim and their Affiliates.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have executed this Asset Purchase Agreement as of the date first above written.

DIAMOND GLASS ACQUISITION, LLC, AS PURCHASER

By: _____
    Name:
    Title:

DIAMOND GLASS, INC., AS SELLER

By: _____
    Name:
    Title:

DT SUBSIDIARY CORPORATION, AS SELLER

By: _____
    Name:
    Title:

**EXHIBIT B**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DIAMOND GLASS, INC., *et al.*,[1] | ) | Case No. 08-10601 (CSS) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |
| | ) | **Ref. Docket No.:** _____ |

**ORDER PURSUANT TO 11 U.S.C. §§ 105(A), 363, AND 365 AND
FEDERAL BANKRUPTCY RULES 2002, 6004, 6006, AND 9014,
(A) APPROVING ASSET PURCHASE AGREEMENT AND AUTHORIZING THE SALE
OF ASSETS OF DEBTORS OUTSIDE THE ORDINARY COURSE OF BUSINESS
(B) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS,
CLAIMS, INTERESTS AND ENCUMBRANCES; (C) AUTHORIZING THE
ASSUMPTION AND SALE AND ASSIGNMENT OF CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES; AND (D) GRANTING RELATED RELIEF**

This matter having come before this Court on the *Motion For Entry Of An Order*

*Pursuant To 11 U.S.C. §§ 105(A), 363 And 365 And Federal Bankruptcy Rules 2002, 6004,*

*6006, And 9014, (A) Approving Asset Purchase Agreement And Authorizing The Sale Of Assets*

*Of Debtors Outside The Ordinary Course Of Business; (B) Authorizing The Sale Of Assets Free*

*And Clear Of All Liens, Claims, Interests And Encumbrances; (C) Authorizing The Assumption*

*And Sale And Assignment Of Certain Executory Contracts And Unexpired Leases; And (D)*

*Granting Related Relief* (the "Sale Motion")[2] filed on April ___, 2008 by Diamond Glass, Inc.

("Diamond"), and DT Subsidiary Corporation ("DT Subsidiary", and, together with Diamond,

the "Debtors"). In the Sale Motion, Debtors request that the Court enter an order, among other

---

[1]  The Debtors in these proceedings are: Diamond Glass, Inc. (Tax ID No. XX-XXX8853); and DT Subsidiary Corp., a wholly owned subsidiary of Diamond Glass (Tax ID No. XX-XXX3494), each with a mailing address of 220 Division Street, Kingston, PA 18704. Diamond Glass, Inc. is formerly known as Diamond Glass Companies, Inc. and Diamond Triumph Auto Glass, Inc.

[2]  All capitalized terms not defined herein shall be given the meaning ascribed to them in the Agreement, the Sale Motion, or the Bid Procedures Order (as defined below), as appropriate.

things, (A) approving that certain Asset Purchase Agreement (the "Agreement" or the "APA") entered into or to be entered into by and between the Debtors and Diamond Glass Acquisition, LLC or its assignee(s) or designee(s) (the "Stalking Horse Bidder"); (B) approving the sale (the "Sale") of substantially all of the Debtors' assets (the "Assets") outside the ordinary course of business and free and clear of all liens, claims, interests and encumbrances (collectively, the "Encumbrances"), and subject to higher or better bids; (C) authorizing and approving the assumption and assignment of certain executory contracts and unexpired leases (the "Designated Contracts"); and (D) granting related relief; and this Court having entered an order dated April ___, 2008 (the "Bid Procedures Order") authorizing Debtors to conduct the Auction and establishing a date for the Auction, and approving, among other things, (i) the terms and conditions of the bid procedures set forth in the Bid Procedures Order (the "Bid Procedures"), (ii) the use of the Bid Procedures in connection with the Auction; (iii) the form and manner of notice of the Bid Procedures; and (iv) procedures relating to certain Designated Contracts, including notice of proposed cure amounts; and the Court having established the date of the Sale Hearing; and the Court having jurisdiction to consider the Sale Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157(b)(2) and 1334; and consideration of the Sale Motion, the relief requested therein, and the responses thereto, if any, being a core proceeding in accordance with 28 U.S.C. § 157(b); and the appearance of all interested parties and all responses and objections, if any, to the Sale Motion having been duly noted in the record of the Sale Hearing; and upon the record of the Sale Hearing, and all other pleadings and proceedings in this case, including the Sale Motion; and it appearing that notice of the Motion and of the Bid Procedures are sufficient under the circumstances, and that no further notice is required; and it appearing that the relief requested in the Sale Motion is in the best interests of

Debtors, their estates and creditors, and all other parties-in-interest thereof; and after due deliberation and sufficient cause appearing therefore;

IT IS HEREBY FOUND, DETERMINED AND CONCLUDED THAT:[3]

A.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.      The Court has jurisdiction over this matter and over the property of Debtors, including the Assets to be sold, transferred, or conveyed pursuant to the Agreement, and their estates pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue for this chapter 11 case and the Sale Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

C.      The statutory predicates for the relief sought in the Sale Motion and the basis for the approvals and authorizations herein are (i) sections 105(a), 363, and 365 of the Bankruptcy Code and (ii) Bankruptcy Rules 2002, 6004, 6006, and 9014.

D.      On April 1, 2008 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Since the Petition Date, the Debtors have continued in possession and management of their business and property as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

E.      As evidenced by the proofs of service and publication filed with the Court, proper, timely, adequate, and sufficient notice of the Sale Motion, the Auction, and the Sale Hearing

---

[3] All findings of fact and conclusions of law announced by the Court at the Sale Hearing and related to the Sale Motion are hereby incorporated herein to the extent not inconsistent herewith.

have been provided in accordance with sections 102(1) and 363(b), Bankruptcy Rules 2002, 6004, 6006, 9006, 9007, 9008, and 9014, the local rules of this Court, the procedural due-process requirements of the United States Constitution, and in compliance with the Bid Procedures Order. The Debtors also provided due and proper notice of the assumption, sale, and assignment of each Designated Contract to each non-debtor party under each such Designated Contract. Such notice was good and sufficient and appropriate under the particular circumstances. No other or further notice of the Sale Motion, the Auction, the Sale Hearing, the assumption and assignment of the Designated Contracts (including with respect to the payment by the Debtors of any cure amount due thereunder), or of the entry of this Order is necessary or shall be required.

      F.     A reasonable opportunity to object or be heard regarding the requested relief has been afforded to all interested persons and entities, including, without limitation, (i) all entities that claim any interest in or lien on the Assets; (ii) all parties to Designated Contracts assumed and sold and assigned pursuant to this Order; (iii) all governmental taxing authorities that have, or as a result of the sale of the Assets may have, claims, contingent or otherwise, against the Debtors; (iv) all parties that filed requests for notices under Bankruptcy Rule 9010(b) or were entitled to notice under Bankruptcy Rule 2002; (v) all creditors (whether liquidated, contingent or unmatured) of the Debtors; (vi) all interested governmental, pension, and environmental entities; (vii) the Office of the United States Trustee; and (viii) all entities that have, within the past 12 months, expressed to the Debtors an interest in purchasing the Assets. Other parties interested in bidding on the Assets were provided, upon request, sufficient information to make an informed judgment on whether to bid on the Assets in accordance with the Bid Procedures Order and Bid Procedures.

G.     The Assets are property of the Debtors' estates and title thereto is vested in the Debtors' estates.

H.     The Debtors have demonstrated a sufficient basis and the existence of exigent circumstances requiring it to enter into the Agreement, sell the Assets and assume and assign the Designated Contracts under sections 105(a), 363, and 365 of the Bankruptcy Code, and such actions are appropriate exercises of the Debtors' business judgment and in the best interests of the Debtors, their estates and the creditors thereof.  There can be no assurance that the value of the Assets would be maintained if any undue delay in consummation of the transactions contemplated in the Motion and Agreement were to occur.  There can be no assurance that the Purchaser would be willing to complete such transactions if delay in the consummation of the transactions were to occur.

I.     The Bid Procedures set forth in the Bid Procedures Order were non-collusive, substantively and procedurally fair to all parties, were the result of arm's-length negotiations between the Debtors and the Purchaser, and were reasonable and appropriate in the context of these cases.

J.     The Debtors and their professionals have complied, in good faith, in all respects with the Bid Procedures Order.  As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Hearing and (ii) the representations of counsel made on the record at the Sale Hearing, through marketing efforts and a competitive sale process conducted in accordance with the Bid Procedures Order, the Debtors (a) afforded interested potential purchasers a full, fair, and reasonable opportunity to qualify as bidders and submit their highest and/or otherwise best offer to purchase all of the Debtors' assets, (b) provided potential purchasers, upon request, sufficient information to enable them to make an informed judgment

5

on whether to bid on the Assets, (c) considered any bids submitted on or before the Bid Deadline, and (d) commenced the Auction on June __, 2008.

K.    At the conclusion of the Auction, the Debtors announced that they had determined that the offer submitted by the Purchaser in the Agreement was the highest and/or otherwise best offer, and the Purchaser is the Successful Bidder for the Assets in accordance with the Bid Procedures Order or no bids were submitted on or before the Bid Deadline, other than the offer submitted by the Purchaser in the Agreement. The Purchaser submitted the highest and/or otherwise best offer, and the Purchaser is the Successful Bidder for the Assets in accordance with the Bid Procedures Order. The Bid Procedures therefore obtained the highest value for the Assets for the Debtors and their estates.

L.    The offer of the Purchaser, on the terms and conditions set forth in the Agreement, including the form and total consideration to be realized by the Debtors pursuant to the Agreement, (i) is the highest and/or best offer received by the Debtors; (ii) is fair and reasonable; (iii) is in the best interests of the Debtors' estates and the creditors thereof; (iv) constitutes full and adequate consideration and reasonably equivalent value for the Assets; and (v) will provide a greater recovery for the Debtors' creditors and other interested parties than would be provided by any other practically available alternative.

M.    The Purchaser is a buyer in good faith, as that term is used in the Bankruptcy Code and the decisions thereunder. The Agreement was negotiated and entered into in good faith, based on arm's-length bargaining, and without collusion or fraud of any kind. The Auction was conducted in accordance with the Bid Procedures Order and in good faith within the meaning of section 363(m) of the Bankruptcy Code. Based on the record before the Court, neither the Debtors nor the Purchaser has engaged in any conduct that would prevent the

6

application of section 363(m) of the Bankruptcy Code or cause the application of or implicate section 363(n) of the Bankruptcy Code to the Agreement or to the consummation of the sale transaction and transfer of the Assets and Designated Contracts to the Purchaser. The Purchaser is therefore entitled to all the protections and immunities of section 363(m) of the Bankruptcy Code, including with respect to all of the Assets.

N.     The Debtors have full power and authority to execute the Agreement and all other documents contemplated thereby, and the sale of the Assets as contemplated by Agreement has been authorized and approved by the Debtors. Other than as may be expressly provided for in the Agreement, no consents or approvals are required by the Debtors to consummate such transactions.

O.     The Debtors have advanced sound business reasons for seeking to enter into the Agreement and to sell and/or assume and assign the Assets, as more fully set forth in the Sale Motion and as demonstrated at the Sale Hearing, and it is a reasonable exercise of the Debtors' business judgment to sell the Assets and to consummate the transactions contemplated by the Agreement. Notwithstanding any requirement for approval or consent by any person, the transfer of the Assets to the Purchaser and the assumption and assignment of the Designated Contracts is a legal, valid, and effective transfer of the Debtors' right, title and interest in the Assets and any Designated Contracts.

P.     The terms and conditions of the Agreement, including the consideration to be realized by the Debtors pursuant to the Agreement, are fair and reasonable, and the transactions contemplated by the Agreement are in the best interests of the Debtors' estates.

Q.     Except as otherwise provided in the Agreement, the Assets shall be sold free and clear of all Encumbrances with Encumbrances to attach to the net proceeds to be received by the

Debtors in the same priority and subject to the same defenses and avoidability, if any, as before the Closing (as defined in the Agreement), and the Purchaser would not enter into the Agreement to purchase the Assets otherwise; provided, however, that no Encumbrances shall attach to payments made by the Purchaser, in accordance with the Agreement, to satisfy (i) any payments to be made to NatCity pursuant to section 2.3(b)(i) of the Agreement (the "Investment Banking Fee"), or (ii) any payments made by the Purchaser pursuant to section 2.3(b)(iii) of the Agreement (the "Wind Down Expenses").

R.      The transfer of the Assets to the Purchaser will be a legal, valid, and effective transfer of the Assets, and, except as may otherwise be provided in the Agreement, shall vest the Purchaser with all right, title, and interest of the Debtors to the Assets free and clear of any and all Encumbrances. Except for the Assumed Liabilities as specifically provided in the Agreement or this Order, the Purchaser shall not assume or become liable for any Encumbrances relating to the Assets being sold by the Debtors.

S.      The transfer of the Assets to the Purchaser free and clear of all Encumbrances will not result in any undue burden or prejudice to holders of any Encumbrances as all such, Encumbrances of any kind or nature whatsoever shall attach to the net proceeds of the sale of the Assets received by the Debtors in the order of their priority, with the same validity, force, and effect that they now have as against the Assets and subject to any claims and defenses the Debtors or other parties may possess with respect thereto. All persons having Encumbrances of any kind or nature whatsoever against or in the Debtors or the Assets shall be forever barred, estopped and permanently enjoined from pursuing or asserting such Encumbrances against the Purchaser, any of its assets, property, successors or assigns, or the Assets.

T.     The Debtors may sell the Assets free and clear of all Encumbrances of any kind or nature whatsoever because, in each case, one or more of the standards set forth in section 363(f) of the Bankruptcy Code has been satisfied. Those (i) holders of Encumbrances and (ii) non-debtor parties, who did not object, or who withdrew their objections, to the sale of the Assets and the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of Encumbrances who did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their Encumbrances, if any, attach to the net proceeds of the sale of the Assets ultimately attributable to the property against or in which they claim or may claim any Encumbrances, with such Encumbrances being subject to treatment as prescribed in the Plan filed by the Debtors or by separate order of this Court; provided, however, that no Encumbrances shall attach to payments made by the Purchaser, in accordance with the Agreement, to satisfy the Wind-Down Expenses and Investment Banking Fee. All objections to the Sale Motion have been resolved or withdrawn or overruled.

U.     Not selling the Assets free and clear of all Encumbrances would adversely impact the Debtors' estates, and the sale of Assets other than one free and clear of all Encumbrances would be of substantially less value to the Debtors' estates.

V.     The Debtors and the Purchaser have, to the extent necessary, satisfied the requirements of section 365 of the Bankruptcy Code, including sections 365(b)(1)(A), (B) and 365(f) of the Bankruptcy Code, in connection with the sale and the assumption and assignment of the Designated Contracts. The Purchaser has demonstrated adequate assurance of future performance with respect to the Designated Contracts pursuant to section 365(b)(1)(C) of the Bankruptcy Code. The assumption and assignment of the Designated Contracts pursuant to the

9

terms of this Order is integral to the Agreement and is in the best interests of the Debtors, their estates, creditors and other parties-in-interest thereof, and represents the exercise of sound and prudent business judgment by the Debtors.

W.    The Designated Contracts are assignable notwithstanding any provisions contained therein to the contrary. The Debtors have provided for the cures and/or other payments or actions required to assume and assign the Designated Contracts to the Purchaser. The Purchaser has provided adequate assurance of its future performance under the Designated Contracts.

X.    The Purchaser will be acting in good faith, pursuant to section 363(m) of the Bankruptcy Code, in closing the transactions contemplated by the Agreement at any time on or after the entry of this Order and cause has been shown as to why this Order should not be subject to the stay provided by Bankruptcy Rules 6004 and 6006.

Y.    The transactions contemplated under the Agreement do not amount to a consolidation, merger, or *de facto* merger of the Purchaser and the Debtors and/or the Debtors' estates, there is not substantial continuity between the Purchaser and the Debtors, there is no continuity of enterprise between the Debtors and the Purchaser, the Purchaser is not a mere continuation of the Debtors or their estates, and the Purchaser does not constitute a successor to the Debtors or their estates.

Z.    The sale of the Assets outside of a plan of reorganization pursuant to the Agreement neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a liquidating plan of reorganization for the Debtors. The sale does not constitute *a sub rosa* chapter 11 plan.

AA.     The Agreement, including the Purchaser's credit bid contemplated thereunder, is a valid and proper offer and "Qualified Bid" pursuant to the Bid Procedures Order and sections 363(b) and 363(k) of the Bankruptcy Code.

BB.     The total consideration provided under the Agreement by the Purchaser for the Assets is the highest and/or best offer received by the Debtors, and the Purchase Price constitutes (a) reasonably equivalent value under the Bankruptcy Code and the Uniform Fraudulent Transfer Act, (b) fair consideration under the Uniform Fraudulent Conveyance Act and (c) reasonably equivalent value, fair consideration, and fair value under any other applicable laws of the United States, any state, territory or possession, or the District of Columbia, for the Assets.

CC.     Time is of the essence in consummating the sale. To maximize the value of the Assets, it is essential that the sale of the Assets occur within the time constraints set forth in the Agreement. Accordingly, there is cause to lift the 10-day stays imposed by Bankruptcy Rules 6004 and 6006.

DD.     Other than the Assumed Liabilities and its obligations under the Agreement, the Purchaser shall have no obligation with respect to any liability of the Debtors.

NOW, THEREFORE, BASED ON ALL OF THE FOREGOING, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.     The relief requested in the Sale Motion is granted, pursuant to 11 U.S.C. §§ 105(a), 363, and 365, in its entirety, subject to the terms and conditions contained in this Order.

2.     All objections and responses to the Sale Motion are resolved in accordance with the terms of this Order and as set forth in the record of the Sale Hearing. If any such objection or response was not otherwise withdrawn, waived, or settled, it, and all reservations of rights contained therein, is overruled and denied.

3.     Notice of the Sale Hearing was fair and equitable under the circumstances and complied in all respects with 11 U.S.C. § 102(1) and Bankruptcy Rules 2002, 6004 and 6006.

*Approval of Sale*

4.     The sale of the Assets, the terms and conditions of the Agreement (including all schedules and exhibits affixed thereto), the credit bid(s) by the Purchaser and the transactions contemplated thereby are approved in all respects.

5.     The sale of the Assets and the consideration provided by the Purchaser (through its credit bid or otherwise) under the Agreement, is fair and reasonable and shall be deemed for all purposes to constitute a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law.

6.     The Purchaser is hereby granted and is entitled to all of the protections provided to a good-faith the Purchaser under section 363(m) of the Bankruptcy Code, including with respect to the transfer of the Designated Contracts as part of the sale of the Assets pursuant to section 365 of the Bankruptcy Code and this Order.

7.     The Debtors are authorized and directed to fully assume, perform under, consummate, and implement the terms of the Agreement together with any and all additional instruments and documents that may be reasonably necessary or desirable to implement and effectuate the terms of the Agreement and this Order and sale of the Assets contemplated thereby including, without limitation, deeds, assignments, stock powers, and other instruments of transfer, and to take all further actions as may reasonably be requested by the Purchaser for the purpose of assigning, transferring, granting, conveying, and conferring to the Purchaser, or reducing to possession any or all of the Assets or Assumed Liabilities, as may be necessary or appropriate to the performance of the Debtors' obligations as contemplated by the Agreement, without any further corporate action or orders of this Court. The parties shall have no obligation to proceed

12

with the Closing of the Agreement until all conditions precedent to their respective obligations to do so have been met, satisfied or waived.

8.     The Debtors and each other person or entity having duties or responsibilities under the Agreement, any agreements related thereto or this Order, and their respective directors, officers, employees, members, agents, representatives, and attorneys, are authorized and empowered, subject to the terms and conditions contained in the Agreement, to carry out all of the provisions of the Agreement and any related agreements; to issue, execute, deliver, file, and record, as appropriate, the documents evidencing and consummating the Agreement, and any related agreements; to take any and all actions contemplated by the Agreement, any related agreements or this Order; and to issue, execute, deliver, file, and record, as appropriate, such other contracts, instruments, releases, indentures, mortgages, deeds, bills of sale, assignments, leases, or other agreements or documents and to perform such other acts and execute and deliver such other documents, as are consistent with, and necessary or appropriate to implement, effectuate, and consummate, the Agreement, any related agreements and this Order and the transactions contemplated thereby and hereby, all without further notice to any person, application to, or order of, the Court or further action by their respective directors, officers, employees, members, agents, representatives, and attorneys, and with like effect as if such actions had been taken by unanimous action of the respective directors, officers, employees, members, agents, representatives, and attorneys of such entities. The officers, directors, or any other authorized representative of the Debtors are authorized to certify or attest to any of the foregoing actions (but no such certification or attestation shall be required to make any such action valid, binding, and enforceable). The Debtors are further authorized and empowered to cause to be filed with the secretary of state of any state or other applicable officials of any

applicable governmental units any and all certificates, agreements, or amendments necessary or appropriate to effectuate the transactions contemplated by the Agreement, any related agreements and this Order, including amended and restated limited-liability-company agreements, certificates or articles of incorporation and by-laws or certificates or articles of amendment, and all such other actions, filings, or recordings as may be required under appropriate provisions of the applicable laws of all applicable governmental units or as any officer of the Debtors may determine are necessary or appropriate. The execution of any such document or the taking of any such action is deemed conclusive evidence of the authority of such person to so act. Without limiting the generality of the foregoing, this Order shall constitute all approvals and consents, if any, required by the corporation laws of the state of Delaware and all other applicable business corporation, trust, and other laws of the applicable governmental units with respect to the implementation and consummation of the Agreement, any related agreements and this Order, and the transactions contemplated thereby and hereby.

9.      Effective as of the Closing, (a) the sale of the Assets by the Debtors to the Purchaser shall constitute a legal, valid, and effective transfer of the Debtors' right, title and interest in the Assets notwithstanding any requirement for approval or consent by any person and shall vest the Purchaser with all right, title, and interest of the Debtors in and to the Assets, free and clear of all Encumbrances of any kind, pursuant to sections 363(f) and (b) of the Bankruptcy Code, the assumption of any Assumed Liabilities by the Purchaser shall constitute a legal, valid and effective delegation of any Assumed Liabilities to the Purchaser and shall divest the Debtors of all liability with respect to any Assumed Liabilities.

10.     The sale of the Assets is not subject to avoidance pursuant to section § 363(n) of the Bankruptcy Code.

14

*Transfer of Assets*

11.     Except to the extent specifically provided in the Agreement, upon the closing of

the sale pursuant to the Agreement, the Debtors are authorized, empowered, and directed,

pursuant to sections 105(a), 363(b), and 365 of the Bankruptcy Code, to sell the Assets,

including those within the Assignment and Assumption Agreement, to the Purchaser.  The sale

of the Assets shall vest the Purchaser with all right, title, and interest of the Debtors to the Assets

free and clear of any and all Encumbrances and other liabilities and claims, whether secured or

unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed,

recorded or unrecorded, contingent or non-contingent, liquidated or unliquidated, matured or

unmatured, disputed or undisputed, or known or unknown, whether arising prior to or subsequent

to the Petition Date, whether imposed by agreement, understanding, law, equity, or otherwise,

with all such Encumbrances to attach only to the proceeds of the sale (if any) with the same priority,

validity, force, and effect, if any, as they now have in or against the Assets, subject to all claims

and defenses the Debtors may possess with respect thereto; provided, however, that no Lien,

Claim Encumbrance or Interest shall attach to payments made by the Purchaser, in accordance

with the Agreement, to satisfy the Wind-Down Expenses and Investment Banking Fee.

Following the date of such closing, no holder of any Encumbrances in the Assets shall interfere

with the Purchaser's use and enjoyment of the Assets based on or related to such Encumbrances,

or any actions that the Debtors may take in their chapter 11 cases and no person shall take any

action to prevent, interfere with, or otherwise enjoin consummation of the transactions

contemplated in or by the Agreement or this Order.

12.     The provisions of this Order authorizing the sale of the Assets free and clear of

Encumbrances, other than Assumed Liabilities, shall be self-executing, and neither the Debtors

nor the Purchaser shall be required to execute or file releases, termination statements,

15

assignments, consents, or other instruments to effectuate, consummate, and implement the provisions of this Order. However, the Debtors and the Purchaser, and each of their respective officers, employees, and agents, are authorized and empowered to take all actions and execute and deliver any and all documents and instruments that either the Debtors or the Purchaser deem necessary or appropriate to implement and effectuate the terms of the Agreement and this Sale Order. Moreover, effective as of the Closing Date, the Purchaser, its successors and assigns, shall be designated and appointed the Debtors' true and lawful attorney and attorneys, with full power of substitution, in the Debtors' name and stead, on behalf and for the benefit of the Purchaser, its successors and assigns, to demand and receive any and all of the Assets and to give receipts and releases for and in respect of the Assets, or any part thereof, and from time to time to institute and prosecute in the Debtors' name, for the benefit of the Purchaser, its successors and assigns, any and all proceedings at law, in equity or otherwise, that the Purchaser, its successors and assigns, may deem proper for the collection or reduction to possession of any of the Assets, and to do all acts and things with respect to the Assets that the Purchaser, its successors and assigns, shall deem desirable. The foregoing powers are coupled with an interest and are irrevocable by the Debtors.

13.     On or before the Closing Date, the Debtors' creditors are authorized to execute such documents and take all other actions as may be necessary to release any Encumbrances of any kind against the Assets, as such Encumbrances may have been recorded or may otherwise exist. If any person or entity that has filed financing statements or other documents or agreements evidencing any Encumbrances in or against the Assets shall not have delivered to the Debtors prior to the Closing after request therefor, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of all such

Encumbrances that the person or entity has with respect to the Assets, the Debtors are authorized to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to such Assets prior to the Closing, and the Purchaser is authorized to file such documents after Closing.

14.    To the greatest extent available under applicable law, the Purchaser shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and governmental authorization or approval of the Debtors with respect to the Assets, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been and are directed to be transferred to the Purchaser as of the Closing Date.

15.    All of the Debtors' rights, title and interests in the Assets to be acquired by the Purchaser under the Agreement shall be, as of the Closing Date and upon the occurrence of the Closing, transferred to and vested in the Purchaser. Upon the occurrence of the Closing, this Order shall be considered and constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Assets acquired by the Purchaser under the Agreement and/or a bill of sale or assignment transferring good and marketable, indefeasible title and interest in the Assets to the Purchaser.

16.    Except for the Assumed Liabilities as expressly provided in the Agreement, the Purchaser is not assuming nor shall it or any affiliate of the Purchaser be in any way liable or responsible, as a successor or otherwise, for any liabilities, debts, or obligations of the Debtors in any way whatsoever relating to or arising from the Debtors' ownership or use of the Assets prior to the consummation of the transactions contemplated by the Agreement, or any liabilities calculable by reference to the Debtors or their operations or the Assets, or relating to continuing or other conditions existing on or prior to consummation of the transactions contemplated by the

Agreement. Except for the Assumed Liabilities, all of the Debtors' liabilities, debts, and obligations arising prior to the Closing Date are extinguished insofar as they may give rise to liability, successor, vicarious or otherwise, against the Purchaser or any affiliate of the Purchaser and their respective officers, directors and advisors.

17.     Except as otherwise provided in the Agreement, on the Closing Date, each creditor of the Debtors is authorized to execute such documents and take all other actions as may be necessary to release its Encumbrances in and against the Assets, if any, as may have been recorded or may otherwise exist.

18.     Except as otherwise expressly provided in the Agreement, all persons or entities, presently or on or after the Closing Date, in possession of some or all of the Assets are directed to surrender possession of the Assets to the Purchaser on the Closing Date or at such time thereafter as the Purchaser may request.

*Designated Contracts*

19.     The Assignment and Assumption Agreement is valid and binding, in full force and effect, and enforceable in accordance with its terms.

20.     Subject to the terms of the Agreement, the Assumption and Assignment Agreement and the occurrence of the Closing Date, the assumption by the Debtors of the Designated Contracts and the sale and assignment of such agreements to the Purchaser, as provided for or contemplated by the Agreement, is authorized and approved pursuant to sections 363, 365, 1123(a)(5)(D) and 1141(c) of the Bankruptcy Code.

21.     The Designated Contracts shall be deemed valid and binding and in full force and effect and assumed by the Debtors and sold and assigned to the Purchaser at the Closing, pursuant to sections 363 and 365 of the Bankruptcy Code, subject only to (a) the payment of all cures and/or other payments or actions required to assume and assign the Designated Contracts

18

to the Purchaser; and (b) the Purchaser's right to exclude Designated Contracts from the definition of Designated Contracts in accordance with the terms of the Agreement. The Purchaser shall be liable for all obligations under such assumed and assigned Designated Contracts arising on and after the Closing Date.

22. Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Purchaser shall be fully and irrevocably vested the Debtors' right, title and interest of each Designated Contract. The Debtors shall cooperate with, and take all actions reasonably requested by, the Purchaser to effectuate the foregoing.

23. Pursuant to sections 365(b)(1)(A) and (B) of the Bankruptcy Code, and except as otherwise provided in this Order, the Debtors shall promptly pay or cause to be paid to the parties to any Designated Contracts the requisite Cure Amounts, if any, set forth in the notice served by the Debtors on each of the parties to the Designated Contracts, except to the extent that a cure amount was amended on the record of the Sale Hearing (the "Cure Amounts"), following the assumption and assignment thereof. The Cure Amounts are fixed at the amounts set forth in the notice served by the Debtors, or the amounts set forth on the record of the Sale Hearing, as the case may be, and the non-debtor parties to the Designated Contracts are forever bound by such Cure Amounts.

24. All defaults or other obligations under the Designated Contracts arising prior to the Closing (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be deemed cured by payment of the Cure Amounts.

25. Any provision in any Designated Contract that purports to declare a breach, default, or payment right as a result of an assignment or a change of control in respect of the

19

Debtors is unenforceable, and all Designated Contracts shall remain in full force and effect, subject only to payment of the appropriate Cure Amounts, if any. No sections or provisions of any Designated Contract that purport to provide for additional payments, penalties, charges, or other financial accommodations in favor of the non-debtor third party to the Designated Contracts shall have any force and effect with respect to the sale transaction and assignments authorized by this Order, and such provisions constitute unenforceable anti-assignment provisions under section 365(f) and/or are otherwise unenforceable under section 365(e) of the Bankruptcy Code and no assignment of any Designated Contract pursuant to the terms of the Agreement shall in any respect constitute a default under any Designated Contract. The non-Debtors party to each Designated Contract shall be deemed to have consented to such assignment under section 365(c)(1)(B) of the Bankruptcy Code, and the Purchaser shall enjoy all of the rights and benefits under each such Designated Contract as of the applicable date of assumption without the necessity of obtaining such non-Debtors party's written consent to the assumption or assignment thereof.

26. The Purchaser has satisfied all requirements under sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code to provide adequate assurance of future performance under the Designated Contracts. The Purchaser shall be responsible for all post-Closing liabilities and obligations under the Designated Contracts.

27. The Debtors and their estates shall be relieved of any liability for any breach of any of the Designated Contracts occurring from and after Closing, pursuant to and in accordance with section 365(k) of the Bankruptcy Code.

*Additional Provisions*

28. The Purchaser has not assumed or is otherwise not obligated for any of the Debtors' liabilities other than the Assumed Liabilities as set forth in the Agreement, and the

20

Purchaser has not purchased any of the Excluded Assets. Consequently, all persons, Governmental Units (as defined in sections 101(27) and 101(41) of the Bankruptcy Code) and all holders of Encumbrances based on or arising out of liabilities retained by the Debtors are hereby enjoined from taking any action against the Purchaser (or its affiliates) or the Assets to recover any Encumbrances or on account of any liabilities of the Debtors other than Assumed Liabilities pursuant to the Agreement. All persons holding or asserting any Encumbrances in the Excluded Assets are hereby enjoined from asserting or prosecuting such Encumbrances or cause of action against the Purchaser or the Assets for any liability associated with the Excluded Assets.

29. The Purchaser is not a "successor" to the Debtors or their estates by reason of any theory of law or equity, and the Purchaser shall not assume, nor be deemed to assume, or in any way be responsible for any liability or obligation of the Debtors and/or their estates including, without limitation, any bulk-sales law, successor or vicarious liability or similar liability except as otherwise expressly provided in the Agreement. Except to the extent the Purchaser assumes the Assumed Liabilities pursuant to the Agreement, neither the purchase of the Assets by the Purchaser or its affiliates or designees, nor the fact that the Purchaser or its affiliates or its designees are using any of the Assets previously operated by the Debtors, will cause the Purchaser or any of its affiliates or designees to be deemed a successor in any respect to the Debtors' business within the meaning of any foreign, federal, state, or local revenue, pension, ERISA, tax, labor, employment, environmental, or other law, rule, or regulation (including without limitation filing requirements under any such laws, rules or regulations), or under any products-liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine, or under any product-warranty liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine. Except to the extent expressly included in

21

the Assumed Liabilities, the Purchaser and its affiliates shall have no liability or obligation under the WARN Act (29 U.S.C. §§ 210 *et seq.*) or the Comprehensive Environmental Response Compensation and Liability Act, or any foreign, federal, state, or local labor, employment, or environmental law by virtue of the Purchaser's purchase of the Assets or assumption of the Assumed Liabilities.

30.     Except to the extent expressly included in the Assumed Liabilities, pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, all persons and entities, including, without limitation, the Debtors, all debt security holders, equity security holders, the Debtors' employees or former employees, governmental, tax, and regulatory authorities, lenders, parties to or beneficiaries under any benefit plan, trade and other creditors asserting or holding any Lien, Claim, Encumbrance, and Interest of any kind or nature whatsoever against, in or with respect to the Debtors or the Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to the Debtors, the Assets, the operation of the Debtors' business prior to the Closing Date or the transfer of the Assets to the Purchaser, shall be forever barred, estopped, and permanently enjoined from asserting, prosecuting or otherwise pursuing such Lien, Claim, Encumbrance, and Interest against the Purchaser or any affiliate, successor or assign thereof and each of their respective current and former members, officers, directors, managed funds, investment advisors, attorneys, employees, partners, affiliates and representatives (each of the foregoing in its individual capacity), or the Assets. To avoid doubt, the foregoing shall not prevent the Debtors, their estates, successors, or permitted assigns from pursuing claims, if any, against the Purchaser and/or its successors and assigns in accordance with the terms of the Agreement.

22

31.     The general release set forth in section 12.16 of the Agreement is approved in its entirety.

32.     Subject to the terms of the Agreement, the Agreement and any related agreements may be waived, modified, amended, or supplemented by agreement of the Debtors and the Purchaser, without further action or order of the Court; provided, however, that any such waiver, modification, amendment, or supplement is not material and substantially conforms to, and effectuates the Agreement and any related agreements.

33.     The failure to specifically include any particular provision of the Agreement or any related agreements in this Order shall not diminish or impair the effectiveness of such provision. It is the intent of the Court, the Debtors and the Purchaser that the Agreement and any agreement related thereto are authorized and approved in their entirety with such amendments thereto as may be made by the parties in accordance with this Order prior to Closing.

34.     No bulk-sale law or any similar law of any state or other jurisdiction shall apply in any way to the sale and the transactions contemplated by the Agreement.

35.     To the extent any provisions of this Order conflict with the terms and conditions of the Agreement, this Order shall govern and control.

36.     Nothing in this Order shall alter or amend the Agreement and the obligations of the Debtors and the Purchaser thereunder.

37.     This Order and Agreement shall be binding on and govern the acts of all persons and entities, including without limitation, the Debtors and the Purchaser, their respective successors and permitted assigns, including, without limitation, any chapter 11 trustee hereinafter appointed for the Debtors' estates or any trustee appointed in a chapter 7 case if this case is converted from chapter 11, all creditors of the Debtors (whether known or unknown), filing

agents, filing officers, title agents, recording agencies, secretaries of state, and all other persons

and entities who may be required by operation of law, the duties of their office or contract, to

accept, file, register, or otherwise record or release any documents or instruments or who may be

required to report or insure any title in or to the Assets.

38.     The provisions of this Order are non-severable and mutually dependent.

39.     Nothing in any order of this Court or contained in any plan of reorganization or

liquidation confirmed in the chapter 11 case, or in any subsequent or converted case of the

Debtors under chapter 7 or chapter 11 of the Bankruptcy Code, shall conflict with or derogate

from the provisions of the Agreement or the terms of this Order.

40.     Notwithstanding Bankruptcy Rules 6004, 6006, 7062, and 9021, this Order shall

be effective and enforceable immediately upon entry and its provisions shall be self-executing.

In the absence of any person or entity obtaining a stay pending appeal, the Debtors and the

Purchaser are free to close under the Agreement at any time, subject to the terms of the

Agreement. In the absence of any person or entity obtaining a stay pending appeal, if the

Debtors and the Purchaser close under the Agreement, the Purchaser shall be deemed to be

acting in "good faith" and shall be entitled to the protections of section 363(m) of the Bankruptcy

Code as to all aspects of the transactions under and pursuant to the Agreement if this Order or

any authorization contained herein is reversed or modified on appeal.

41.     The automatic stay under section 362(a) of the Bankruptcy Code shall not apply

to and otherwise shall not prevent the exercise or performance by any party of its rights or

obligations under the Agreement.

42.     This Court shall retain exclusive jurisdiction to enforce the terms and provisions

of this Order, the Bid Procedures Order, the Agreement in all respects and to decide any disputes

concerning this Order, the Agreement, or the rights and duties of the parties hereunder or thereunder or any issues relating to the Agreement and this Order including, without limitation, the interpretation of the terms, conditions, and provisions hereof and thereof, the status, nature, and extent of the Assets and any Designated Contracts and all issues and disputes arising in connection with the relief authorized herein, inclusive of those concerning the transfer of the assets free and clear of all Encumbrances. To the extent there are any inconsistencies between the terms of this Order and the Agreement, the terms of this Order shall control.

43.     [Pursuant to their bid, [_____] is the backup bidder to the Purchaser's successful bid to acquire the Assets pursuant to the Agreement, and [_____] shall be obligated to close on and be bound by the terms of their backup bid if the Debtors and the Purchaser shall fail to close on the sale of the Assets by the outside date set forth in the Agreement. In such event, the Debtors and [_____] will submit to the Court a further order authorizing the Debtors to consummate and close the sale with [_____] pursuant to the terms of the backup bid and subject to all the terms and conditions thereof].

Dated: _____
      Wilmington, Delaware

                                              _____
                                              Christopher S. Sontchi
                                              United States Bankruptcy Judge